**EXHIBIT**

**1**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

-------------------------------------------------------------------X

**JOHN DOE,**                                                            :

                    **Plaintiff,**          :    **Civil Action No:** 19-cv-4082

                                   :

           **-against-**          :

                                   :    <u>**JURY TRIAL DEMANDED**</u>

**DORDT UNIVERSITY** f/k/a/ **DORDT COLLEGE**;          :
**DORDT UNIVERSITY BOARD OF TRUSTEES**;          :
**HOWARD WILSON**, individually and as agent for          :
Dordt University; **ROBERT TAYLOR**, individually          :
and as agent for Dordt University; **DEREK BUTEYN**,          :
individually and as agent for Dordt University;          :
and **ERIN OLSON**, individually and as agent for          :
Dordt University;          :

             **Defendants.**          :

-------------------------------------------------------------------X

<u>**COMPLAINT**</u>

    Plaintiff John Doe[1] ("Plaintiff" or "Doe"), by and through his attorneys, Nesenoff & Miltenberg, LLP, and Babich Goldman, P.C., as and for his Complaint against Defendants Dordt University ("Dordt" or "the University")[2], Dordt University Board of Trustees of ("Board"), Howard Wilson ("Wilson"), Robert Taylor ("Taylor"), Derek Buteyn ("Buteyn"), and Erin Olson ("Olson") (collectively, "Defendants"), respectfully alleges as follows:

---

[1] Plaintiff has filed herewith a motion to proceed by pseudonym.

[2] As of May 13, 2019, Dordt College became officially known as Dordt University. The events underlying this Complaint took place both before and after this change. Any references to Dordt College or Dordt University herein refer to one and the same entity.

1

## THE NATURE OF THIS ACTION

1.      This case arises out of the outrageous, gender-biased, and unlawful actions and inactions taken by Defendants in adjudicating a complaint of sexual misconduct filed on behalf of Jane Roe,[3] a female undergraduate student at Dordt, against Plaintiff John Doe, a male undergraduate student at Dordt, resulting in Plaintiff's dismissal just weeks before he was set to graduate, as well as Defendants' deliberate, bad-faith retaliation against Plaintiff for seeking to enforce his rights under the law.

2.      Dordt University, a reformed Christian school that provides "a biblical, Christ-centered education," has a particularly strict behavioral code of conduct, in accordance with the University's religious philosophy.  According to the Dordt Student Handbook, *all* sexual relations outside of the marital bond between a man and a woman are considered impermissible and grounds for potential disciplinary action.  In addition, Dordt prohibits the consumption of alcohol on campus.  However, the Dordt Student Handbook provides amnesty for policy violations to those who report an alleged sexual assault.  In other words, an underage student who consumes alcohol on campus and has extra-marital sex in violation of the conduct code may avoid disciplinary action by later claiming that the intercourse was non-consensual.

3.      Making matters worse, the Dordt Student Handbook contains *no* policies or procedures for addressing or adjudicating complaints of sexual assault or harassment, and provides no substantive information on Dordt's processes for investigation, findings, standard of proof, rights of the accused, or who makes what decision at any given point in the process.  Nor are any such policies available on the Dordt University Title IX website.

---

[3] Jane Roe is a pseudonym.

2

4. Hidden obscurely on the Dordt University webpage for "Publications," under the subheading, "Annual Security Report", there is a brief, vague statement of Dordt's obligations to complainants and respondents in a Title IX proceeding—but even here, there are virtually no specific procedures, and the policy consistently refers to victims of sexual assault or dating violence as female, while consistently referring to perpetrators and assailants as male.

5. The combination of a blanket ban on nearly all sexual activity, plus the absence of any clearly communicated or established policies, procedures, or rules with respect to Title IX complaints, and Dordt's unequivocal embrace of gender stereotypes, creates a situation ripe for abuse, bias, and selective enforcement, as was evident throughout Dordt's adjudication of the allegations against Plaintiff.

6. Plaintiff and Roe met, consumed alcohol, and had sexual intercourse one evening in early February 2018. They each poured their own drinks, and Plaintiff consumed more alcohol than Roe. On information and belief, while Roe initially reported the encounter to be consensual, Roe was subsequently convinced by other Dordt students that she could not have consented if she had been drinking, and, on information and belief, other students and/or Dordt staff then filed a Title IX complaint against Plaintiff on Roe's behalf.

7. What followed was a preposterous, haphazard, Kafkaesque series of events whereby Plaintiff was presumed guilty from the start, deliberately kept in the dark at every stage in the disciplinary process, forced to appear for a sham "hearing" that took place after a decision had already been made, and precluded from completing his final semester coursework before the sanction was even finalized. Dordt's disciplinary "process" in this case was a straight line from accusation to guilt, based primarily on gender stereotypes and Plaintiff's status as a male accused,

3

and did not even come close to the thorough, fair, and equitable process promised by Dordt to its students.

8.     By way of example and not limitation, in April 2018, Plaintiff was given twenty–four hours' notice to attend a "hearing" before Dordt's Student Life Committee on multiple disciplinary charges, with no clear statement of the allegations against him, no access to any investigatory materials relied upon by Dordt, no information on the Committee members or procedure, no opportunity to present witnesses or evidence on his own behalf, and no opportunity to question his accuser.

9.     Within minutes of being dismissed from the "hearing," Plaintiff was handed a four-page, typed-up finding of responsibility that was clearly drafted prior to the hearing and made no reference whatsoever to the hearing process or the Student Life Committee, instead indicating that Defendant Howard Wilson, Dordt's Title IX coordinator, had alone determined Plaintiff's responsibility (as well as his sanction), based upon Wilson's personal judgment.

10.    By applying blatantly gender-normative and gender-based stereotypes, Wilson paternalistically concluded that Roe could not consent by virtue of her alcohol consumption, yet Plaintiff, who had consumed more alcohol than Roe, could consent and was responsible for gaining Roe's consent.  Wilson's decision was based on the biased and inappropriate assumption that sex is always initiated by the male, that a drunk male is presumed to consent to sex, while a drunk female is presumed to be incapacitated and therefore non-consenting, and that the male is always responsible for gaining consent of the female, but not vice-versa.  These biased presumptions are evidenced by, among other things, Wilson's conclusion that Plaintiff "was aware of *the female's* condition," (emphasis added) and Wilson's absolute refusal to acknowledge or consider that

4

Plaintiff was intoxicated at the time of the encounter and that Roe unequivocally initiated the sexual activity.

11.     Plaintiff was dismissed from Dordt effective immediately, even though Plaintiff was still entitled to an appeal, which he did submit.  Dordt then dragged out the appeal process for over a month, through the end of the semester, guaranteeing that Plaintiff could not complete his last few weeks of coursework and timely earn his diploma.  After ensuring that Plaintiff would not graduate on time, Dordt then summarily denied Plaintiff's Appeal without explanation.

12.     The improper finding and wildly disproportionate sanction issued against Plaintiff were the result of Dordt's patent embrace of gender stereotypes and its complete lack of established policies and procedures for adjudicating complaints of sexual assault, leading Dordt to act arbitrarily, capriciously, and inequitably.

13.     Making matters worse, any time that Plaintiff dared to question or correct Dordt's improper actions, he was met with hostility and retaliation.

14.     In fact, when Plaintiff eventually applied for readmission at the close of his dismissal period, Dordt expressly and directly tied his eligibility for readmission to his previously expressed intent to sue Dordt over their unfair and biased treatment.  After asking Plaintiff numerous times during the readmission process whether he was moving forward with legal action, Dordt then attempted to extort Plaintiff into signing a document accepting Dordt's previous actions and admitting guilt.  When he refused, Dordt retaliated by refusing to extend a full readmission, forcing Plaintiff to take transfer courses and forfeit a multi-thousand dollar tuition credit.

15.     Dordt's disciplinary process in the instant case was replete with errors, including but not limited to Defendants':

     a.  refusal to provide Plaintiff with notice of the allegations against him;

5

b.   failure to advise Plaintiff of his rights under the relevant policies;

c.   refusal to permit Plaintiff an advisor of his choosing, including his attorney;

d.   failure to conduct a thorough, impartial investigation;

e.   failure to provide Plaintiff access to the investigative report, witness identities, or any evidence used against him in reaching a finding;

f.   failure to provide Plaintiff sufficient notice prior to his disciplinary hearing;

g.   failure to provide Plaintiff a meaningful opportunity to be heard before a neutral arbiter;

h.   failure to provide Plaintiff an opportunity to question (or submit questions for) his accuser or any other witness;

i.   failure to apply the appropriate burden of proof;

j.   failure to submit the issue to the appropriate hearing body, instead having Dordt's Title IX coordinator determine the finding and sanction;

k.   abuse of discretion in the issuance of an unduly harsh and unwarranted sanction;

l.   abuse of discretion in the immediate implementation of the sanction while Plaintiff's appeal was still pending, where such implementation precluded Plaintiff from completing his final courses and graduating on time, causing irreparable harm;

m.   abuse of discretion in delaying Plaintiff's appeal for a month and repeatedly trying to prevent Plaintiff's appeal from being heard; and

n.   retaliation against Plaintiff for hiring an attorney and pursuing legal action.

16.    From the start, and throughout the disciplinary process, Plaintiff was presumed guilty as the male accused and subjected to gender-biased, unfair treatment leading to an erroneous outcome.  By way of example, and not limitation:

a. Plaintiff and Roe were *both* intoxicated when they had sex, and it was Roe who initiated the activity, yet Plaintiff was investigated and treated as a rapist, while Roe was presumed innocent and treated as a victim;

b. Dordt's investigators essentially told Plaintiff that the mere *consumption* of alcohol by Roe invalidated her verbal consent (yet the same principle did not apply to him);

c. Plaintiff was presumed guilty from the start, with Dordt's investigators ambushing Plaintiff while he was working, demanding he submit to an immediate interview without stating what the interview was for, and asking Plaintiff whether he had ever "tried this before";

d. Plaintiff was summoned to the "hearing" on one day's notice, whereas Roe, on information and belief, did not even attend the hearing;

e. Roe was purportedly found to be more credible than Plaintiff, even though the Student Life Committee never met with Roe and thus had no opportunity to evaluate her credibility;

f. Plaintiff was never provided access to Roe's statement, if any, and was not provided any opportunity to submit questions for Roe, cross-examine her, or challenge her credibility in any way;

g. Defendant Wilson's factual findings were based on the presupposition that a drunk female is incapable of consenting to sex, and that it is the male's obligation to gain the consent of the female; and

h. Nearly all relevant decisions throughout the Title IX process were made by the Title IX coordinator, who had a blatant conflict of interest by virtue of his position and

7

who was openly hostile to Plaintiff, routinely denying and/or misinforming Plaintiff of his rights.

17.     As detailed further below, Defendants engaged in a flawed process causing an erroneous outcome motivated by Plaintiff's gender, in violation of Title IX of the Education Amendments of 1972.

18.     As detailed further below, Defendants selectively enforced Title IX against Plaintiff, charging Plaintiff with Sexual Misconduct and Sexual Assault for engaging in behavior identical to that of Roe, whereas Roe was not investigated or disciplined in any way, in violation of Title IX of the Education Amendments of 1972.

19.     Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief for violation of Title IX of the Education Amendments of 1972, due process under the common law of Iowa, breach of contract, and negligence.

## THE PARTIES

20.     Plaintiff John Doe is a natural person and a resident of Washington state.  At all relevant times herein, Plaintiff was an undergraduate student at Dordt University.

21.     Dordt University is a partially federally funded, private liberal arts university in Sioux Center, Iowa, with an undergraduate enrollment of approximately 1500 students.  Dordt is affiliated with the Christian Reformed Church in North America.

22.     The Dordt University Board of Trustees oversees the organization and governance of the University and is responsible for the overall operation of the University, including final control over the policies of the University.  The Board is comprised of no fewer than eighteen and no more than thirty persons.  The Board of Trustees operates in accordance with the Dordt University corporate bylaws, which are governed by the laws of the state of Iowa.

8

23.    Howard Wilson is a natural person and, at all relevant times herein, was the Vice President, Chief Administrative Officer, and Title IX Coordinator at Dordt University.  On information and belief, Wilson is a resident of Iowa.

24.    Robert Taylor is a natural person and, at all relevant times herein, was the Dean of Students at Dordt University.  On information and belief, Taylor is a resident of Iowa.

25.    Erin Olson is a natural person and, at all relevant times herein, was a Professor of Social Work at Dordt University.  On information and belief, Olson is a resident of Iowa.

26.    Derek Buteyn is a natural person and, at all relevant times herein, was the Director of Residence Life at Dordt University.  On information and belief, Buteyn is a resident of Iowa.

## JURISDICTION AND VENUE

27.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the laws of the United States, specifically, under Title IX of the Education Amendments of 1972, as well as diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

28.    This Court has personal jurisdiction over Defendants Dordt, Wilson, Taylor, Buteyn, and Olson on the grounds that these Defendants resided and/or conducted business within the state of Iowa during the relevant time period.

29.    This Court has personal jurisdiction over the Board of Trustees on the grounds that the Board is organized under the laws of the state of Iowa.

30.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because the acts or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

## I.  BACKGROUND.

### A.  The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities by Threatening to Withhold Federal Funding.

31.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

32.     The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

33.     The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice*, National Public Radio (Feb. 24, 2010), http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g., that

10

women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.

34.     The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study, and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." *See* Christopher Krebs and Christine Lindquist, *Setting the Record Straight on "1 in 5"*, Time Magazine (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

35.     Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.

36.     The DCL advised that schools responding to Title IX complaints should "minimize the burden on the complainant" and focus on victim advocacy.  For example, it stated that schools should give both parties the right to appeal a decision – in other words, if an accused student was found not responsible, the complainant could then appeal and force the respondent to defend the charges all over again, functionally constituting double-jeopardy.

37.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

38.     On April 19, 2014, the OCR issued additional directives to colleges and universities

11

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 11 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 11 of 96

in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* (the "2014 Q&A").

39.     Like the DCL, the 2014 Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."  The 2014 Q&A advised schools to adopt a "trauma-informed" approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." 2014 Q&A at 31.  The Q&A further advised that, although "the rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights . . . a school should ensure that any due process rights do not restrict or unnecessarily delay the protections provided by Title IX *to the complainant*."  2014 Q&A at 13 (emphasis added).

40.     In the same month that the OCR issued its 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), available at https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.  The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

41.     In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to

12

terminate federal funds or refer the case to the Department of Justice.  *See* Testimony of Catherine

E. Lhamon, Assistant Secretary Office For Civil Rights, U.S. Department Of Education (June 26,

2014), https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-

violence.pdf.

42.    To support its enforcement of the DCL, the OCR hired hundreds of additional

investigators.  To date, OCR has conducted *over five hundred* investigations of colleges for the

potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault

Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited

Mar. 1, 2019).

43.    The threat of revocation of federal funds—the ultimate penalty—was a powerful

tool in motivating colleges to aggressively pursue and punish male students accused of sexual

misconduct.  In that regard, Anne Neal, of the American Council of Trustees and Alumni,

observed: "There is a certain hysteria in the air on this topic, . . . .  It's really a surreal situation, I

think." *See* Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention*,"

National Public Radio (Aug. 12, 2014), https://www.npr.org/2014/08/12/339822696/how-

campus-sexual-assaults-came-to-command-new-attention.   Neal   explained   that   "schools   are

running so scared of violating the civil rights of alleged victims that they end up violating the due

process rights of defendants instead."

44.    Robert Dana, Dean of Students at the University of Maine, echoed the sentiment

that a fear of governmental intervention and withdrawal of funds could lead colleges to rush to

judgment against male students in disciplinary proceedings.  *See* Tovia Smith, *Some Accused of

Sexual Assault on Campus Say System Works Against Them*, National Public Radio (Sept. 3, 2014),

https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-

13

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 13 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 13 of 96

works-against-them.  Dana told NPR, "[c]olleges and universities are getting very jittery about it."
*Id.*

45.     Likewise, on September 1, 2014, the Chronicle of Higher Education noted that colleges were facing "increasing pressure from survivors and the federal government," including claims that college campuses had become "hazardous places" for female students.  *See* Robin Wilson, *Presumed Guilty: College Men Accused of Rape Say the Scales are Tipped Against Them*, Chronicle of Higher Education (Sept. 1, 2014), https://www.chronicle.com/article/Presumed-Guilty/148529.  For example, the article noted that different standards were being applied to male students versus female students: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no.  That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." *Id.*

46.     Indeed, this precise issue came to a head in a series of events that took place just weeks after this article was published: In late September 2014, at Miami University, Ohio, a female and male student engaged in various sexual acts while *both* claimed to be intoxicated; the university subsequently pursued sanctions against the male student, but not against the similarly situated female student.  *See Doe v. Miami Univ.*, 882 F.3d 579, 596 (6th Cir. 2018).  In a decision issued recently in that case, the Sixth Circuit Court of Appeals found the male student sufficiently alleged gender-based unequal treatment as a result of the college's refusal to pursue disciplinary action against the female student for the same conduct on which it based disciplinary action against plaintiff, the male student.

47.     On September 22, 2017, the OCR rescinded the DCL and the 2014 Q&A, and put in place interim guidance (the "2017 Q&A"), while the current administration reviews and revises its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed*., Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

48.     As Secretary of Education, Betsy DeVos, noted, the rescission of the DCL was largely motivated by "[t]he truth . . . that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

49.     As one college administrator observed shortly thereafter, "I think that [DeVos's] reference to due process is because of her overall assessment that the pendulum has swung too far in favor of complainants as a result of the directives in the Dear Colleague Letter." Sarah Asch, *Federal Changes to Title IX on Sexual Assault Could Impact Middlebury*, The Middlebury Campus (Sept. 20, 2017), https://middleburycampus.com/36090/features/federal-changes-to-title-ix-on-sexual-assault-could-impact-middlebury/.

### B.  Dordt Fails to Embrace Changes to the Title IX Guidelines as Promised.

50.     The 2017 Q&A, in a significant departure from the 2011 DCL, permits colleges to utilize a higher burden of proof than "preponderance of the evidence" when adjudicating sexual misconduct; it also emphasizes the need for equal rights under Title IX proceedings, mandating that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." 2017 Q&A at 4.

51.     The 2017 Q&A directs that colleges "*must adopt and publish* grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct." *Id.* at 3 (emphasis added). In that regard, the "elements in evaluating whether a school's grievance procedures are prompt and equitable[] includ[e] whether the school (i) provides notice of the school's grievance procedures, . . . ; (ii) applies the grievance procedures to complaints filed . . . ; [and] (iii) ensures an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence." *Ibid.*

52.     With respect to the investigation and decision-making process, the 2017 Q&A requires "[a] person free of actual or reasonably perceived conflicts of interest and biases for or against any party [to] lead the investigation on behalf of the school." *Id.* at 4.

53.     The 2017 Q&A also requires investigators to "synthesize *all* available evidence— including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case." *Id.* at 4 (emphasis added).

54.     Critically, the 2017 Q&A directs that, once a school "decides to open an investigation that may lead to disciplinary action against the responding party, [the] school should provide *written notice* to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response *before any initial interview*." *Id.* at 4 (emphasis added).

55.     As the 2017 Q&A goes on to explain, "[s]ufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident." *Ibid.* In addition, "[e]ach party should receive written notice in advance of any

16

interview or hearing *with sufficient time to prepare for meaningful participation*. *Ibid.* (emphasis added).

56.      The 2017 Q&A further directs that "the investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials *must have timely and equal access to any information that will be used* during informal and formal disciplinary meetings and hearings." *Ibid.* (emphasis added).

57.      In October 2017—four months *before* the filing of Roe's complaint in this matter— the Dordt administration, including Title IX Coordinator, Defendant Wilson, acknowledged the updated Title IX guidance and indicated that Dordt would conform its policies and procedures accordingly.  *See* Tess Hemmila and Allison Wordes, *Federal Governmnet Updates Title IX Policy,* The Dordt Diamond (Oct. 12, 2017), https://dordtdiamond.com/2017/10/12/federal-governmnet-updates-title-ix-policy/ ("Dordt College officials say the campus policy regarding sexual assaults will be adapted to fit the needs of new regulations.").

58.      In the same article, Dordt University President, Erik Hoekstra, stated, "There is no place on a Christian college campus for sexual assault. . . .  Our policy is going to be, first of all, biblical, and second legal. We take sexual assault very seriously at Dordt."  *Id.*

59.      According to the article, Dordt supported the 2017 changes to Title IX guidance and their focus on equality, acknowledging that the new Title IX guidance "place[s] an emphasis on fairness for both the reporting party and the responding parties."  *Id.*

60.      In that regard, Leah Zuidema, Associate Provost and one of Dordt's Title IX investigators, said she is "pleased with new changes, which follow the 'spirit of the law.'"  *Id.*

"I'm glad to see additional emphasis on due process," she continued. "On both sides we should be asking, 'are we being ethical and are we doing justice?'" *Id.*

61.    Defendant Olson, professor of Social Work and Title IX investigator, also weighed in on the issue, noting that "Title IX cases can be mishandled, but, when it's done correctly, it can help both parties." She remarked further, "[i]t's our job as Title IX investigators to determine if school policy was broken, not to determine guilt or innocence." *Id.*

62.    Notwithstanding the Dordt administration's enthusiasm for the new guidelines and its acknowledgment that the Title IX process requires equity, diligence, and due process, none of the procedures and guarantees set forth in the 2017 guidelines were followed when it came time to adjudicate Roe's claims against Plaintiff several months later.

63.    As Defendant Wilson fittingly summed up Dordt's understanding of Title IX's requirements: "At present, there's a lot of smoke and not necessarily any light." *Id.*

64.    Indeed, as will be explained further below, Dordt maintained almost no policies or procedures with respect to the resolution of Title IX complaints, and, to the extent it did, such policies were blatantly gender biased—such as referring to assault and abuse victims exclusively as female—or directly in contradiction to Title IX requirements—such as denying students the opportunity to have an attorney as an advisor.

65.    On information and belief, Dordt's actions were deliberate, designed expressly to give its Title IX employees free reign to make unfounded, improper findings based primarily on gender stereotypes, entirely removed from the facts of the case.

   C.    **Dordt University Embraces Gender Bias, Including Stereotypes of Female Victimhood and Male Assailants.**

66.    In addition to the lack of any identifiable, proper procedure or standard for addressing Title IX complaints, Dordt university policies and administrators consistently

embraced gender biased and gender-normative views on sexuality, promoting the concept of female victimhood and implying that Dordt's policies about sexual assault and abuse are intended specifically for the protection of female students against male perpetrators.

67. As noted above, President Hoekstra told students that Dordt's Title IX policy is intended to be "first, biblical." Tess Hemmila and Allison Wordes, *Federal Governmnet Updates Title IX Policy,* The Dordt Diamond (Oct. 12, 2017), https://dordtdiamond.com/2017/10/12/federal-governmnet-updates-title-ix-policy/.

68. That Dordt intends its policy to be "biblical" as its top priority is particularly concerning, in light of the fact that one of the common tenets of reformed Christianity is Complementarianism—put simply, the concept that women submit to men and that men lead and control. Obviously, imposing such beliefs into the Title IX process inherently introduces improper gender bias and a denial of female sexual autonomy that precludes an appropriate evaluation of sexual interactions.

69. Indeed, sex and gender discrimination is embedded in Dordt's standards for students and staff. The Dordt Student Handbook expressly prohibits "Engaging in, promoting, or advocating homosexual relations," and the "General Information" section of Dordt's Student Life webpage prohibits transgender students, stating, "Adopting an identity discordant with one's biological sex is prohibited." In fact, in 2015, Dordt University President Erik Hoekstra sought an exemption from certain Title IX regulations in order to permit Dordt to discriminate against transgender students and staff. *See* Letter to U.S. Dep't of Ed., Request for Religious Exemption From Certain Applications of Title IX (Oct. 1, 2015), *available at* https://www.campuspride.org/wp-content/uploads/dordt-college-request-10012015.pdf.

19

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 19 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 19 of 96

70. Complementing Dordt's strict views on gender roles, deep-seated gender bias is embedded within many of Dordt's policies on sexual misconduct.

71. According to Dordt's Campus Sexual Assault/Rape Policy:

> College communities across the nation may not be the safe havens for learning they are often perceived to be. Some studies suggest that nearly five percent of *women* on college campuses experience a sexual assault in any given year with up to 84 percent of rape victims knowing and trusting their attacker. While these statistics are alarming to any campus community, even more disturbing is the fact that many such incidents remain unreported. Society's misunderstanding of the reality of rape and sexual assault contributes to this under-reporting, keeping many *women* silent and alone. Learning the facts about rape and unlearning the lies are everyone's responsibility.

> (emphasis added).

72. The policy contains no such statistics or warnings for male victims of sexual assault.

73. Likewise, Dordt's Campus Relationship Violence/Domestic Violence Policy states:

> Millions of *women* in this country and thousands within the state of Iowa are physically and emotionally abused by their relationship partners each year. These are not isolated instances affecting only "certain" *women*. Violence does not discriminate. College campuses around the nation are becoming aware that their students are not outside the scope of such forms of violence. In a study of dating violence, 25 percent of college *men* surveyed admitted to slapping, pushing, or restraining a female partner.

> (emphasis added).

74. Again, the policy focuses exclusively and expressly on female victims and male assailants, and does not even acknowledge that men can be victims and women can be perpetrators of domestic abuse.

20

75. Dordt even embeds gender within its very definitions of abuse. The Dordt Campus Relationship Violence/Domestic Violence Policy, in defining "Psychological Abuse," states: "[t]he purpose of psychological abuse is to make the complainant emotionally insecure about *her* own self-worth and to cause *her* to feel helpless and/or not able to escape further physical, sexual, emotional, or psychological abuse." (emphasis added). Again, according to Dordt, abuse victims—and specifically, "complainants," as they are referred to in Title IX proceedings—are expressly female.

76. Similarly, the Dordt Campus Relationship Violence/Domestic Violence Policy defines "Emotional Abuse" as **"**hurting another person's feelings by saying cruel, unfair comments or by name calling, and may include but is not limited to:. . . Controlling or limiting complainant's behavior (e.g., keeping *her* from using the phone or seeing *her* friends, not letting *her* leave the room, following *her*, checking mileage on *her* car)." (emphasis added). Again, Dordt policy defines victims/complainants as specifically female.

77. Likewise, according to the Dordt Campus Stalking Policy,

> Stalking is another pervasive form of abuse throughout the United States. Based upon U.S. Census estimates of the number of women and men in the country, one out of every 12 U.S. *women* (8.2 million) has been stalked at some time in their life. On some campuses, as many as 35 percent of *female students* have been stalked, with 80 percent of these *women* knowing their stalker. These *women* live with fear throughout every moment of their day and are thus plagued with difficulty in regard to their academic lives and purpose for attending college.

> (emphasis added).

78. Yet again, as with Dordt's Sexual Assault and Domestic Violence policies, Dordt's Stalking policy expressly denotes victims as female and provides no relevant statistics for—or acknowledgment of—male victims.

21

79.     In addition to Dordt's policies expressly denoting victims as female and assailants as male, Dordt administrators and employees have similarly embraced gender stereotypes when it comes to sexual assault.

80.     In a 2017 article in the Dordt University newspaper, several Dordt employees expressed their belief that sexual abuse and assault is a female issue. For example, "Professor Boer, who worked at a sexual abuse treatment center . . . believes much of sexual abuse and assault can be avoided if children are taught to respect themselves at a young age." Specifically, Boer opined that "a lot of our girls lack a lot of assertion skills, leaving them vulnerable to guys who would schmooze 'em, and they don't know how to say no." As such, she emphasizes "the need to teach young girls about their bodies, sex and sexuality, as well as how to say 'no' to potential perpetrators." *See* Ashley Bloemhof, April, *A Time to Consider Sexual Assault Awareness*, The Dordt Diamond (May 3, 2017), https://dordtdiamond.com/2017/05/03/april-a-time-to-consider-sexual-awareness/.

81.     In other words, Dordt Professor Boer believes that sexual assault occurs when a male student "schmoozes" a female student, who submits because she has been insufficiently educated on resistance. *Id.*

82.     In the same article, Defendant Olson defined "rape culture" as guided by "the language we use to talk about sex or women." *Id.*

83.     Commenting for a February 2017 article about rape culture at Christian colleges, Defendant Wilson opined that "[w]e don't believe [rape culture] exists on our campus . . . It's just not who we are." *See* Gayla R. Postma, *Rape Culture and Christian Colleges*, The Banner (Feb. 8, 2017), https://www.thebanner.org/news/2017/02/rape-culture-and-christian-colleges. Wilson

22

opined that sexual assault is less common at Dordt because "Dordt has community standards and students live within that culture. 'Our students are self-selecting into a certain way of living.'" *Id.*

84.     Wilson's comment that rape culture doesn't exist at Dordt resulted in considerable backlash from the student body, prompting Defendant Olson to subsequently clarify Wilson's statement, telling Dordt students, "I think what Howard was trying to say was not that it doesn't exist, but that it's not who we are."  According to Olson, a visitor "won't walk on campus and think we blame victims."  *See* Ashley Bloemhof, April, *A Time to Consider Sexual Assault Awareness*, The Dordt Diamond (May 3, 2017), https://dordtdiamond.com/2017/05/03/april-a-time-to-consider-sexual-awareness/.  In that same article, Olson opined that sexual assault on campus "is happening more often than it is reported." *Id.*

85.     Olson's comment that Dordt doesn't "blame victims," combined with the policy implications that females are always the victims, indicates that Dordt's sexual misconduct procedures are heavily skewed in favor of female complainants and against male respondents.

86.      In light of Dordt's express policies declaring that victims and complainants of sexual assault, domestic violence, and stalking are female, and that "assailants" or "perpetrators" are male, and in light of the administration's knowing and deliberate failure to conform or create its Title IX policies in accordance with the 2017 guidance and the guarantees of fair and equitable treatment to respondents, and in light of various Dordt employees' opinions that sexual assault and rape culture are female issues, it is clear that Dordt's disciplinary system was systemically biased against male respondents and in favor of female complainants, resulting in selective enforcement as well as flawed processes and outcomes, and that the process and outcome in Plaintiff's case specifically was infected by gender bias.

87.     On information and belief, as a result of the systemic bias inherent in Dordt's policies and procedures, as well as the specific gender-based decisions implemented in Plaintiff's case, Dordt endeavored to find Plaintiff responsible for Policy violations as a male accused and to punish him to the utmost, regardless of the actual facts of the case.

## II. DORDT PROSECUTES PLAINTIFF, REVERES ROE.

### A. Plaintiff and Jane Roe.

88.     Plaintiff matriculated to Dordt in the Fall of 2014 with an expected graduation date of June 2018.

89.     Prior to his dismissal from Dordt in April 2018, Plaintiff maintained a grade point average of approximately 3.6, equating to just under an "A-" average.  He also served as a teaching assistant (TA) and a tutor on campus.

90.     On information and belief, Jane Roe matriculated to Dordt in the Fall of 2016 with an expected graduation date of May 2020.

91.     In the Fall semester of Plaintiff's senior year, he was involved in a casual sexual relationship with another student, A.D.  This relationship lasted from approximately October through November 2017, after which the parties discontinued the sexual portion of their relationship, but remained good friends.

92.     On or about February 2, 2018, Plaintiff attended a concert off campus, where he met up with A.D.  A.D. brought along Jane Roe.  Plaintiff and Roe had never met before that evening.

93.     At the concert, Plaintiff, who was over twenty-one years old at the time, consumed several beers.  A.D. and Roe, who were underage, did not drink.

24

94.     After the concert, Plaintiff purchased a bottle of vodka and the three went back to Plaintiff's apartment, where he lived with a roommate, J.B.  At the apartment, Plaintiff, A.D., and Roe each consumed several beverages of vodka mixed with cranberry juice.  Roe poured her own drinks, and she and Plaintiff consumed approximately the same number of drinks.

95.     At around 9:30 p.m., A.D. decided to go back to her dorm.  Because of the late hour, Plaintiff offered to walk A.D. back to ensure she made it home safely.

96.     Since Roe lived in the same dorm as A.D., Plaintiff asked Roe whether she wanted to walk back with him and A.D.  Roe said no, choosing instead to stay at Plaintiff's apartment.

97.     While Plaintiff walked A.D. home, Roe stayed behind and watched television with Plaintiff's roommate on Plaintiff's couch.  When Plaintiff returned from walking A.D. home, he sat in the middle of the couch, with Roe and J.B. sitting on either side of him.  Plaintiff and Roe shared a blanket.

98.     As they watched TV, Roe repeatedly, and without prior consent, attempted to put her hands down Plaintiff's pants and fondle his genitals.  At first, Plaintiff brushed her hand away, both because he did not know Roe well and because his roommate was in close proximity.

99.     Roe continued to grope at Plaintiff.  Eventually, Plaintiff asked Roe if she wanted to go somewhere else with him.  Roe said yes.  The two announced to J.B. that Plaintiff was going to take Roe back to her dorm.  J.B. offered to go with them; Plaintiff declined.

100.    Plaintiff and Roe left Plaintiff's apartment and took the stairs down towards the exit.  Both parties were intoxicated, but walked without assistance.  After kissing in the stairwell, Plaintiff and Roe made their way outside to Plaintiff's car.

101.    At the car, Plaintiff and Roe each partially undressed themselves and partially assisted the other in undressing.  Roe then performed oral sex on Plaintiff, and Plaintiff

25

subsequently performed oral sex on Roe.  At that point, Plaintiff asked Roe something to the effect of, "do you want to keep going?" to which Roe verbally, affirmatively responded, "yes."

102.    At this point in time, both parties were still drunk, but awake, lively, and engaging in coherent and logical conversation, including conversing about their sexual intentions.  Plaintiff retrieved a condom from a compartment in his car and the two then engaged in intercourse.  During the encounter, they exchanged some jokes about the physical constraints of the vehicle.

103.    At the same time Plaintiff and Roe were engaging in sexual activity in the car, A.D. had begun texting and calling Roe.  Roe told Plaintiff she did not want to respond to A.D. at that moment.

104.    After they had intercourse, Plaintiff and Roe remained in the car, talking and getting dressed for about five to ten minutes.  Plaintiff then drove Roe a short distance back to her dorm, where she walked inside unassisted.

105.    After dropping Roe off, Plaintiff noticed A.D. had been texting him as well.  A.D. had assumed that Plaintiff and Roe "hooked up," and was furious.

106.    On information and belief, Roe told several friends the next morning that she had gotten drunk and had sex with Plaintiff.  On information and belief, she did not initially report the sex to be non-consensual.

107.    Notably, in accordance with Dordt's policies, if anyone reported Roe for consuming alcohol and having pre-marital intercourse, she could have been subject to discipline.

108.    Indeed, it is not unheard of at Dordt for students to report each other for code violations, even such seemingly minor violations as having an opposite sex visitor in their dorm room.

26

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 26 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 26 of 96

109.    On information and belief, one of the friends Roe spoke to the next day was S.S., another Dordt student with whom Plaintiff had previously been friendly, but had a falling out with in December 2017.

110.    Plaintiff and S.S. often disagreed over their religious and world views, with S.S. having a more conservative and, in Plaintiff's opinion, naïve and close-minded viewpoint.   On information and belief, S.S. strongly disapproved of Plaintiff's consumption of alcohol.   In addition, S.S. had expressed romantic interest in one of Plaintiff's friends in the past, and asked Plaintiff to see if the friend felt the same.  The friend did not feel the same, and Plaintiff felt that S.S. blamed Plaintiff or was upset with him over the outcome.

111.    On information and belief, S.S., along with one or more of Roe's other friends, told Roe that the sex could not be consensual if she had been drinking, and that she should report the incident as an assault.

112.    In addition, if Roe reported the sex as nonconsensual, in accordance with Dordt policies, Roe would be given amnesty for her own policy violations.

113.    On information and belief, Roe never filed a formal Title IX complaint against Plaintiff.  On information and belief, two others did so on her behalf, prompted largely by S.S.

**B.  Dordt Engages in a Biased, Kafkaesque Title IX Process Replete with Procedural and Substantive Infirmities.**

114.    On or about February 9, 2018, Defendant Robert Taylor, Dean of Students, and Defendant Derek Buteyn, Director of Residence Life, showed up at Plaintiff's professor's office, where Plaintiff was assisting as a TA, and asked to speak with Plaintiff.  Plaintiff asked what they wanted to speak to him about.  Taylor and Buteyn refused to answer until Plaintiff accompanied them back to Robert Taylor's office.

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 27 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 27 of 96

115.   Back at Taylor's office, Taylor told Plaintiff "there is a Title IX investigation that mentioned your name." It was not clear, at first, whether Plaintiff was a witness or a respondent.

116.   Taylor then asked Plaintiff whether he knew Roe, and to describe the night they met. At no point did they advise Plaintiff that he had a right to an advisor, nor provide or direct him to any written policies or procedures with respect to the Title IX process. When Plaintiff asked what the specific claims against him were, Taylor replied, "I can't disclose that to you at this point."

117.   Plaintiff asked Taylor and Buteyn what he should be concerned about. Taylor responded, "you should be most concerned that alcohol is involved—that's what the law says."

118.   Plaintiff followed up by asking whether a person regretting a sexual encounter afterwards meant that the encounter was sexual assault. Taylor responded, "your words, not mine."

119.   Taylor and Buteyn asked Plaintiff several pointed questions, presuming his guilt from the start, including, "have you tried this with anyone else?"

120.   During the meeting, Taylor also told Plaintiff that the matter had been reported to the local police.[4] Taylor and Buteyn told Plaintiff that he was going to hear from a detective, and that Plaintiff should speak to the police when they reach out because Taylor and Buteyn didn't want "guys in uniform" coming to campus.

121.   At the end of the meeting, Plaintiff was handed a No-Contact Order (NCO) for Roe, as well as for S.S. Plaintiff had no sexual history whatsoever with S.S., and it was unclear what the basis was for that order.

---

[4] Plaintiff was never arrested or charged with any offense in connection with Roe or the evening in question.

122.     For the next few months, despite the NCO, Roe would frequently sit near Plaintiff in the school cafeteria, or stand near Plaintiff at social events off-campus.  Plaintiff did his best to ignore Roe.

123.     Other than a brief second meeting with Taylor and Buteyn, which Plaintiff had requested in order to provide further information about the night he met Roe, Plaintiff did not hear anything from Dordt regarding the Title IX complaint for nearly two months.

124.     On April 5, 2018, Defendant Howard Wilson, Dordt's Vice President and Chief Administrative Officer and Title IX Coordinator, sent Plaintiff a notice stating he was required to attend a hearing *the next day*, April 6, 2018, at 3:30 p.m. before Wilson and the "Student Life Committee."  Plaintiff had no prior notice that a hearing would take place.

125.     The letter simply gave the time and location for the hearing and listed three "policy violations being considered": Misuse of Alcohol, Sexual Misconduct, and Sexual Assault.  The definitions of the violations were not included in the letter.  There was no reference to any policies or procedures that would govern the hearing, nor did the letter identify the Student Life Committee members or provide Plaintiff an opportunity to object for conflict or bias.

126.     The letter did not contain any factual allegations, date or location of alleged misconduct, identity of a complainant, or proposed witnesses for the hearing.  It made no mention of any investigation, report or findings, and did not provide Plaintiff any method to review any such materials before the hearing.  It made no mention of the burden of proof or potential sanctions he faced if he were to be found responsible.  It did not notify Plaintiff that he had a right to an advisor.  It was little more than a bald demand for Plaintiff's presence within twenty-four hours.

127.     Plaintiff appeared for his "hearing" on April 6, 2018.  At the hearing, Plaintiff was not permitted to make an opening statement, call witnesses, submit or ask questions for any other

29

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 29 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 29 of 96

parties or witnesses, or make a closing statement. Roe was not present. Plaintiff was not apprised of the specific factual allegations against him. Plaintiff was not apprised of any investigation, report, interviews, or other evidence gathered. As far as Plaintiff knows, no other witnesses were called or questioned at the hearing, including Roe.

128. Plaintiff recognized one of the members of the Student Life Committee: a student who had taken a class for which Plaintiff was a TA. Plaintiff had graded her papers for one semester. Clearly, Dordt did not even endeavor to conduct a conflict check. Nor was Plaintiff advised of any right to object to a conflicted Committee member.

129. At the hearing, Plaintiff was asked approximately fifteen questions by Defendant Erin Olson, one of Dordt's Title IX investigators. Plaintiff was expressly asked about his sexual history unrelated to Roe. Plaintiff was also asked whether he had ever previously provided alcohol to "other underage women." The Student Life Committee asked no questions. It was clear from the nature and tone of the questions that Plaintiff was already considered guilty.

130. Plaintiff was then permitted to ask questions of the Title IX staff. Plaintiff asked whether they had considered that Roe poured her own drinks and initiated the activity, as he presumed was confirmed by his roommate, assuming anyone even interviewed the roommate. Defendant Taylor responded, "that doesn't mean a whole lot, we've had instances of married couples, one will hand the other a condom, but that doesn't mean consent because they were incapacitated."

131. Throughout the process, Dordt's Title IX staff made no distinction between mere alcohol *consumption*, alcohol *intoxication*, and *incapacitation*—at least not when it came to Roe. There was no acknowledgment that Plaintiff was admittedly intoxicated and had consumed more alcohol than Roe on the evening in question.

30

132.    Plaintiff was then excused from the hearing room.

133.    Approximately ten minutes later, Wilson handed Plaintiff a four-page, typed document entitled "Title IX Incident Review and Finding by Howard Wilson, Title IX Coordinator" (hereinafter, "the Decision Letter"). The document made no mention whatsoever of the Student Life Committee, nor the hearing itself.

134.    According to the Decision Letter, a "final" Investigative Summary Report (hereinafter "the Report") was submitted to Defendant Wilson on March 29, 2018, from Defendants Taylor and Olson. This was the first time Plaintiff was made aware of the existence of the Report; Defendants did not permit Plaintiff access to the Report or any other investigative materials prior to the hearing.

135.    In a section of the Decision Letter titled, "Description of Incident," the allegations against Plaintiff were written as fact, while Plaintiff's statements were referred to as "claims." For example, the description stated Roe "consumed alcohol to the point that she was drifting in and out of consciousness," but Plaintiff "claims in his statement that [Roe] provided consent."

136.    In a two-paragraph section of the Decision Letter entitled "Finding," Wilson wrote "[f]ollowing careful review of the investigatory report and its supporting documents, *I have made* the following finding." (emphasis added). Clearly, the Student Life Committee did not take part in the finding, as neither the Committee nor the hearing were mentioned at all in this section, and it was plainly stated that Wilson made the finding.

137.    Moreover, there was no description of what the referenced "supporting documents" entailed, nor how many witnesses were interviewed or who they were.

138.    The Finding section made no reference or acknowledgment of the fact that Plaintiff was intoxicated on the night in question and had consumed more alcohol than Roe.

31

139.    Wilson concluded the Finding section, "*in my judgment*, [Roe] was unable to provide informed consent to [Plaintiff]'s sexual activities, due to being incapacitated by alcohol provided by [Plaintiff]."  The letter contained no mention anywhere of the "preponderance of the evidence" standard of proof, or weighing of the evidence.  Instead, the standard of proof was apparently Wilson's personal judgment.

140.    The Finding contained no assessment of credibility, other than a clear presumption that Plaintiff, as the older male, was responsible for gaining the consent of Roe, the younger female, who was presumed to be non-consenting by virtue of her alcohol *consumption*.

141.    Based on the fact that Plaintiff had purchased alcohol for the group, and Plaintiff and Roe subsequently had sex, Wilson concluded that "[Plaintiff] appears to have been intentional in his actions throughout the incident, and was aware of the female's condition, though he did repeatedly request consent."  Thus, despite acknowledging that Plaintiff repeatedly sought (and received) Roe's verbal consent, Wilson concluded Plaintiff "conducted a sexual assault."

142.    Wilson thus found Plaintiff responsible for three conduct policy violations: Misuse of Alcohol, Sexual Misconduct, and Sexual Assault.

143.    Notably, the Sexual Misconduct violation was apparently imposed on the basis that Plaintiff admitted to having intercourse with Roe, which, even though consensual, would violate Dordt's prohibition on premarital sex.  Thus, Dordt imposed two policy violations—Sexual Misconduct and Sexual Assault—for *the same act*, constituting an egregious and unduly punitive outcome, in a veiled effort to give Dordt grounds to impose the harshest sanction possible against Plaintiff.

144.    The Decision Letter unequivocally stated that Wilson was the party who found Plaintiff responsible, and that Wilson reached his determination, in his own personal judgment,

32

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 32 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 32 of 96

based on the Investigation Report, which Defendants intentionally withheld from Plaintiff throughout the process.

145.    As such, the entire "hearing" was merely a sham proceeding to give the impression of some minimal due process. In reality, Plaintiff was presumed guilty from the start and deprived of any substantive opportunity to be heard, having been deliberately deprived of (i) the opportunity to view the claims and evidence against him, (ii) reasonable time to prepare an adequate defense, and (iii) a meaningful opportunity to have his arguments actually considered prior to adjudication by a neutral arbiter.

146.    The Decision Letter also handed down Plaintiff's sanction for the violations ("the Sanction"): Plaintiff was dismissed from Dordt immediately and would not be permitted to re-apply for admission until Fall of 2019.

147.    According to the letter, the Sanction would be imposed immediately, even though Plaintiff had a right to appeal, and even though it was the last few weeks of Plaintiff's final semester of his senior year. In other words, even if Plaintiff later won his appeal, the immediate imposition of the Sanction would functionally guarantee that Plaintiff would not graduate on time.

148.    Just like the Finding, the Sanction was also determined *solely* by Wilson, as the letter states, "*[m]y decision*, based on this review, is that [Plaintiff] will be dismissed from Dordt College immediately." (emphasis added). There was no explanation as to how the Sanction was determined. Plaintiff was given twenty-four hours to pack his things and vacate campus.

149.    At the same time Plaintiff was given the Decision Letter, he was given a one-page document instructing on how to submit an appeal (the "Appeal Document"). According to the Appeal Document, which was issued to Plaintiff at the end of the day on Friday, April 6, 2018, Plaintiff had "seven days" from the issuance of the Decision to submit a notice of appeal. The

33

Appeal Document did not specify whether it was business days or calendar days. The Appeal Document directed Plaintiff to file his notice of appeal with the Title IX coordinator, Defendant Wilson.

150.    According to the Appeal Document, the first step in the appeal process was for the Title IX coordinator to "review the process and decision and determine whether further review is warranted." In other words, Wilson was to review *his own* decision in order to decide whether it should be reviewed.

151.    According to the Appeal Document, if the Title IX coordinator determined the matter may be reviewed, it could then go to an Appeals Committee.

152.    According to the Appeal Document, the Appeals Committee was comprised of "one staff member, one faculty member, one student, and one trustee" *along with the Title IX coordinator*. In other words, not only was Wilson the sole arbiter of Plaintiff's guilt or innocence from the start, he was also the gatekeeper to appellate review *and* a participant in the substantive appeal.

153.    Wilson was biased and conflicted, and his presence infected the entire decision-making process from start to finish.

154.    Within a day or two after the Decision Letter was handed down, Plaintiff reached out to Defendant Taylor for clarity on the deadline for his appeal; specifically, Plaintiff asked whether his appeal was due the next Friday, April 13, or whether he could submit on Monday, April 16. Taylor told Plaintiff that he could submit his appeal on Tuesday, April 17, 2018—seven business days, and to contact Wilson if Plaintiff had any further questions about the deadline.

155.    On Monday, April 16, 2018, Plaintiff submitted his appeal to Defendant Wilson. Plaintiff's appeal cited, inter alia: (i) the lack of any identified Title IX policies or procedures; (ii)

34

the absence of any identified evidentiary standard; (iii) Dordt's withholding of all investigatory materials and evidence from Plaintiff until *after* the decision was issued; (iv) insufficient evidence for Wilson's findings; and (v) the unduly harsh sanction.

156.  Wilson responded to Plaintiff's submission: "the deadline for your appeal has passed, as of Friday, April 13 at 5:00 p.m." Notably, nothing in any of the documentation specified a submission time of 5:00 p.m.

157.  Plaintiff replied, informing Wilson that Taylor had told him the appeal period was seven business days. Wilson replied that according to Taylor, Taylor told Plaintiff "to contact [Wilson] regarding the date for the appeal," and since Plaintiff did not contact Wilson, the appeal was untimely.

158.  Plaintiff and Wilson had several more exchanges regarding the deadline and the lack of clarity in the Appeal Document and Plaintiff's communications with Taylor. Throughout the communications, Wilson was hostile, confrontational and adversarial, and plainly sought to close off Plaintiff's avenue for review.

159.  On April 27, 2018, Wilson wrote Plaintiff a follow-up letter regarding the status of Plaintiff's appeal. In the letter, Wilson stated: "We are considering your appeal carefully, and *may* submit it to the Title IX Appeals Committee." (emphasis added).

160.  This added layer of "review" whereby the Title IX administrators determine whether their own decision should be subject to review is not only plainly inappropriate, it is not provided for in the disciplinary policy as set forth in the Student Handbook.

161.  Wilson's letter continued, "Dordt College has determined that your sole point of contact with Dordt College is with me, Howard Wilson, Title IX Coordinator, regarding this

35

matter. There is no value in attempts to lobby other Dordt employees on your behalf, as they do not have any jurisdiction."

162. On information and belief, this was in response to Plaintiff having submitted a copy of his appeal to the provost, per the instructions in the Dordt Student Handbook. This clearly hostile tone permeated all of Wilson's communications with Plaintiff since the "hearing."

163. Wilson's letter closed with a description of the decision-making process entirely at odds with reality: "You met with the Student Life Committee, and *they provided* a unanimous decision based on evidence gathered by trained investigators and by your own statements." (emphasis added). To the contrary, the Decision Letter, which was plainly drafted by Wilson prior to the "hearing," made expressly clear that *Wilson* made all decisions in *his* "judgment" based on investigatory materials which were deliberately withheld from Plaintiff.

164. Wilson's statement about the Student Life Committee was a farcical attempt to re-write the history of Plaintiff's disciplinary process in order to obscure the blatant procedural and substantive defects that had tainted the entire proceedings.

165. Between April 27, 2018, and May 11, 2018, Plaintiff and Wilson engaged in an extended email exchange wherein Wilson became increasingly, openly hostile, wildly misrepresented Plaintiff's rights under Title IX, and continually sought to quash Plaintiff's appeal.

166. Throughout this time, as Wilson dragged out the appeal process, Plaintiff's final semester dwindled away, along with any hope of completing his education and receiving his degree on time, as Plaintiff was still banned from campus during the pendency of his appeal.

167. Wilson's blatant attempts to deny Plaintiff an opportunity to appeal began with Plaintiff's request for "mercy and grace when considering the timeliness of the appeal," wherein Plaintiff noted he had been "forthcoming . . . to the extent the allegations are true." Wilson

36

responded by stating, "My interpretation of this statement is that you are not disputing the veracity of the facts and your statements leading to the conclusions of the Student Life Committee, resulting in the discipline you have received."

168.    Plaintiff responded to clarify that he did provide alcohol to Roe, who was underage, and they did have premarital sex in violation of Dordt's conduct policies, about which he was forthcoming and willing to accept responsibility.  However, he did not commit sexual assault, and he sought to appeal on those grounds, seeking a lesser sanction.

169.    Plaintiff then offered to "*meet* to speak at a mutually agreeable time." (emphasis added).  Wilson agreed, and the two then discussed a convenient time to meet and discuss Plaintiff's appeal from the Title IX findings.  Plaintiff asked if he could have a support person present, and Wilson agreed, as long as Plaintiff submitted a FERPA (Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g) release.

170.    A day or so before their scheduled meeting, Plaintiff wrote Wilson to confirm they would be meeting in his office, and indicated that his planned support person was a current student. Wilson shot back: "It is not necessary to come to campus, and I would strongly discourage you from doing that. . . .  This is a conversation, and not a hearing. . .  Our clear verbal instruction to you, when you were given your dismissal document, was that you may not be on campus without the express permission of Robert Taylor. You may not be on campus without that permission. You no longer have any standing as a student.  Also, we will not accept a current student as your support person."

171.    Wilson gave no explanation as to why Dordt would not permit Plaintiff to have a fellow student as his advisor.

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 37 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 37 of 96

172.    Plaintiff apologized for any confusion about the meeting being in person, and, in light of Wilson's aggressive tone and refusal to permit Plaintiff his advisor of choice, stated he would not pursue their planned phone conversation in the following days.

173.    Plaintiff further advised that, in response to Wilson's (incorrect) statement that Plaintiff could not have a student advisor, Plaintiff had retained legal counsel to serve as his advisor moving forward, and provided the name and contact information for his advisor.

174.    Wilson responded by again attempting to deny Plaintiff his right to an appropriate advisor, claiming that "we will not consider a conversation with [Plaintiff's attorney]" because "he does not have standing in the State of Iowa."

175.    Plaintiff responded to Wilson by citing the relevant federal laws and regulations permitting Plaintiff to utilize an attorney as an advisor in any Title IX meeting, and noting there is no requirement that such attorney advisor be admitted to the bar in the state where the meeting will take place.

176.    Wilson, rather than acknowledging his continued misinformation, doubled down on his refusal to permit Plaintiff his right to an attorney advisor, telling Plaintiff that he may be entitled to an attorney advisor at a "hearing," but what they had planned was a "telephone conversation, not a meeting." Wilson then blamed Plaintiff for canceling the meeting, even though it was Wilson who had aggressively and adamantly rebuked Plaintiff for assuming their meeting would be on campus and rejected Plaintiff's original choice of a student advisor, leading to the cancellation of the meeting.

177.    Wilson then continued to defend his incorrect statements about Plaintiff's attorney advisor, claiming "you previously told me . . . that you plan to pursue litigation against Dordt College, and that puts us on different footing. . . . If you are going to continue to pursue litigation

your legal representative must have standing, and we have the right to representation as well.  Our attorney does have the right to challenge your representative for standing."

178.    Several days later, on May 11, 2018, at around 5:30 p.m., Wilson sent Plaintiff an "update" on Plaintiff's appeal.  The update stated that "Dordt College has determined that we will refer your appeal to the Title IX appeals committee."

179.    Apparently, it took nearly a month for Wilson to decide whether Plaintiff's appeal was timely submitted and therefore worthy of consideration.  During this inexplicably long period of time, Plaintiff lost all opportunity to complete his academic requirements on time and receive his degree along with the rest of his graduating class.  He was given no credit for any of his courses that semester because the immediate imposition of the suspension forced him to miss the last three weeks of class and final exams.

180.    In that same notification, Wilson attempted yet again to derail Plaintiff's appeal, asking Plaintiff, for no particular reason, "is it your desire to continue with your appeal at this point?"  Plaintiff answered with an unequivocal yes.

181.    Just five days later, on May 16, 2018, Wilson notified Plaintiff via letter that Plaintiff's appeal was denied (the "Appeal Outcome").  The Appeal Outcome indicated the Appeals Committee met and made its decision on May 14, 2018.  The Appeal Outcome did not identify the Appeals Committee members.

182.    Thus, Dordt spent *nearly a month* considering whether to accept Plaintiff's appeal for timeliness, during which time Wilson continually tried to talk Plaintiff out of the appeal, and then took fewer than four business days to reject the appeal on the merits.

39

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 39 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 39 of 96

183.   Notably, by the time the Appeals Committee even met to consider the appeal, the semester had concluded and, in fact, commencement had passed. In other words, even if Plaintiff had won his appeal, his education was already irretrievably derailed.

184.   The Appeal Outcome letter was conclusory and non-informative.

185.   The Appeal Outcome letter stated that "a motion was made to not consider the appeal on the basis of timeliness," but did not state who made the motion or when.  It was also unclear why such a motion would be necessary after Wilson already spent a month deliberating over the timeliness issue.

186.   The Appeal Outcome letter stated that "a motion was made to deny the appeal based on the failure to meet the recognized grounds for appeal."  The letter then simply listed the three permissible grounds for appeal and stated "[t]he Appeals Committee unanimously approved and carried this motion."  There was no substantive explanation or rationale provided for denying Plaintiff's appeal.

187.   Plaintiff has exhausted all avenues for appeal under Dordt's policies.  This lawsuit represents Plaintiff's last chance to clear his name and right the wrongs occasioned by Defendants' improper conduct.

**C.   Dordt Retaliates Against Plaintiff.**

188.   After Plaintiff's improper dismissal from Dordt University, he applied for admission to several other undergraduate institutions in order to complete his degree, but was unable to gain admission.  In light of Plaintiff's top-notch academics, Plaintiff believes his disciplinary record from Dordt precluded his admission.

189.   Unable to earn his bachelor's degree elsewhere, Plaintiff had no option but to wait out his dismissal period and apply for readmission to Dordt for Fall 2019 to complete his degree.

190.    On March 1, 2019, Plaintiff reached out to Defendant Wilson to inquire about the "timeline, process, and requirements" for readmission.

191.    Wilson responded that Plaintiff would need to: (1) complete an online application; (2) submit character references from his current pastor and his employer; and (3) attend a meeting with Defendants Wilson and Taylor – the very same employees who investigated and adjudicated Plaintiff's case, imposed the sanction, and repeatedly delayed and attempted to derail his appeal. Wilson stated the deadline for submission of the requisite materials was May 1, 2019.

192.    Plaintiff thereafter timely completed his application per Wilson's instructions, and on March 26, 2019, contacted Wilson to schedule his interview.

193.    On or about Tuesday, April 9, 2019, Plaintiff attended, via telephone, his readmission interview with Wilson and Taylor, along with Aaron Baart, Dordt's Dean of Chapel.

194.    The interview lasted approximately thirty minutes, and was primarily focused on Plaintiff's activities since his dismissal and his plans for the future, as well as his behavior if readmitted to Dordt, including how he would interact with the other Dordt students who were involved in the events that led to his dismissal. Plaintiff stated that, if readmitted, he intended to have no contact with the other students, would try to secure off-campus housing, and was focused on religion, self-improvement, and completing his degree.

195.    Wilson, Taylor, and Baart had very positive reactions during the interview, even telling Plaintiff that his response about his future goals was "beautiful."

196.    Towards the end of the interview, Plaintiff asked what the next step in the readmission process would be. He was told that Wilson and Taylor would confer and provide an answer by the following Monday.

41

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 41 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 41 of 96

197.    Wilson then told Plaintiff that he had some final "true or false" questions for Plaintiff.  The first question was whether Plaintiff would abide by Dordt's community standards if he were permitted to return.  Plaintiff stated that he would.

198.    Wilson then made a reference to Plaintiff's previous engagement of legal counsel during the disciplinary process, and asked Plaintiff, verbatim: "are you currently pursuing legal action against Dordt College?"

199.    Plaintiff replied that his focus at that time was readmission and completing his degree.  Wilson told Plaintiff that his answer was unsatisfactory, and again asked, verbatim, "are you currently pursuing legal action against Dordt College?"

200.     Plaintiff reiterated his prior response that he was focused on readmission and completing his degree, and that he did not see the relevance of the question to his readmission.  Wilson again pushed for an answer, saying something to the effect of, "so the answer is no?"

201.    After Plaintiff stated, again, that he did not see why that question was relevant to his readmission interview, Wilson finally relented and quickly wrapped up the call.

202.    Two days later, Wilson's secretary e-mailed Plaintiff to state that Wilson and Taylor wanted to have a follow-up interview.  Plaintiff asked whether they wanted to discuss anything in particular, as he thought the admission interview covered everything.  Wilson's secretary said that the conversation "would be much like last Tuesday's conversation about your application for readmission."

203.    On April 23, 2019, Plaintiff attended a second phone interview with Wilson, Taylor, and Baart.  With their permission, Plaintiff recorded the interview.

42

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 42 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 42 of 96

204.    Baart began the conversation by stating "it's our hope and intent . . . to readmit you, come on back in, and finish this up.  That's our goal, I know that's your goal, and we are hoping we can do that."

205.    Baart continued, "we just wanted to circle back on one last thing, at the end of our last phone call, we asked you a question about whether or not you were currently pursuing any legal action against Dordt, and um, and, just wanted to follow back, um, not necessarily even asking the same thing, but we want to make sure we recap the rest of our conversation accurately."

206.    In that regard, Baart stated, Dordt had drafted a "statement" for Plaintiff to sign "just making sure that we got this all right." (hereinafter, "the Statement").  Baart told Plaintiff he would email him the Statement shortly, and expressly told Plaintiff that once he signed the Statement and returned it to Dordt, "with that, we'd feel pretty good about moving forward with the readmit process."

207.    Wilson followed up, "once you've looked at this and agreed to it, . . . we will work on your acceptance letter."

208.    The Statement that Dordt sent to Plaintiff contained several mischaracterizations and false and inaccurate statements, including a claim that Plaintiff "entered a rehabilitation program related to [his] issues at Dordt," which was categorically untrue.

209.    The Statement also included the following: "I broke . . . Dordt's rules while I was attending Dordt College" and "I am repentant for my actions while I was attending Dordt College."

210.    Because the Statement was inaccurate and misleading, Plaintiff was hesitant about signing it.  Plaintiff emailed Wilson and asked whether signing the agreement was a required condition of his readmission.

211.    Wilson wrote back:

43

The process in which we are engaged is not a negotiation. It is a simple process. Please let me review the salient facts with you:

. . .

• In your dismissal, you were told that you would be eligible to reapply for admission, and that this process would involve an interview with Robert Taylor and me.

• You wish to return to Dordt to complete your degree. You have submitted an application for admission.

• Dordt gets to decide who it chooses to admit, based on our determination of the applicant's suitability to be a student at this institution. It is the student's responsibility to provide the necessary information for Dordt to make a decision.

• It is our responsibility to determine that your behavior and attitude have changed since you were last enrolled at Dordt, to ensure that you will be a responsible member of our community going forward.

• We conducted an initial interview with you. At the conclusion of that interview, Robert Taylor, Aaron Bart, and I were not fully persuaded that you have indeed changed and did not believe we had adequate information to make a decision.

• In course of that interview you made several clear statements. These were heard by Robert, Aaron Baart, and I. The three of us are in full agreement on what you said to us.

• The statement we have issued for you to sign is our clear recollection of your words. We are asking you to affirm, in writing, what you said to us—i.e. to confirm the veracity of your own statements. This process is providing more information to support your application for admission.

. . .

From our perspective, I think we have answered your questions.

212.    Notably, Wilson's summary of events was incorrect and nonsensical on its face. While claiming that the first interview left insufficient information on which to form an admission decision, Wilson also stated that the purpose of the Statement was simply to reaffirm the information provided in the first interview.

44

213.    Additionally, Wilson's claim that "Robert Taylor, Aaron Bart, and I were not fully persuaded that you have indeed changed and did not believe we had adequate information to make a decision" was directly contradicted by his and Baart's own statements during the second interview, wherein they expressly stated they were ready and intended to readmit Plaintiff.

214.    Plaintiff replied:

> I do want to move forward with readmission and come back to Dordt to complete my degree.  While I stand by everything we discussed in our conversation, with all due respect, the document you produced is not an accurate summary of our conversation, and so I cannot sign it.  I would like to work with you all to move forward in this process, and in that regard, I would like to lay out my specific concerns about the document so that we can work through them together and come to a mutual understanding.  I will address each statement in turn.

215.    Plaintiff then addressed each claim in the Statement.  With respect to the claims "I broke . . . Dordt's rules" and "I am repentant," Plaintiff clarified that he did violate the rules about alcohol consumption and premarital sex, but that he maintained his innocence as to the assault charge.  With respect to the claim about "rehabilitation," Plaintiff clarified that the volunteer program he had participated in during his time away from Dordt was "a discipleship program, not a rehabilitation."

216.    Plaintiff closed his email, "I hope you will give me the benefit of the doubt in my recollection of our conversation, and at least take some time to discuss amongst yourselves.  Please let me know how we can move forward from here."

217.    On May 20, 2019, Wilson replied:

> It appears to us that you desire to unduly parse the terms of your return.  However, from our perspective, **the real and primary questions have to do with whether or not you are willing to accept the terms of your dismissal from Dordt** . . . .

> (emphasis added).

45

218.    In other words, after Dordt directly and repeatedly asked Plaintiff whether he was seeking legal action with respect to his dismissal, and after Plaintiff declined to answer, Dordt then sought to force Plaintiff to sign a document essentially admitting all liability and accepting Dordt's actions.  Dordt then confirmed that Plaintiff's readmission was contingent upon his written acceptance of Dordt's disciplinary actions.

219.    When Plaintiff refused to sign the Statement, which was inaccurate and plainly geared towards immunizing Dordt from legal action, Dordt refused to grant Plaintiff full readmission.

220.    Instead, Dordt granted Plaintiff a limited readmission, forcing him to take courses at another institution and transfer the credits in order to complete his degree requirements.  Plaintiff was not permitted to return to Dordt Campus or take any on-campus courses, and was only permitted to take two online courses through Dordt.

221.    When Plaintiff was initially dismissed from Dordt, he was given information about a "dismissal grant" – a tuition credit upon Plaintiff's readmission, in acknowledgment of the fact that Plaintiff paid in full for his Spring 2018 semester, but was not granted any course credit due to his disciplinary sanction.

222.    The dismissal grant paperwork indicated Plaintiff would have been entitled to a credit of over $8,000 towards his tuition upon his return to Dordt.

223.    With Dordt's limited readmission, Plaintiff was essentially forced to forfeit this credit and spend money at other educational institutions in order to complete his degree.

224.    Dordt's limitation of Plaintiff's readmission was directly and specifically tied to Plaintiff's refusal to waive his legal claims against Dordt.

46

225.     Dordt's refusal to fully readmit Plaintiff was a retaliatory act, intended to dissuade and punish Plaintiff for enforcing his legal rights, which caused Plaintiff direct pecuniary harm.

## III. DEFENDANTS BREACHED THEIR CONTRACTUAL AND LEGAL OBLIGATIONS.

### A. Dordt Failed to Maintain and Publish Proper Policies and Procedures for Addressing Complaints of Sexual Misconduct.

226.     Upon Plaintiff's acceptance into Dordt, Dordt provided Plaintiff with a copy of the Dordt College Student Handbook ("the Handbook"), which contains Dordt's various policies on student conduct, discipline, and students' rights and responsibilities.

227.     On information and belief, the Handbook is updated and/or reissued each new school year.

228.     On information and belief, the Handbook and/or the various policies contained therein are also available online on the Dordt University website.

229.     The Handbook sets forth a strict code of sexual conduct, in accordance with Dordt's religious teachings.  According to the Handbook,

> Dordt College is committed to maintaining an environment where employees and students abide by biblical injunctions and admonitions regarding sexual activity, and refrain from sexual immorality. Although it is understood that a person's desire for sexual intimacy is a natural and powerful characteristic in human nature, it is the college's position, based on its biblical beliefs, that the only appropriate and permissible context in which sexual intimacy may be expressed as overt sexual activity is within the bonds of the marriage covenant between a man and a woman. All members of the college community are expected to live in accord with this understanding of sexual activity. . . .  The college may determine, . . . that sexual activity outside of the marriage covenant, sexual activity with someone other than one's spouse, sexual activity with someone of the same gender, promoting or advocating sexually immoral activity, or sexual harassment and other inappropriate

47

conduct should result in an employee's discharge or a student's dismissal.

(Handbook at 33).

230.     In that regard, Dordt prohibits the following conduct: "Engaging in, promoting, or advocating sexually immoral activity;" "Engaging in, promoting, or advocating extramarital sexual relations;" and "Engaging in, promoting, or advocating homosexual relations." (Handbook at 34).

231.     Dordt also has a strict policy regarding alcohol use and consumption:

The college supports and has a duty to uphold federal and state laws related to the use of alcohol. Students under the age of 21 are not to use or possess alcohol and will be held accountable should they choose to do so on or off campus. Students who are 21 or over are expected to abide by local, state, and federal laws with regard to alcohol and will be held accountable for violations of law that occur off campus as well as on campus. The consumption or possession of alcoholic beverages by anyone is prohibited on campus or in college-controlled areas, in college-approved housing facilities, in vehicles, and at college related activities. The presence of alcohol containers will be regarded as possession. Students who return to campus in an intoxicated state or are discovered on or off campus in an intoxicated state are subject to college discipline.

(Handbook at 54).

232.     However, Dordt provides amnesty for students who report sexual assault or harassment:

Students are strongly encouraged to report incidents of, or share information about, sexual misconduct as soon as possible. This is true even if the student with a complaint or a witness may have concern that his or her own alcohol or drug use, or other prohibited activity were involved. The Office of Student Services will not pursue disciplinary violations against a student with a complaint or a witness for his or her improper use of alcohol or drugs if the student is making a good faith report of sexual misconduct.

(Handbook at 25).

48

233.    Thus, Dordt's policies create a perverse incentive for students who consume alcohol and have extra-marital intercourse to report such interactions as assault, in order to avoid discipline.

234.    The Handbook also devotes several pages to identifying resources and reporting options for victims of sexual assault and harassment.  One such entry reads "To assist victims, SART has female sexual assault nurse examiners . . . ." (Handbook at 24). The Handbook contains no similar assurances for male victims, again reinforcing Dordt's presumption that sexual assault victims are universally female.

235.    However, the Handbook fails to set forth *any* established policy or procedure for the investigation and adjudication of complaints of sexual assault or harassment.  Specifically, the Handbook contains *no*:

   a.   Timeline for investigation and adjudication of complaints;

   b.   Process for investigation and adjudication of complaints;

   c.   Identified individuals responsible for adjudicating such complaints;

   d.   Standard of evidence[5] for adjudicating such complaints; or

   e.   Rights/resources for the accused/respondent in a Title IX proceeding.

236.    Similarly, Dordt's Title IX webpage contains no specific policies or procedures for investigating and adjudicating complaints of sexual misconduct.

---

[5]   The sole reference to standards of evidence in the Handbook is a statement that "[t]he disciplinary process is not a legal proceeding, and there are different standards of evidence for holding persons accountable." (Handbook  at 66).  The Handbook fails to elaborate what those standards are.

49

237.    Dordt's only published statement that somewhat resembles a "procedure" for addressing complaints of sexual misconduct is contained within Dordt's Annual Security Report ("Clery Report"), which is hidden in several sub-menus on the Dordt University website.

238.    Specifically, the report can only be accessed after clicking through "About Dordt", then "Publications," then "Annual Security Report."  There is no link to this report on Dordt's Title IX webpage, nor is there any reference to the policies contain therein in the Student Handbook.

239.    In addition to the obscured nature of Dordt's Annual Security Report, even the policies contained therein fail to comply with federal mandates.

240.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.,* and The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), 20 U.S.C. § 1092, and the regulations promulgated thereto, require universities to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

241.    The "prompt and equitable" procedures that a school must implement include, at a minimum: "Notice . . . of the procedure,. . . ; Application of the procedure to complaints alleging harassment . . .; Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; [and] Designated and reasonably prompt timeframes for the major stages of the complaint process." Dep't of Ed., Office for Civ. Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20.

50

242.     In addition, Clery Act regulations require universities such as Dordt to publish, maintain and follow certain "Procedures for institutional disciplinary action." *See* 34 C.F.R. 668.46(k).   Such procedures are defined as "a *clear* statement of policy that addresses the *procedures* for institutional disciplinary action in cases of alleged dating violence, domestic violence, sexual assault or stalking." *Id.* (emphasis added).

243.     In accordance with the regulations, these procedures must describe:

a.     "each type of disciplinary proceeding used by the institution; the steps, anticipated timelines, and decision-making process for each type of disciplinary proceeding; how to file a disciplinary complaint; and how the institution determines which type of proceeding to use based on the circumstances of an allegation of dating violence, domestic violence, sexual assault or stalking;"

b.     "the standard of evidence that will be used during any institutional disciplinary proceeding arising from an allegation of dating violence, domestic violence, sexual assault, or stalking;" and

c.     "all of the possible sanctions that the institution may impose following the results of any institutional disciplinary proceeding for an allegation of dating violence, domestic violence, sexual assault, or stalking."

244.     In addition, such procedures must "[p]rovide[] that the proceedings will:"

a.     "Include a prompt, fair, and impartial process from the initial investigation to the final result;"

b.     "Be conducted by officials who, at a minimum, receive annual training on the issues related to dating violence, domestic violence, sexual assault, and stalking and on

51

how to conduct an investigation and hearing process that protects the safety of victims and promotes accountability;"

c. "Provide the accuser and the accused with the same opportunities to have others present during any institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice;" and

d. "*Not limit the choice of advisor* or presence for either the accuser or the accused in any meeting or institutional disciplinary proceeding." (emphasis added).

245.    The regulations further define "prompt, fair, and impartial" as:

a. "consistent with the institution's policies *and transparent* to the accuser and accused;" (emphasis added);

b. "Includ[ing] timely notice of meetings at which the accuser or accused, or both, may be present;" and

c. "Provid[ing] *timely and equal access* to the accuser, the accused, and appropriate officials to *any information that will be used* during informal and formal disciplinary meetings and hearings." (emphasis added).

246.    Lastly, with respect to a respondent's right to have an advisor of choice at all relevant proceedings, the regulations provide that "*Advisor* means any individual who provides . . . support, guidance, or advice," and "*Proceeding* means all activities related to a non-criminal resolution of an institutional disciplinary complaint, including, but not limited to, factfinding investigations, *formal or informal meetings*, and hearings." (emphasis added).

247.    Dordt's policies and procedures for Title IX complaints, as set forth in Dordt's Clery Report, meet almost none of these requirements. The relevant policies read:

52

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 52 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 52 of 96
Appendix

## Filing a Complaint with the College

Even if a complainant decides not to press criminal charges against the accused, they can still file a complaint with the College. This form of disciplinary process is not a legal proceeding and there are different standards for holding persons accountable.
. . .

## Responsibilities of Dordt College Toward the Complainant
. . .

- In cases of sexual assault, relationship violence, or stalking, the college will not seek disciplinary action toward the complainant for lesser offenses that may have occurred near the time of an assault. For example, an underage student who may have been drinking at the time of the assault, can report the assault without facing disciplinary action for the underage drinking.

- When a crime is reported to college officials, those officials will offer assistance in notifying proper authorities.

- The college will take all reported incidents of sexual assault, relationship violence, and stalking seriously and has the responsibility to respond in an appropriate manner to any formally reported incident.

- When a report is filed with the institution, Dordt College will investigate and follow appropriate disciplinary procedures. If there is an institutional disciplinary hearing the complainant assumes the role of a witness to the allegations.

- The college will allow the complainant to have an advocate (such as a friend, family member, counselor, etc.) accompany them through the college disciplinary proceedings.

- The college will notify the complainant of the progress of the investigation, including notification of the initial contact with the alleged assailant and will provide a written notice of the outcomes related to any institutional disciplinary proceedings, including the outcome of any appeal. The complainant and charged student have the responsibility to respect the privacy rights of all involved.

- The college will inform the complainant of medical and legal services available, and will work with the student to inform the student of, and to provide, appropriate counseling support.

- The college will make every effort to accommodate requests by the complainant for on-campus housing relocation, transfer of classes,

53

or other steps to prevent unnecessary or unwanted contact or proximity to an alleged assailant.

- The college will offer consultation with an administrator regarding academic support services if needed.

### Discipline Policies and Procedures for Complainants and/or Witnesses

Dordt College does not intend for this policy to be a substitute for related civil or criminal legal options. The College strongly encourages complainants to report all incidents and violations to the local law enforcement officials or agencies and utilize all of the services and rights to which they are entitled to by law.

After complainants or witnesses submit an official report to the vice president and chief administrative officer (or the director of human resources), the vice president and chief administrative officer, director of residence life and others, if deemed necessary, will meet with the complainant or witness to discuss the report and determine whether a violation of conduct has occurred. At this meeting, discipline procedures will be explained to the complainant or witness, including the role of the complainant, any witnesses, the accused, and the college in the disciplinary process. *The college will follow the guidelines outlined in the Student Conduct Code*. The complainant will be kept informed about the progress of the investigation, including but not limited to notification of the initial meeting with the alleged assailant.

During this initial meeting an investigative interview may be conducted. At the complainant's request or with their permission, an advisor or advocate may attend this interview. If it is determined that there exists sufficient reason to believe a violation of the college's conduct policy has occurred, *disciplinary procedures may be initiated*. When this occurs, it should be understood that complainants and witnesses are not initiating such charges; the college is considered to be the complainant, and is responsible for continuing the investigative process. Complainants and witnesses will be asked to contribute testimony and information to assist in the investigation. The complainant or witness has the right to withdraw from the investigation at any time. Charges can be investigated on the basis of **either** a statement of sexual assault, relationship violence or stalking from the complainant **or** a witness's statement or complaint (residence hall staff, campus security, faculty, staff, or another student). **Dordt College may proceed with disciplinary action even if the alleged complainant chooses not to participate**

54

**or continue in the process.** [6] Additional questions or concerns regarding disciplinary proceedings should be addressed to the vice president and chief administrative officer.

### Discipline Policies and Procedures for the Accused

At the beginning of the disciplinary investigation, individuals thought to have relevant information, including the accused, will be contacted and interviewed by the vice president and chief administrative officer (or director of human resources), director of residence life, and others, if deemed necessary. If sufficient information is gathered to determine that there are grounds to *proceed with the discipline process*, appropriate action will then be taken.

If the alleged assailant is a student, the college will proceed *according to guidelines established in the Student Conduct Code*.[7] . . . Violations of the college's policies will result in *appropriate disciplinary action*, up to and including discharge or dismissal from the college.

### Responsibilities of Dordt College Toward the Accused

Further questions or concerns on the part of the accused student should be directed to the vice president and chief administrative officer.

- The college will inform the accused of the *institution's disciplinary process*.

- The college will provide the accused with a written statement of charges.

- The college will inform the accused that they may present witnesses and material evidence relevant to the case.

- The college will inform the accused that they may request an advocate on their behalf. Such an advocate must be a member of the college community and may assist the student in presenting information but is not used in a role to defend the accused.

---

[6] (Emphasis in original).

[7] As established above, there are no guidelines for disciplinary procedures in the Code of Conduct within the Student Handbook.

55

- To the best of its ability, the college will provide the accused, in advance of the hearing, with all information to be presented at the hearing.

- The college will inform the accused in writing of the outcome of an institutional disciplinary proceeding, including the outcome of any appeal.

- The college will inform the accused of available services including but not limited to: access to services from the counseling office, voluntary residence hall relocation when available, and consultation with an administrator regarding academic support services and referrals to community resources when appropriate.

248.   Notably, despite numerous references to "disciplinary procedures" and "guidelines established in the Code of Conduct," *there are no* relevant procedures or guidelines in the Code of Conduct (which is contained within the Student Handbook), nor anywhere else that such information might be expected to be posted, such as on Dordt's Title IX website.

249.   Thus, Dordt's policies fail to set forth: (i) a clear statement of the relevant procedures; (ii) each type of disciplinary proceeding used by the institution; (iii) the steps, anticipated timelines, and decision-making process for each type of disciplinary proceeding; (iv) how the institution determines which type of proceeding to use based on the circumstances of an allegation of dating violence, domestic violence, sexual assault or stalking; (v) the standard of evidence to be applied to disciplinary proceedings; and (vi) respondents' ability to select an advisor of their choosing, without limitation.

250.   Moreover, in the "Definitions" section of Dordt's Campus Sexual Assault/Rape Policy, as contained within Dordt's Clery Report, "Consent" is defined as follows:

> Consent: Dordt College remains firm in its position, based on its biblical beliefs, that the only appropriate and permissible context in which sexual intimacy may be expressed as overt sexual activity is in the marriage partnership of husband and wife and expects that all members of the campus community will live in accordance with this policy . . . . It is in the context of what constitutes sexual assault that all members of the community are expected to understand the

56

definition of consent, and that sexual assault can be committed by strangers, acquaintances and spouses, as well as casual and long-term dating partners.

251. The Sexual Assault/Rape Policy also states, "A person who is drunk or has passed out cannot be assumed to give consent." In that regard, Dordt apparently draws no distinction between the mere consumption of alcohol and incapacitation occasioned by alcohol.

## B. **Dordt Failed to Follow Its (Few) Published Rules and Procedures.**

252. Compounding Dordt's failure to establish, maintain, and publish adequate policies and procedures for the adjudication of sexual misconduct claims, Dordt also failed to comply with what few protections and guidelines it purported to provide to Plaintiff.

253. By way of example, and not limitation, in Dordt's "Responsibilities of Dordt College Toward the Accused," Dordt promises to:

a. "inform the accused of the institution's disciplinary process." Plaintiff was never informed of the clear steps and procedures for his disciplinary process.

b. "inform the accused that they may request an advocate on their behalf." Plaintiff was never informed that he had a right to an advocate/advisor.

c. permit the accused student to select an advocate who is "a member of the college community."[8] In Howard Wilson's April 2018 emails to Plaintiff, he expressly denied Plaintiff's choice of a current student as an advisor, without explanation.

d. "provide the accused, in advance of the hearing, with all information to be presented at the hearing." Plaintiff was deliberately kept in the dark throughout the

---

[8] The policy actually requires the advisor to be a member of the college community, in direct contravention to federal regulations, which prohibit such limitations.

57

disciplinary process, and was made to attend a hearing on twenty-four hours' notice with no access to the information to be presented at the hearing.

254. In addition, the Appeal Document that Wilson gave Plaintiff along with the Decision Letter conflicted with numerous provisions in the Student Handbook regarding how appeals are handled. By way of example, and not limitation:

a. The Appeal Document directed Plaintiff to file his notice of appeal with the Title IX coordinator within seven days. The Student Handbook (i) does not provide a seven day deadline for appeals, and (ii) directs appeals to be submitted to the provost, not the Title IX coordinator. (Handbook at 66).

b. According to the Appeal Document, the first step in the appeal process is for the Title IX coordinator to "review the process and decision and determine whether further review is warranted." The Student Handbook states that "The administrator/committee of the *next higher level* of discipline will review the action of the previous level administrator/committee." (Handbook at 66) (emphasis added).

c. According to the Appeal Document, the appeal goes to an Appeals Committee *only if* the Title IX coordinator first determines the matter may be reviewed. The Student Handbook indicates students may appeal as of right, and contains no provision for the Title IX coordinator to make such a decision.

d. According to the Appeal Document, the Appeals Committee is comprised of "one staff member, one faculty member, one student, and one trustee" *along with the Title IX coordinator*. The Student Handbook does not include the Title IX coordinator in the Appeals Committee. (Handbook at 66).

58

e. Wilson responded to Plaintiff's appeal submission: "the deadline for your appeal has passed, as of Friday, April 13 at 5:00 p.m." Neither the Appeal Document nor the Student Handbook make any reference to a 5:00 p.m. deadline.

255. Dordt also failed to abide by certain promises in the Student Handbook. According to the Handbook:

a. "In all situations, the college's goal is to treat the student who reports misconduct with sensitivity and fairness, while also ensuring the accused individual receives due process if any disciplinary action is to be imposed." (Handbook at 27). Plaintiff was not provided any true notice of the allegations against him, nor any time to prepare a defense, nor access to the investigative materials relied upon by the decision-maker, nor a reasonable opportunity to present a defense or have his arguments heard prior to adjudication, before a neutral arbiter. As such, Plaintiff was blatantly and egregiously denied due process.

b. "[T]he college's goal is to treat the student who reports misconduct with sensitivity and fairness, while also ensuring the accused individual receives fair treatment if any disciplinary action is to be imposed." (Handbook at 31). Plaintiff did not receive fair treatment, as Defendants discriminated against him based on his gender, and denied him a thorough, impartial, and fundamentally fair process.

c. "For complaints against other students, the Student Handbook shall govern the complaint, investigation, and adjudication process." In reality, the Student Handbook contains *no* provisions for the investigation and adjudication of student-on-student complaints.

59

d. "Dordt College is committed to nondiscrimination on the basis of . . . gender, . . . in the administration of its admissions, education, and employment policies . . . ." (Handbook at 21). In the instant case, Plaintiff was discriminated against based upon and motivated by his gender.

e. The sanction of dismissal will be "[a]dministered by the Student Life Committee." According to the Decision Letter, Defendant Wilson, acting alone, made the determination to dismiss Plaintiff, stating "*my decision* . . . is that [John Doe] will be dismissed from Dordt College immediately."

256. In sum, not only were Dordt's policies deficient under the relevant federal guidelines, Dordt also failed to abide by its own policies in investigating and adjudicating the claims against Plaintiff.

### C. Dordt Failed to Provide Plaintiff with a Fair, Impartial, Equitable Disciplinary Process.

257. As described in detail above, Dordt failed to establish, maintain, publish, and implement the requisite policies and procedures for the fair and equitable treatment of Title IX complaints.

258. In addition, Dordt failed to comply with OCR's September 2017 updated Title IX guidance.

259. In accordance with the 2017 Q&A, once a school "decides to open an investigation that may lead to disciplinary action against the responding party, [the] school should provide *written notice* to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response *before any initial interview*." *Id.* at 4 (emphasis added).

60

260.    In the instant case, Plaintiff was physically detained for an interview with no notice whatsoever, and Defendants Buteyn and Taylor expressly refused to disclose the allegations against Plaintiff prior to (or during) their first meeting.

261.    According to the 2017 Q&A, respondents must be notified in writing of "the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident." *Ibid.*

262.    In the instant case, Plaintiff's only "notice" of the charges against him was the April 5, 2018 hearing notice that provided nothing but a list of three potential code violations and a hearing time set for the next day.  The notice did not contain: party names, factual allegations, or date/location of alleged incident.

263.    The 2017 Q&A also directs that "[e]ach party should receive written notice in advance of any interview or hearing *with sufficient time to prepare for meaningful participation*." (emphasis added).

264.    As stated above, Plaintiff was given no notice for his initial interview with Taylor and Buteyn.  Plaintiff was given only one day's notice for his hearing before the Student Life Committee.  Plaintiff was given no option to request an extension and was never informed of the precise factual allegations against him.

265.    Finally, the 2017 Q&A notes that "[t]he investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials *must have timely and equal access to any information that will be used* during informal and formal disciplinary meetings and hearings." (emphasis added).

61

a. Plaintiff was never notified of the existence of an investigation report, and was not provided access to such a report before his hearing.

b. To the extent the Decision Letter purportedly summarized the Investigative Report, such report apparently contained no acknowledgment or analysis of exculpatory evidence, including the fact that Plaintiff had consumed more alcohol than Roe, that Roe poured her own drinks, that Roe initiated the activity in front of a witness, and that Roe verbally, affirmatively indicated she wanted to have intercourse.

266.    Essentially, Plaintiff was presumed guilty from the start as a male accused, and was made to submit to a disciplinary process in which Dordt:

a. failed to provide timely notice of the allegations/charges against him;

b. failed to provide timely notice of an adjudicatory hearing;

c. failed to provide access to information gathered by investigators and relied upon by Defendant Wilson in adjudicating the claims against Plaintiff;

d. failed to provide Plaintiff a meaningful opportunity to be heard, as Wilson had plainly drafted the Decision Letter prior to Plaintiff's "hearing";

e. failed to provide Plaintiff a meaningful opportunity to be heard, as he was not permitted to submit questions for his accuser or to call witnesses at his hearing;

f. applied blatant gender stereotypes in deciding to prosecute and find Plaintiff responsible, including the presumption that male students are responsible for gaining consent of female students, even where the female student in this case initiated the sexual activity

62

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 62 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 62 of 96

g.  applied blatant gender stereotypes in determining that Roe's consumption of alcohol resulted in her incapacity to consent, whereas Plaintiff's consumption of alcohol did not;

h.  imposed an unduly harsh sanction that was not tailored to the needs of the case;

i.  imposed the sanction of dismissal before Plaintiff's appeal was decided, improperly separating Plaintiff from his education and preventing his timely graduation before the sanction was final;

j.  routinely and deliberately misinformed Plaintiff of his rights throughout the process; and

k.  summarily denied Plaintiff's well-founded appeal.

267.  Defendants' actions, collectively and individually, deprived Plaintiff of due process and a fair and equitable disciplinary proceeding.

## IV. PLAINTIFF'S DAMAGES.

268.  As a result of Defendants' unlawful, gender-biased, improper conduct, Plaintiff was subjected to a disciplinary process that failed to comport with Dordt's promises to Plaintiff as an enrolled student, and deprived Plaintiff of any semblance of due process or fundamental fairness.

269.  As a result of Dordt's unlawful, gender-biased and fundamentally unfair disciplinary process, Plaintiff was summarily dismissed from Dordt just weeks before he was set to graduate, denying him the timely conferral of a degree he had earned through four years of diligent work and unjustly enriching the school by virtue of Plaintiff's tuition payments for courses for which he was not given credit.

270.  As a result of Defendants' biased, unlawful, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual assault.

63

271.     As a result of Defendants' biased, unlawful, and improper conduct, Plaintiff's academic/disciplinary file is now marred by a false and baseless finding of sexual assault and a dismissal.

272.     As a result of Defendants' biased, unlawful, and improper conduct, Plaintiff will have to disclose to any future educational institution or professional program, licensing authority, or job that he applies to that he was found responsible for committing a sexual assault, conduct which carries a particularly harmful and overwhelming stigma in today's social and political climate.

273.     As a result of Defendants' biased, unlawful and improper conduct, Plaintiff's education and career path have been derailed, resulting in considerable economic and other harm.

274.     As a result of Defendants' biased, unlawful and improper retaliation, Plaintiff was further prohibited from full readmission to Dordt and forced to expend additional sums of money to complete his degree and forfeit a considerable tuition credit.

275.     As a result of Defendants' unlawful and improper conduct, Plaintiff was subjected to a gender-biased, fundamentally unfair investigation and adjudication process which destroyed his reputation, precluded him from receiving the education he was promised by virtue of his enrollment at Dordt, and has impacted and will permanently impact his education and career prospects.

276.     As a result of Defendants' biased, unlawful, improper conduct, Plaintiff has suffered and will continue to suffer reputational harm, mental pain and anguish, emotional distress, ridicule, fear, persecution, pecuniary harm, deprivation of his education and damage to his education and career prospects.

64

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 64 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 64 of 96

**AS AND FOR A FIRST CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*-**
**Erroneous Outcome**
**(Against Defendant Dordt University)**

277.     Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

278.     Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

279.     Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Dordt University.

280.     Title IX is enforceable through a private right of action.

281.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

282.     The "prompt and equitable" procedures that a school must implement include, at a minimum: "[n]otice . . . of the procedure, including where complaints may be filed; Application of the procedure to complaints alleging harassment" and "[a]dequate, *reliable, and impartial* investigation of complaints, including the opportunity to present witnesses and other evidence." Dep't of Ed., Office for Civ. Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20 (emphasis added).

65

283.    To succeed on an erroneous outcome claim under Title IX, a plaintiff must demonstrate: (1) a flawed proceeding, which (2) led to an erroneous outcome; and (3) gender was a motivating factor.

284.    An erroneous outcome occurred in this case because Plaintiff was subjected to a blatantly flawed proceeding and erroneously found to be responsible for sexual assault which he did not commit, and gender was a motivating factor behind this erroneous outcome.

285.    The proceedings were flawed and caused an erroneous outcome because, by way of example and not limitation:

   a.  Defendants failed to maintain, publish and/or disseminate proper procedures for the investigation and adjudication of Title IX complaints;

   b.  Dordt's policies failed to set forth a timeline or standard of evidence to be utilized in the Title IX process;

   c.  Defendants failed to give Plaintiff timely advance notice of his first interview with Taylor and Buteyn, instead physically detaining Plaintiff while he was engaging in TA work in his professor's office;

   d.  Defendants failed to provide notice of the allegations against Plaintiff prior to his interview with Taylor and Buteyn;

   e.  Defendants failed to notify Plaintiff that he was entitled to have an advisor of his choosing at all relevant meetings;

   f.  Defendants failed to provide Plaintiff adequate notice of, and time to prepare for, his hearing before the Student Life Committee;

66

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 66 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 66 of 96

g.  Defendants failed to provide Plaintiff advance notice of the identities of the members of the Student Life Committee or an opportunity to object to their participation on the basis of bias or conflict;

h.  Defendants failed to provide Plaintiff with access to *any* information gathered during the investigation (and relied upon by Wilson in reaching his conclusions);

i.  On information and belief, Defendants' Investigation Report failed to include and synthesize *all* available evidence, including exculpatory evidence;

j.  Defendants never provided Plaintiff with a specific statement of the factual claims against him;

k.  Defendants precluded Plaintiff from asking or submitting questions to be asked of the complainant, including any cross-examination;

l.  Defendants subjected Plaintiff to a hearing before an untrained, tainted/biased Committee, including one of Plaintiff's former TA students;

m.  Defendants subjected Plaintiff to a sham hearing, as evidenced by the fact that Wilson had a four-page, typed report ready within minutes of the end of the hearing, stating unequivocally that Wilson alone—not the Student Life Committee—determined Plaintiff's guilt and sanction based upon the Investigation Report, which Dordt withheld from Plaintiff;

n.  Defendants failed to set forth, in writing, the standard of evidence to be applied in the adjudication of Roe's claims, and failed to properly apply the minimum required standard – preponderance of the evidence;

67

o. Defendants ignored all exculpatory evidence and relied primarily on gender stereotypes and presumptions about sex, gender, and female sexual autonomy in adjudicating Roe's claims, rather than looking at the facts of the case;

p. Defendants failed to weigh and consider all relevant evidence, including the fact that Plaintiff consumed more alcohol than Roe, Roe served herself, Roe declined an opportunity to leave with her friend and elected to stay with Plaintiff, and Roe initiated the sexual activity;

q. Defendants found Plaintiff responsible for numerous violations based upon the same alleged act, improperly compounding his record;

r. Defendants prosecuted and found Plaintiff responsible for sexual assault based upon having sex with Roe while Roe was intoxicated, but declined to investigate Roe for having sex with Plaintiff while Plaintiff was intoxicated;

s. Defendants imposed an unduly harsh and unwarranted sanction;

t. Defendants improperly imposed Plaintiff's sanction of dismissal while his appeal was pending, separating him from his education before the decision was final;

u. Defendants improperly delayed consideration of Plaintiff's appeal for nearly a month, until after Commencement, ensuring that Plaintiff would not timely graduate with the rest of his class;

v. Defendants provided Plaintiff with false/contradictory information about the Appeals process, which injected additional and improper levels of review, whereby Defendant Wilson designated himself as the gatekeeper for submitting Plaintiff's appeal to the Appeals Committee;

68

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 68 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 68 of 96

w.  Defendants routinely, improperly denied Plaintiff his choice of advisor, first rejecting Plaintiff's choice of a current student, and then rejecting Plaintiff's choice of an attorney;

x.  Defendants improperly stated Plaintiff was not entitled to an advisor during a meeting to discuss his Title IX appeal, in direct contravention to federal regulations;

y.  Defendants withheld the identities of the Appeals Committee and did not provide Plaintiff any opportunity to object to their participation for bias or conflict; and

z.  Defendants summarily rejected Plaintiff's appeal without rationale or explanation.

286.  Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous findings and/or the decision to impose unduly harsh discipline upon Plaintiff.  These circumstances include, by way of example and not limitation:

a.  The pressure imposed by OCR and the DCL to aggressively pursue complaints of sexual harassment and assault by or on behalf of female students against male respondents, or else risk the loss of federal funding;

b.  Dordt's blatant incorporation of gender stereotypes into its policies, including the very definitions of abuse, which repeatedly and expressly designate victims as female and assailants as male;

c.  Dordt's blatant incorporation of gender stereotypes into its policies, wherein statistics and resources are specifically geared towards female victims, and no similar provisions are made for male victims;

d.  Dordt faculty's statements that sexual assault occurs when male students "schmooze" female students;

69

e.  Dordt's patent embrace of gender-normative behavior and gender-based sexual roles, including the prohibition of homosexuality and transgenderism, and, on information and belief, the reinforcement of complementarianism;

f.  Dordt's prosecution of Plaintiff and its refusal to investigate Roe for engaging in identical behavior – consuming alcohol and having sex with another student who consumed alcohol;

g.  Defendants' reliance on gender stereotypes in reaching the Finding of responsibility, placing all responsibility for gaining consent to sexual activity on the male student, despite evidence that Roe initiated the activity and that both parties were drunk;

h.  Defendants' reliance on gender stereotypes in reaching the Finding of responsibility, wherein the Decision Letter repeatedly referred to Roe as "the female" rather than "complainant," and stated that Plaintiff was responsible because he was "aware of the female's condition;"

i.  Defendants' insistence on interrogating Plaintiff, the male accused, without notice or an advisor, whereas, on information and belief, Roe was permitted advisors throughout the process;

j.  Defendants' withholding of all evidence and all information regarding investigatory steps from Plaintiff, whereas, on information and belief, Roe was provided access to such information;[9]

---

[9] Dordt's relevant policy states, "[t]he complainant will be kept informed about the progress of the investigation."

k.  Defendant's presumption that Roe's claims were true, as evidenced by the summary information in the Decision Letter, wherein Roe's claims were stated as fact and Plaintiff's statements were referred to as "claims;" and

l.  Defendants' swift and summary actions to hold Plaintiff responsible and punish him to the utmost, while completely and entirely refusing to address Roe's own violations of the Policy.

287.  On information and belief, Dordt's mishandling of Roe's complaint was informed by institutional, systemic gender bias, as well as external pressure from the United States Department of Education, under a threat of rescission of federal funds.

288.  On information and belief, Dordt is in possession of disciplinary records and statistics that show disproportionate enforcement of the conduct policy against male students.

289.  Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

290.  This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including, without limitation, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

291.  As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Dordt to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's dismissal from his educational file; (iv) permanently destroy any record of Jane Roe's complaint;

(v) award Plaintiff's degree retroactively to June 2018;[10] (vi) remove the notation on Plaintiff's transcript indicating incompletion of his final semester courses, and update all relevant records to reflect a degree conferral date of June 2018; and (vii) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.**
**Selective Enforcement**
**(Against Defendant Dordt University)**

292.    Plaintiff John Doe repeats and realleges each and every allegation above as if fully set forth herein.

293.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

294.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Dordt University.

295.    Title IX is enforceable through a private right of action.

296.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

---

[10]  As of the date of this submission, Plaintiff has completed his degree requirements.

72

297. The "prompt and equitable" procedures that a school must implement include, at a minimum: "Notice . . . of the procedure, including where complaints may be filed; Application of the procedure to complaints alleging harassment . . .; Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; Designated and reasonably prompt timeframes for the major stages of the complaint process; Notice to the parties of the outcome of the complaint; and [a]n assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects . . . ." Dep't of Ed., Office for Civ. Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20.

298. According to the 2001 Guidance, schools are obligated under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'" *Id.* at 21.

299. To succeed on a selective enforcement claim, a plaintiff must demonstrate that gender was a motivating factor in the decision to initiate a disciplinary action and/or the severity of the punishment.

300. Selective enforcement occurred in this case because Plaintiff's gender was a motivating factor in both Dordt's decision to initiate proceedings and in the implementation of the unduly harsh sanction of dismissal just weeks before Plaintiff was set to graduate.

301. Plaintiff and Roe were similarly situated in that both students admitted to consuming a similar amount of alcohol and having intercourse on the night in question.

302. Dordt selectively enforced its policies as between similarly situated male and female students. By way of example and not limitation:

a. Dordt's own policies state that "Dordt College may proceed with disciplinary action even if the alleged complainant chooses not to participate or continue in the process." The 2017 Q&A likewise directs that Dordt is obligated to investigate all potential incidents of sexual misconduct, regardless of whether the reporting student wishes to pursue a formal complaint. Thus, if Dordt believed consent to be an issue with respect to Plaintiff and Roe, Dordt was obligated to investigate whether *either* party committed a policy violation. Instead, Dordt solely initiated proceedings against Plaintiff for Plaintiff and Roe's mutual sexual activity. Dordt also declined to investigate or prosecute Roe despite Plaintiff's statements to Dordt's Title IX employees that while Plaintiff was intoxicated, Roe repeatedly stuck her hand down his pants without prior consent.

b. Despite the fact that Plaintiff and Roe both consumed similar amounts of alcohol, and despite the fact that Roe initiated sexual activity, and despite the fact that Roe verbally consented to intercourse, Defendants held Plaintiff responsible for gaining Roe's consent, ignoring the facts of the case and instead relying on gender stereotypes.

c. Throughout the proceedings, Roe's consumption of alcohol was treated as a factor negating her consent, whereas Plaintiff's consumption of alcohol was not even acknowledged.

d. Roe was presumed credible from the start and Plaintiff was presumed guilty from the start, as evidenced by Taylor and Buteyn's pointed questions to Plaintiff about whether he had "tried this before," as well as the Decision Letter stating Roe's allegations as fact, but referring to Plaintiff's statements as "claims."

74

e. On information and belief, Dordt does not pursue disciplinary actions against female students for violations of the alcohol and sexual conduct policies with the same frequency and fervor as it does for male students with respect to the same violations; and

f. On information and belief, female students accused of/found responsible for violations of the alcohol and sexual conduct policies are given fewer and less harsh sanctions than male students accused of/found responsible for the same or substantially similar violations.

303. Dordt also imposed an unduly harsh sanction, which was motivated by Plaintiff's gender.

304. As Dordt University President, Erik Hoekstra, stated, "There is no place on a Christian college campus for sexual assault. . . . We take sexual assault very seriously at Dordt." In addition, Dordt's policies make clear that Dordt views females as victims of sexual assault and males as perpetrators of sexual assault, and seeks to utilize the disciplinary process to protect its female students. Taken together, this means that Dordt imposes a particularly harsh penalty on violations which it believes are exclusively committed by males, resulting in undue punishment based on gender.

305. According to the Student Handbook, Dordt has four levels of discipline, and there are no specific sanctions required for specific policy violations. (Handbook at 64–66). However, Dordt provided no rationale for the imposition of the extremely harsh sanction of immediate dismissal, which was imposed *before* Plaintiff's appeal was decided—in other words, before the finding was even final—and which functionally guaranteed that Plaintiff would not graduate on time, even if he subsequently won his appeal.

a. Dordt's absolute lack of urgency in deciding Plaintiff's appeal further evidences Dordt's sham process, whereby Dordt had no intention of giving Plaintiff's appeal a genuine and substantive review, and clearly intended to rubber-stamp the decision from the start.

306. Particular circumstances suggest that gender bias was a motivating factor behind Dordt's selective enforcement of its policies. These circumstances include, by way of example and not limitation:

a. The pressure imposed by OCR and the DCL to aggressively pursue complaints of sexual harassment and assault by or on behalf of female students against male respondents, or else risk the loss of federal funding;

b. Dordt's blatant incorporation of gender stereotypes into its policies, including the very definitions of abuse, which repeatedly and expressly designate victims as female and assailants as male;

c. Dordt's blatant incorporation of gender stereotypes into its policies, wherein statistics and resources are specifically geared towards female victims, and no similar provisions are made for male victims;

d. Dordt faculty's statements that sexual assault occurs when male students "schmooze" female students;

e. Dordt's patent embrace of gender-normative behavior and gender-based sexual roles, including the prohibition of homosexuality and transgenderism, and, on information and belief, the reinforcement of complementarianism;

76

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 76 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 76 of 96

f.  Dordt's prosecution of Plaintiff and its refusal to investigate Roe for engaging in identical behavior – consuming alcohol and having sex with another student who consumed alcohol;

g.  Defendants' reliance on gender stereotypes in reaching the Finding of responsibility, placing all responsibility for gaining consent to sexual activity on the male student, despite evidence that Roe initiated the activity and that both parties were drunk;

h.  Defendants' reliance on gender stereotypes in reaching the Finding of responsibility, wherein the Decision Letter repeatedly referred to Roe as "the female" rather than "complainant," and stated that Plaintiff was "aware of the female's condition;"

i.  Defendants' insistence on interrogating Plaintiff, the male accused, without notice or an advisor, whereas, on information and belief, Roe was permitted advisors throughout the process;

j.  Defendants' withholding of all evidence and all information regarding investigatory steps from Plaintiff, whereas, on information and belief, Roe was provided access to such information;[11]

k.  Defendant's presumption that Roe's claims were true, as evidenced by the summary information in the Decision Letter, wherein Roe's claims were stated as fact and Plaintiff's statements were referred to as "claims;"

---

[11] Dordt's relevant policy states, "[t]he complainant will be kept informed about the progress of the investigation."

77

l. Defendants' swift and summary actions to hold Plaintiff responsible and punish him to the utmost, while completely and entirely refusing to address Roe's own violation of the Policy;

307. Based on the foregoing, Dordt selectively enforced its policies based upon gender, in violation of Title IX.

308. This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including, without limitation, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

309. As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Dordt to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's dismissal from his educational file; (iv) permanently destroy any record of Jane Roe's complaint; (v) award Plaintiff's degree retroactively to June 2018; (vi) remove the notation on Plaintiff's transcript indicating incompletion of his final semester courses, and update all relevant records to reflect a degree conferral date of June 2018; and (vii) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

## AS AND FOR A THIRD CAUSE OF ACTION
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.**
**Retaliation**
**(Against Defendant Dordt University)**

310. Plaintiff John Doe repeats and realleges each and every allegation above as if fully set forth herein.

78

311. Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

312. Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Dordt University.

313. Title IX is enforceable through a private right of action.

314. As the Supreme Court has made clear, "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). "Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel." *Id.* at 180.

315. Filing a lawsuit for Title IX violations is considered a protected activity under Title IX. *See Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1113 (S.D. Cal. 2012) *aff'd,* 768 F.3d 843 (9th Cir. 2014).

316. In the instant case, Plaintiff John Doe, during his Title IX disciplinary process, hired an attorney and communicated to Dordt that he planned to pursue legal action against Dordt. Wilson confirmed this conversation in the same May 5, 2018 email wherein Wilson wrongly asserted that Plaintiff was not entitled to his attorney advisor during the Title IX process.

317. Plaintiff's conversation with Wilson about his intended litigation against Dordt took place in the context of, and in conjunction with, Plaintiff's Appeal, which expressly stated that Dordt University violated Title IX throughout the disciplinary process.

79

318.    Therefore, Dordt University was on notice that Plaintiff intended to pursue legal action against Dordt for gender discrimination under Title IX.

319.    When Plaintiff sought readmission to Dordt University, Defendants expressly, directly, repeatedly, and unequivocally tied Plaintiff's readmission to his decision to pursue legal action against Dordt University for Title IX violations.

320.    When Plaintiff refused to relinquish his right to sue Dordt, Dordt retaliated by severely limiting his readmission, which forced Plaintiff to expel additional sums of money and forfeit a considerable portion of his $8,000+ tuition credit.

321.    This unlawful retaliation in violation of Title IX caused Plaintiff to sustain economic injuries and other direct and consequential damages.

322.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.


## AS AND FOR A FOURTH CAUSE OF ACTION
### Common Law Due Process: Fundamental Fairness in School Disciplinary Proceedings
### (Against Defendant Dordt University)

323.    Plaintiff John Doe repeats and realleges each and every allegation above as if fully set forth herein.

324.    Iowa state courts, and the United States Court of Appeals for the Eight Circuit, recognize that private school students facing disciplinary actions, up to and including expulsion, are entitled to a disciplinary process that: (i) adheres to the school's established standards, *and* (ii) is not arbitrary, unreasonable, or conducted in bad faith.    *See Harvey v. Palmer Coll. of Chiropractic*, 363 N.W.2d 443, 444 (Iowa Ct. App. 1984) ("'The requirements imposed by the common law on private universities parallel those imposed by the due process clause on public

80

universities.' . . . It is clear . . . that a private university may not expel a student arbitrarily, unreasonably, or in bad faith." (citations omitted)); *see also Warren v. Drake Univ.*, 886 F.2d 200, 202 (8th Cir. 1989) (citing *Harvey*).

325. In the instant case, Dordt's disciplinary process failed to conform to its established procedures and was patently arbitrary, unreasonable, and conducted in bad faith.

326. As described in Section III, *supra*, Dordt violated numerous substantive and procedural provisions of its policies in investigating and adjudicating Roe's claims against Plaintiff, as well as failing to investigate or adjudicate Plaintiff's claims against Roe.

327. Moreover, Dordt entirely failed to provide Plaintiff with the "due process" and "fair treatment" it specifically promised in the Student Handbook. By way of example, and not limitation, Dordt:

    a. failed to provide Plaintiff timely notice (or any notice) of the specific allegations against him;

    b. failed to provide Plaintiff advance notice of his first investigative interview, instead physically detaining Plaintiff while he was engaged in TA work;

    c. failed to advise Plaintiff that he was entitled to an advisor of his choosing at all stages in the process, including informal meetings;

    d. denied Plaintiff's choice of advisor, twice, without proper basis or explanation;

    e. on information and belief, failed to conduct a thorough and impartial investigation, including failing to seek/review exculpatory evidence, and failing to follow-up on Plaintiff's disclosure that certain witnesses may have been biased and/or blackmailed by other witnesses on Roe's behalf;

f.   failed to provide Plaintiff sufficient advance notice of an adjudicatory hearing to prepare his defense;

g.   failed to apprise Plaintiff of the existence of an Investigation Report;

h.   failed to provide Plaintiff access to information gathered by investigators and relied upon by Defendant Wilson in adjudicating the claims against him;

i.   withheld *all* evidence and witness identities from Plaintiff;

j.   withheld the identity of the Student Life Committee before the hearing, and utilized a biased/conflicted Committee member;

k.   failed to provide Plaintiff a meaningful opportunity to be heard before a neutral arbiter, as Wilson had plainly drafted the Decision Letter prior to Plaintiff's "hearing";

l.   failed to provide Plaintiff a meaningful opportunity to be heard, as he was not permitted to question (or submit questions for) his accuser or to call any witnesses at his hearing;

m.   failed to provide Plaintiff a meaningful opportunity to be heard, as Defendant Wilson plainly stated in writing that he personally made all decisions as to the finding and sanction based upon his personal judgment, rather than the Student Life Committee based upon a preponderance of the evidence, rendering the entire "hearing" process nothing but a sham intended to deceive Plaintiff;

n.   applied blatant gender stereotypes in deciding to prosecute and find Plaintiff responsible, including the presumption that male students are responsible for gaining consent of female students, even where the female student in this case initiated the sexual activity;

82

Case 5:19-cv-04082-CJW-KEM   Document 1   Filed 12/05/19   Page 82 of 94
Case 5:19-cv-04082-CJW-KEM   Document 49-2   Filed 03/18/22   Page 82 of 96

o. applied blatant gender stereotypes in determining that Roe's consumption of alcohol resulted in her incapacity to consent, whereas Plaintiff's consumption of alcohol was ignored;

p. imposed an unduly harsh sanction that was not tailored to the needs of the case;

q. imposed the sanction of dismissal before Plaintiff's appeal was decided, improperly separating Plaintiff from his education and preventing his timely graduation before the sanction was final;

r. improperly delayed Plaintiff's appeal for nearly a month, guaranteeing that Plaintiff would not complete his final courses and graduate on time;

s. misinformed Plaintiff about the Appeals process, whereby Defendant Wilson improperly interfered with the entire process;

t. routinely and deliberately misinformed Plaintiff of his rights throughout the process and attempted to delay, derail, and dismiss Plaintiff's appeal;

u. failed to apprise Plaintiff of the identities of the Student Appeals Committee, or provide any opportunity for Plaintiff to object on the basis of conflict or bias; and

v. rubber-stamped Wilson's initial Decision and Sanction, summarily denying Plaintiff's well-founded appeal without providing any support or explanation.

328. Defendants' overwhelming failure to conduct a thorough, fair, and impartial investigation and adjudication of the claims against Plaintiff resulted in a Decision and Sanction that were arbitrary, unreasonable, imposed in bad faith, not in compliance with Dordt's published policies, and ultimately deprived Plaintiff of due process to which he was entitled both by common law and by Dordt's own express promises.

83

329.    Plaintiff has an undeniably strong interest in his disciplinary and educational files, and the timely conferral of his undergraduate degree.

330.    Defendants' arbitrary, unreasonable, unfair and inappropriate actions caused Plaintiff to sustain substantial injury, damage, and loss, including, without limitation, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

331.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Dordt to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's dismissal from his educational file; (iv) permanently destroy any record of Jane Roe's complaint; (v) award Plaintiff's degree retroactively to June 2018; (vi) remove the notation on Plaintiff's transcript indicating incompletion of his final semester courses, and update all relevant records to reflect a degree conferral date of June 2018; and (vii) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Breach of Contract
### (Against Defendant Dordt University)

332.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

84

333. Through the documents it publishes and provides to students, Dordt makes express contractual commitments to students involved in the disciplinary process and/or the reporting of potential violations of the student code of conduct.

334. At all times relevant hereto, a contractual relationship existed between Dordt University and Plaintiff by virtue of Plaintiff's enrollment at Dordt and as defined by and through Dordt's policies and procedures governing the student disciplinary system, as set forth in the Student Handbook and Dordt's other policy statements, including Dordt's Clery Report.

335. Dordt's Handbook recognizes this relationship, stating, "Students are entitled to all the rights and protections enjoyed by members of the Dordt community and are subject to obligations by virtue of this membership." (Handbook at 51).

336. Iowa law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of the Student Handbook and other policies become part of that contract. *See generally Warren v. Drake Univ.*, 886 F.2d 200 (8th Cir. 1989).

337. Iowa law also recognizes an implied covenant of good faith and fair dealing in all contracts. *See Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 730 (Iowa 2014).

338. Based on the aforementioned facts and circumstances, Dordt created express and implied contracts when it offered, and Plaintiff accepted, admission to Dordt, and when Plaintiff paid the required tuition and fees.

339. Throughout the Title IX process in this case, Defendants breached their contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Handbook, as well as other policies published by Dordt.

340.     Dordt breached its agreement(s) with Plaintiff throughout the course of its investigation and adjudication of Jane Roe's complaint against Plaintiff.  By way of example and not limitation:

a.   Dordt failed to inform Plaintiff of the clear steps and procedures for his disciplinary process;

b.   Dordt failed to inform Plaintiff that he had a right to an advocate/advisor before submitting to his initial interview with Buteyn and Taylor;

c.   Dordt denied Plaintiff his choice of advisor, twice;

d.   Dordt withheld from Plaintiff all information and evidence to be presented at the hearing;

e.   Dordt directed Plaintiff to file his notice of appeal with the Title IX coordinator within seven days of the Decision;

f.   Dordt permitted the Title IX coordinator to review his own "process and decision and determine whether further review is warranted;"

g.   Dordt required Plaintiff to jump through hoops in order to have his appeal heard, and refused to forward Plaintiff's appeal to the Appeals Committee until Defendant Wilson determined to do so;

h.   Dordt permitted the Title IX coordinator to insert himself into the Appeals Committee;

i.   Dordt imposed arbitrary deadlines for submission of Plaintiff's appeal;

j.   Dordt deprived Plaintiff of due process and "fair treatment;"

k.   Dordt discriminated against Plaintiff based on his gender; and

86

l. Dordt permitted the Title IX coordinator, instead of the Student Life Committee, to determine Plaintiff's responsibility and assign his sanction.

341. In addition, Dordt breached the implied covenant of good faith and fair dealing by:

a. consistently keeping Plaintiff in the dark as to the allegations and evidence against him, as well as Dordt's procedures for investigating and adjudicating his case;

b. providing Plaintiff with conflicting and contradictory information about the appeals process;

c. giving Plaintiff little to no notice of mandatory meetings and hearings;

d. imposing the sanction of dismissal while the appeal was pending and therefore before the outcome was final, knowing that Plaintiff was a second-semester senior, just weeks away from completing his coursework and earning his degree, and that such a sanction would guarantee that Plaintiff would not graduate on time, even if the finding was subsequently overturned;

e. repeatedly attempting to derail Plaintiff's appeal, and unnecessarily delaying Plaintiff's appeal until after the close of the semester, guaranteeing that Plaintiff would not graduate on time regardless of the outcome of the appeal;

f. repeatedly denying Plaintiff his choice of advisor; and

g. taking on a hostile and adversarial tone and intentionally skewing all conversations and decisions against Plaintiff's interest.

342. Taken together, Dordt's actions and inactions constitute not only breach of the contract with Plaintiff, but also breach of the covenant of good faith and fair dealing implied in such contract(s).

343. As a result of the direct and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, without limitation, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

344. Plaintiff attempted to remediate these damages through his repeated pleas to Dordt to overturn the faulty Finding and undue Sanction.

345. Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**<u>AS AND FOR A SIXTH CAUSE OF ACTION</u>**
**Breach of Implied Contract/Quasi Contract**
**(Against Defendant Dordt University)**

346. Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

347. Plaintiff paid Dordt sums of money for his education, and in return, Dordt was to provide Plaintiff with access to its undergraduate degree program and the issuance of his degree upon the completion of his studies.

348. Plaintiff's enrollment in, and attendance of, classes at Dordt created in Plaintiff an expectation that he would be allowed to continue his course of study until he earned his degree from Dordt, provided that he maintained satisfactory grades and complied with Dordt's rules and policies.

349. Accordingly, an implied or quasi-contractual relationship existed between Plaintiff and Dordt under which each party owed the other certain duties.

350. Under the implied/quasi-contract between Plaintiff and Dordt, Dordt had a duty not to dismiss or otherwise discipline Plaintiff arbitrarily, capriciously, maliciously, discriminatorily,

88

in bad faith or in violation of its posted policies and procedures.

351.    As set forth in detail above, Dordt breached its obligations to Plaintiff.

352.    As a direct and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, without limitation, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

353.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.


## AS AND FOR A SEVENTH CAUSE OF ACTION
### Negligence
**(Against Defendants Dordt University, Wilson, Taylor, Buteyn, and Olson)**

354.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

355.    To state a negligence claim, a plaintiff must show that the defendant owed the plaintiff a duty; that the defendant breached such a duty; and that the breach was the proximate cause of the injury.

356.    Here, the Defendants formed a university-student relationship with Plaintiff and, in light of their participation in the Title IX process and the express provisions of Dordt's policies, as well as federal laws, regulations, and guidelines, Defendants owed Plaintiff a duty to conduct the disciplinary process with due care, to perform a thorough, impartial investigation/adjudication free from bias or conflict, to have proper training in investigating and evaluating claims of sexual misconduct, and to address potential sexual misconduct committed against Plaintiff.

89

357.    In light of the relationship between Plaintiff and Dordt, and the individual Defendants' positions at Dordt, they had certain obligations with respect to the investigation and adjudication of Title IX complaints, including obligations owed to students, including Plaintiff, as to how they would treat students subject to a disciplinary procedure.

358.    The foregoing duties were breached when Plaintiff did not receive the full protection of the disciplinary process, and was subjected to a biased and prejudiced procedure, as described fully above.

359.    In light of Defendants' deliberate, bad-faith failure to conduct a genuine investigation, to apply the policies equally to Plaintiff and Roe, to provide Plaintiff with relevant materials, notice, and opportunity to be heard, and to impose an appropriate Sanction, Defendants' behavior was negligent.

360.    Defendants' actions display a rush to punish Plaintiff before he graduated, rather than a genuine, unbiased search for the truth, constituting bad faith and negligence in light of the severe and lasting harm resulting from their actions.

361.    As a result of Defendants' breach of their duties, Plaintiff suffered substantial harm in the form of delayed educational opportunities, lost or postponed career opportunities and wages, and reputational harm.

362.    As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

363.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Respondeat Superior
**(Against Defendants Dordt University and Dordt University Board of Trustees)**

364.    Plaintiff John Doe repeats and realleges each and every allegation above as if fully set forth herein.

365.    As the employer for Defendants Wilson, Taylor, Buteyn, and Olson, Dordt is vicariously responsible for the negligent acts of its employees committed during the course of their employment.

366.    The Dordt University Board of Trustees oversees the organization and governance of the University and is responsible for the overall operation of the University.  Accordingly, the Board is responsible for the negligent operation of the University, including the negligent and wrongful investigation and adjudication of Title IX complaints.

367.    As detailed above, the enforcement and fair and impartial investigation and adjudication of student disciplinary matters are part of the regular employment duties of Defendants Wilson, Taylor, Buteyn, and Olson.

368.    As detailed above, Wilson, Taylor, Buteyn, and Olson breached their duty of care to Plaintiff in the course of their employment and ordinary duties at Dordt, specifically, with regard to their actions and inactions in selectively enforcing the Dordt's policies and subjecting Plaintiff to a biased, partial, defective, deficient, arbitrary and fundamentally unfair disciplinary process.

369.    As detailed above, the foreseeable, direct and proximate result of Wilson, Taylor, Buteyn, and Olson's intentional and/or negligent behavior was that Plaintiff sustained substantial injury, including, without limitation, loss of educational and career opportunities, reputational harm, economic injuries and other direct and consequential damages.

91

370.    As a result, Dordt University and the Board are liable to Plaintiff for the negligent acts and omissions of Defendants Wilson, Taylor, Buteyn, and Olson under the principle of respondeat superior.

371.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)    On the first cause of action for Violation of Title IX of the Education Amendments of 1972-erroneous outcome, a judgment against Dordt awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Dordt to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's dismissal from his educational file; (iv) permanently destroy any record of Jane Roe's complaint; (v) award Plaintiff's degree retroactively to June 2018; (vi) remove the notation on Plaintiff's transcript indicating incompletion of his final semester courses, and update all relevant records to reflect a degree conferral date of June 2018; and (vii) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

(ii)    On the second cause of action for Violation of Title IX of the Education Amendments of 1972-selective enforcement, a judgment against Dordt awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Dordt to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's dismissal from his educational file; (iv) permanently destroy any record of Jane Roe's complaint; (v) award Plaintiff's degree retroactively to June 2018; (vi) remove the notation on Plaintiff's transcript indicating incompletion of his final semester courses, and update all relevant records to reflect a degree conferral date of June 2018; and (vii) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

(iii)    On the third cause of action for Violation of Title IX of the Education Amendments of 1972-retaliation, a judgment against Dordt awarding Plaintiff damages in an

92

amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

(iv)   On the fourth cause of action for Common-law Due Process/Fundamental Fairness, a judgment against Dordt awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Dordt to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's dismissal from his educational file; (iv) permanently destroy any record of Jane Roe's complaint; (v) award Plaintiff's degree retroactively to June 2018; (vi) remove the notation on Plaintiff's transcript indicating incompletion of his final semester courses, and update all relevant records to reflect a degree conferral date of June 2018; and (vii) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

(v)    On the fifth cause of action for Breach of Contract, a judgment against Dordt awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)   On the sixth cause of action for Breach of Implied/Quasi-Contract, a judgment against Dordt awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)  On the seventh cause of action for Negligence, a judgment against Defendants Wilson, Taylor, Buteyn, and Olson, jointly and severally, in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(viii) On the eighth cause of action for Respondeat Superior, a judgment against Dordt and the Board of Trustees awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ix)   Equitable relief in the form of an order directing Defendants to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's dismissal from his educational file; (iv) permanently destroy any record of Jane Roe's complaint; (v) award Plaintiff's degree retroactively to June 2018; (vi) remove the notation on Plaintiff's transcript indicating incompletion of his final semester courses, and update all relevant records to reflect a degree conferral date of June 2018; and (vii) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(x)    Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff herein demands a trial by jury of all issues so triable in this matter.

Dated:    New York, New York
          December 4, 2019

                                        Respectfully submitted,

                                        BABICH GOLDMAN, P.C.

                                        By: /s/ David Goldman
                                        David H. Goldmna, Esq.
                                        501 SW 7th Street, Suite J
                                        Des Moines, Iowa 50309
                                        (515) 309-6850
                                        dgoldman@babichgoldman.com

                                        *and*

                                        NESENOFF & MILTENBERG, LLP

                                        By:/s/ Andrew T. Miltenberg
                                        Andrew T. Miltenberg, Esq.
                                        Stuart Bernstein, Esq.
                                        Adrienne Levy, Esq.
                                        (*Pro Hac Vice* motions forthcoming)
                                        363 Seventh Avenue, Fifth Floor
                                        New York, New York 10001
                                        (212) 736-4500
                                        amiltenberg@nmllplaw.com
                                        sbernstein@nmllplaw.com
                                        alevy@nmllplaw.com

94

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JOHN DOE

**DEFENDANTS**

DORDT UNIVERSITY f/k/a DORDT COLLEGE, et. al.
(see attached rider for full caption)

**(b)** County of Residence of First Listed Plaintiff   **Grant County, WA**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Sioux County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
NESENOFF & MILTENBERG, LLP
363 7TH AVENUE, 5TH FLOOR
NEW YORK, NEW YORK 10001

Attorneys *(If Known)*
BAIRD HOLM, LLP
1700 FARNAM STREET, SUITE 1500
OMAHA, NE 68102

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government
    Plaintiff

☒ 3 Federal Question
    *(U.S. Government Not a Party)*

☐ 2 U.S. Government
    Defendant

☐ 4 Diversity
    *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*     *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product      Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |      Liability    ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &      Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
|      & Enforcement of Judgment |      Slander      Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'      Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted |      Liability    ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and |
|      Student Loans | ☐ 340 Marine      Injury Product | | |      Corrupt Organizations |
|      (Excludes Veterans) | ☐ 345 Marine Product      Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment |      Liability    **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
|      of Veteran's Benefits | ☐ 350 Motor Vehicle    ☐ 370 Other Fraud | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) |      Protection Act |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle    ☐ 371 Truth in Lending |      Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract |      Product Liability    ☐ 380 Other Personal | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal      Property Damage | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) |      Exchange |
| ☐ 196 Franchise |      Injury    ☐ 385 Property Damage |      Leave Act | | ☐ 890 Other Statutory Actions |
| | ☐ 362 Personal Injury -      Product Liability | ☐ 790 Other Labor Litigation | | ☐ 891 Agricultural Acts |
| |      Medical Malpractice | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** |      Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights    **Habeas Corpus:** | |      or Defendant) |      Act |
| ☐ 220 Foreclosure | ☐ 441 Voting    ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment    ☐ 510 Motions to Vacate | |      26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 240 Torts to Land | ☐ 443 Housing/      Sentence | | |      Act/Review or Appeal of |
| ☐ 245 Tort Product Liability |      Accommodations    ☐ 530 General | | |      Agency Decision |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -    ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of |
| |      Employment    **Other:** | ☐ 462 Naturalization Application | |      State Statutes |
| | ☐ 446 Amer. w/Disabilities -    ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |      Other    ☐ 550 Civil Rights |      Actions | | |
| | ☒ 448 Education    ☐ 555 Prison Condition | | | |
| |      ☐ 560 Civil Detainee - | | | |
| |      Conditions of | | | |
| |      Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
    Proceeding

☐ 2 Removed from
    State Court

☐ 3 Remanded from
    Appellate Court

☐ 4 Reinstated or
    Reopened

☐ 5 Transferred from
    Another District
    *(specify)*

☐ 6 Multidistrict
    Litigation -
    Transfer

☐ 8 Multidistrict
    Litigation -
    Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
20 U.S.C. 1681 et. seq.
Brief description of cause:
Title IX and State Law Related claims brought against an educational institution

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE   12/4/19

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**
-----------------------------------------------------------------------X
**JOHN DOE,**                                                    :
                                                                 :     **Civil Action No:**
                      **Plaintiff,**                             :
                                                                 :
                                                                 :
           **-against-**                                         :
                                                                 :
                                                                 :     **JURY TRIAL DEMANDED**
**DORDT UNIVERSITY** f/k/a/ **DORDT COLLEGE**;                   :
**DORDT UNIVERSITY BOARD OF TRUSTEES**;                          :
**HOWARD WILSON**, individually and as agent for                 :
Dordt University; **ROBERT TAYLOR**, individually                :
and as agent for Dordt University; **DEREK BUTEYN**,             :
individually and as agent for Dordt University;                  :
and **ERIN OLSON**, individually and as agent for                :
Dordt University;                                                :
                                                                 :
                     **Defendants.**                             :
-----------------------------------------------------------------------X


**FULL CAPTION RIDER**