# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

JOHN DOE,

        Plaintiff,

vs.

DORDT UNIVERSITY f/k/a/ DORDT
COLLEGE; DORDT UNIVERSITY
BOARD OF TRUSTEES; HOWARD
WILSON, individually and as agent for
Dordt University; ROBERT TAYLOR,
individually and as agent for Dordt
University; DEREK BUTEYN,
individually and as agent for Dordt
University; and ERIN OLSON,
individually and as agent for Dordt
University,

        Defendants.

No. 19-CV-4082 CJW-KEM

**MEMORANDUM OPINION AND
ORDER**

———————————————

## TABLE OF CONTENTS

I.      BACKGROUND ............................................................................ 4

      A.    Parties and Title IX Investigation Participants ................................ 4

      B.    Dordt's Relevant Policies and Procedures ..................................... 5

      C.    Dordt's Title IX Investigation Process .......................................... 8

      D.    Relevant Guidance and Attitudes on Sexual Assault ........................10

      E.    Facts Underlying Doe's Title IX Investigation...............................12

F.     Title IX Investigation ............................................................13

G.    SLC Hearing and Findings ....................................................18

H.    Appeal..............................................................................22

I.     Readmission.......................................................................25

II.    SUMMARY JUDGMENT STANDARD .............................................26

III.   DISCUSSION.................................................................................29

A.    Title IX Gender Bias (Counts 1 & 2) .........................................30

      1.    Applicable Law ..........................................................30

      2.    Can plaintiff show he was disciplined because of his gender? .....31

            a.    Accuracy of Outcome.............................................32

            b.    Gender Bias as a Motivating Factor ...........................36

      3.    Can plaintiff show a similarly-situated female was treated more favorably? .................................................................42

      4.    Does the First Amendment Insulate Dordt University? ............46

B.    Title IX Retaliation (Count 3).................................................46

      1.    Applicable Law ..........................................................47

      2.    Can plaintiff show a protected activity?..............................48

      3.    Can plaintiff show a causal connection? ..............................51

2

C.      Common-Law Due Process (Count 4)..........................................55

      1.     Applicable Law ....................................................................55

      2.     Can plaintiff show Dordt failed to follow its procedures? ..........57

      3.     Can plaintiff show the disciplinary action against him was arbitrary, unreasonable, or in bad faith?..............................59

D.      Breach of Contract & Breach of Implied Contract (Counts 5 & 6) ........63

      1.     Applicable Law ....................................................................64

      2.     Can plaintiff show breach?...............................................65

      3.     Can plaintiff show damages? ............................................68

E.      Negligence & Respondeat Superior (Counts 7 & 8)..........................70

      1.     Applicable Law ....................................................................71

      2.     Can plaintiff show duty?...................................................71

      3.     Can plaintiff show breach?...............................................73

      4.     Can plaintiff show damages? ............................................79

IV.    CONCLUSION ...............................................................................80

This matter is before the Court on defendants' motion for summary judgment on plaintiff's complaint alleging Title IX violations based in gender bias and retaliation, violation of common-law due process, breach of contract, breach of implied contract/quasi contract, negligence, and vicarious responsibility for negligent acts via respondent superior.[1] (Doc. 49). Plaintiff filed a timely resistance and requested oral argument. (Doc. 58). Defendants filed a timely reply. (Doc. 67). On May 25, 2022, the Court heard argument on the motion. (Docs. 68 & 69). For the following reasons, the Court **grants in part and denies in part** defendants' motion for summary judgment.

## I.      BACKGROUND

The following facts are undisputed unless otherwise noted. The Court will consider additional facts as they become relevant to its analysis.

### A.      *Parties and Title IX Investigation Participants*

Plaintiff John Doe ("Doe") attended defendant Dordt University[2] ("Dordt") as a student from August 2014 to spring 2018. (Docs. 51-1, at 4; 58-1, at 1–2). Following a Tile IX investigation, Doe was dismissed from Dordt based on three policy violations. (Docs. 51-1, at 29; 58-1, at 77). He returned to Dordt in summer 2019. (Docs. 51-1, at 4; 58-1, at 1–2).

Dordt is a private, Christian liberal arts university located in Sioux Center, Iowa. (Docs. 51-1, at 4; 58-1, at 2). Dordt expects students to act in a way that shows their "commitment to the Biblical-Christian principles of life," at least some of which are memorialized as standards and policies in Dordt's Student Handbook. (Docs. 51-1, at 4;

---

[1] Plaintiff asserts his negligence claim against defendants Dordt University, Howard Wilson, Robert Taylor, Derek Buteyn, and Erin Olson. (Doc. 1, at 89). Plaintiff asserts his respondent superior claim against defendants Dordt University and Dordt University Board of Trustees. (*Id.*, at 91). Plaintiff asserts all other claims against defendant Dordt University only. (*See id.*).

[2] During all relevant times, Dordt University was known as Dordt College. (Docs. 51-1, at 1; 58-1, at 2).

58-1, at 2). Defendant Dordt University Board of Trustees (the "Board") oversees Dordt's organization and governance. (Docs. 51-1, at 4; 58-1, at 2). During all relevant times, the following Dordt employees, among others, participated in Dordt's Title IX proceedings: Howard Wilson, Vice President, Chief Administrative Officer, and Title IX Coordinator ("Coordinator Wilson"); Robert Taylor, Dean of Students ("Dean Taylor"); Derek Buteyn, Director of Residence Life ("Director Buteyn"), and; Erin Olson, Professor of Social Work and Chair of the Student Life Committee ("Chair Olson"). (Docs. 51-1, at 4–5; 58-1, at 3–4). Coordinator Wilson, Dean Taylor, Director Buteyn, and Chair Olson all received training regarding Title IX investigations from the Association of Title IX Administrators. (Docs. 51-1, at 11; 58-1, at 17).

Doe attended Dordt along with several students who ultimately became involved in his Title IX proceedings. These students included: Jane Roe, a female student whose sexual encounter with Doe became the foundation of his Title IX investigation and resulting discipline; J.B., a male student and Doe's roommate; A.D., a female student and Roe's roommate; S.S., a female student who reported to Dordt that Roe was sexually assaulted by Doe, and; L.P., a female student. (Docs. 51-1, at 5–6; 58-1, at 4–6; 61-5, at 4). Each of these students was interviewed as part of the investigation of the Title IX complaint against Doe. (Docs. 51-1, at 5–6; 58-1, at 4–6).

### B. Dordt's Relevant Policies and Procedures

During the times relevant to plaintiff's discipline, Dordt maintained a 2017–2018 student handbook ("Handbook") which contained several documents relevant to Doe's investigation and resulting discipline—specifically, Dordt's nondiscrimination policy, Dordt's sexual standards and conduct policy, Dordt's student code of conduct ("Student Code of Conduct"), and a section on reporting sexual assaults. (Docs. 51-1, at 6–7; 58-1, at 6–8). Each of these documents is generally written in gender-neutral terms, though plaintiff points out that some documents include both gender-neutral and gender-

specific terms.  (Docs. 51-1, at 6–7; 58-1, at 6–9).  Elsewhere, Dordt's materials appear to highlight the needs of female victims, such as referencing "female sexual assault nurse examiners" when discussing support options for victims of sexual misconduct.  (Docs. 58-2, at 16–17; 67-1, at 35).  Dordt's campus sexual assault/rape policy, found in Dordt's 2017–2018 annual security report ("Annual Security Report"), provides facts about female victims of sexual assault and rape, but not male victims.  (Docs. 58-2, at 10; 67-1, at 20–22).

Dordt's nondiscrimination policy states that Dordt is committed to nondiscrimination on the basis of gender.  (Docs. 51-1, at 6; 58-1, at 6).

Dordt's student code of conduct enumerated both misuse of alcoholic beverages and sexual misconduct as policy violations.  (Docs. 51-1, at 6–7; 58-1, at 8).  Any consumption of alcohol by a student under the age of 21 was a conduct violation.  (Docs. 58-2, at 16; 67-1, at 34).  But the Handbook also provided amnesty for an alcohol violation related to sexual misconduct for any student making a good faith report of sexual misconduct, whether the student made a complaint or was a witness.  (Docs. 58-2, at 16; 67-1, at 34; 60-3, at 39–40; 49-5, at 13).

The Handbook stated that "the only appropriate and permissible context in which sexual intimacy may be expressed as overt sexual activity is within the bonds of the marriage covenant between a man and a woman."  (Docs. 58-2, at 15; 67-1, at 32–33).  Thus, it prohibited any sexually immoral activity, extramarital sexual relations,[3] or homosexual relations.  (Docs. 58-2, at 15–16; 67-1, at 32–33).  The Handbook stated that it governed complaints of student-on-student sexual misconduct.  (Docs. 58-2, at 17; 67-1, at 35–36).  Director Buteyn stated he never personally imposed any sanction on a

---

[3] The parties do not dispute that extramarital relations include relations occurring before marriage, as discussed here.

Dordt student for consensual extramarital sexual conduct. (Docs. 58-2, at 16; 67-1, at 34).

The Student Code of Conduct's discussion of sexual assault includes a list of persons unable to consent, which includes (1) persons who are sleeping or unconscious; (2) persons who are incapacitated due to their consumption of alcohol and/or drugs, and (3) persons who are unable to communicate consent due to a physical or mental condition. (Docs. 51-1, at 6–7; 58-1, at 8–9; 60-3, at 71). Director Buteyn testified that consuming alcohol significantly impairs an individual's ability to give consent. (Docs. 58-2, at 22; 67-1, at 46). In determining whether a person is incapacitated, Dean Taylor and Chair Olson testified to several relevant factors including food consumption, intake of non-alcoholic fluids, timeline of consumption, and body weight. (Docs. 58-2, at 23; 67-1, at 47–49). Coordinator Wilson testified that, generally speaking, people who weigh more tend to have a higher alcohol tolerance than people who weigh less. (Docs. 58-2, at 24; 67-1, at 50). Dean Taylor further testified that Dordt's policies did not distinguish between inebriation, intoxication, and incapacitation. (Docs. 58-2, at 23; 67-1, at 48).

According to Coordinator Wilson and Dean Taylor, it was the responsibility of each student involved in a sexual encounter to ensure the other one consented. (Docs. 58-2, at 22; 67-1, at 33). The parties agree that a person's regret of a sexual encounter after the fact is not evidence of, nor inherently indicative of, nonconsent during the sexual activity itself. (Docs. 58-2, at 25–26; 67-1, at 53).

The Student Code of Conduct describes the four levels of discipline which can result from code violations. (Docs. 51-1, at 7; 58-1, at 10). Conduct that is willful or intentional, or repeated, is considered more serious. (Docs. 51-1, at 8; 58-1, at 10). The highest level of discipline is a Level IV sanction, which is administered by the Student Life Committee ("SLC"). (Docs. 51-1, at 8; 58-1, at 10). The Appeals Committee ("Appeals Committee) hears appeals of the SLC's Level IV sanctions. (Docs. 51-1, at

7

8; 58-1, at 10). Decision makers cannot review their own decisions on appeal. (Docs. 58-2, at 59; 67-1, at 123). Dordt's appeal policy makes no distinction for appeals based on sexual assault or Title IX matters. (Docs. 58-2, at 59; 67-1, at 123).

### C. Dordt's Title IX Investigation Process

Dordt's Title IX investigation process is outlined in its potential sexual or gender-based discrimination, harassment, and/or violence report form ("Report Form"). (Docs. 51-1, at 9; 58-1, at 13). The Report Form is written in gender-neutral terms, (Docs. 51-1, at 9; 58-1, at 14), and states that following the issuance of Dordt's final written decision, both parties have a right to appeal. (Docs. 51-1, at 9; 58-1, at 14). The appeal process is enumerated in the Student Handbook. (Docs. 58-2, at 59; 67-1, at 38–39).

The rights of the accused in a Title IX investigation are enumerated in the Annual Security Report, which states:

> The college will inform the accused of the institution's disciplinary process.
> The college will provide the accused with a written statement of charges.
> The college will inform the accused that they may present witnesses and material evidence relevant to the case.
> The college will inform the accused that they may request an advocate on their behalf. Such an advocate must be a member of the college community and may assist the student in presenting information but is not used in a role to defend the accused.
> To the best of its ability, the college will provide the accused, in advance of the hearing, with all information to be presented at the hearing.
> The college will inform the accused in writing of the outcome of an institutional disciplinary proceeding, including the outcome of any appeal.
> The college will inform the accused of available services including but not limited to: access to services from the counseling office, voluntary residence hall relocation when available, and consultation with an administrator regarding academic support services and referrals to community resources when appropriate.

(Docs. 51-1, at 9–10; 58-1, at 16–17; 49-6, at 10).

8

Upon receipt of a Title IX complaint, Coordinator Wilson determines whether an investigation is warranted; if so, he initiates the investigation. (Docs. 51-1, at 11; 58-1, at 18). As Title IX Coordinator, Coordinator Wilson is responsible for ensuring that Dordt complied with all federal laws, regulations, and guidelines with respect to its Title IX/sexual misconduct process, including ensuring that the investigators are aware of applicable laws, rules, and regulations. (Docs. 58-2, at 30; 67-1, at 62). Coordinator Wilson is also obligated to remain impartial and unbiased in the Title IX disciplinary process, including when determining whether a policy violation occurred. (Docs. 58-2, at 33; 67-1, at 68).

Each respondent is presumed innocent unless and until a Title IX violation is proven. (Docs. 58-2, at 45; 67-1, at 97). All Title IX investigators must remain impartial and gather relevant evidence to put in their ultimate report. (Docs. 51-1, at 11; 58-1, at 18). Accordingly, investigators were obligated to actively seek out exculpatory evidence, including evidence from relevant text messages, social media messages, or phone records. (Docs. 58-2, at 33; 67-1, at 67–68). Chair Olson testified that, as a Title IX investigator, it was her duty to abide by Dordt's policies and procedures. (Docs. 58-2, at 32; 67-1, at 67).

Dordt did not have a set policy or practice for arranging interviews pertaining to Title IX investigations or providing notice thereof. (Docs. 51-1, at 12; 58-1, at 19). Investigators' notes on interviews were to be typed on a laptop and taken as close to verbatim as possible. (Docs. 51-1, at 11; 58-1, at 19). Dordt's procedure dictates that, at the end of the investigation, investigators generate an investigative summary report ("Investigative Summary" or "Summary")[4] and send it to Coordinator Wilson. (Docs.

---

[4] The Court notes the terms "investigative summary" and "investigative report," used by the parties, appear to refer to the same document produced by Chair Olson and Dean Taylor at the end of their Title IX investigation of Doe. The Court uses the term "Investigative Summary," as the document identifies itself as such. (*See* Doc. 51-6, at 6).

51-1, at 12; 58-1, at 20). Coordinator Wilson and Chair Olson gave conflicting testimony as to how often the Title IX Coordinator and an investigator would be in contact during the investigatory process. (Docs. 58-2, at 29; 67-1, at 61).

Dean Taylor testified he could not recall whether every Title IX matter resulted in an SLC hearing. (Docs. 58-2, at 29; 67-1, at 60). He and Coordinator Wilson each stated that there was no standard for what documents a respondent would be provided. (Docs. 58-2, at 29; 67-1, at 60, 62).

### D.    Relevant Guidance and Attitudes on Sexual Assault

In April 2011, the Department of Education's Office for Civil Rights ("OCR") issued the 2011 Dear Colleague Letter ("2011 DCL"), a guidance letter for college and universities in receipt of federal funding. (Docs. 58-2, at 1–2; 67-1, at 1). Dordt had received federal funding, including a $197,172 grant from the U.S. Department of Justice to fund the Safe Campus project, a school-wide effort to "educate the campus about violence against women." (Docs. 58-2, at 13; 67-1, at 29).

The 2011 DCL advised recipients that sexual violence constitutes sexual harassment within Title IX and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects" when student-on-student harassment creates a hostile environment. (Docs. 58-2, at 2, 67-1, at 2). The 2011 DCL provided that "a single instance of rape is sufficiently severe to create a hostile environment." (Doc. 60, at 4).

In April 2014, the OCR issued additional directives to college and universities in the form of a guidance document titled Questions and Answers on Title IX and Sexual Violence ("2014 Q&A"). (Docs. 58-2, at 3; 67-1, at 5). Later that month, the White House issued a report titled "Not Alone," which warned that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." (Docs. 58-2, at 4; 67-1, at 7).

Coordinator Wilson testified that he volunteered for the role of Dordt's Title IX Coordinator in approximately 2015 or 2016 because he believed "Dordt needed to have more proactive action on Title IX." (Docs. 58-2, at 32; 67-1, at 19; 61, at 13–14).

In February 2017, Coordinator Wilson was quoted in an article about rape culture at Christian colleges as stating, with respect to Dordt: "We don't believe [rape culture] exists on our campus . . .. It's just not who we are." (Docs. 58-2, at 12; 67-1, at 27).

In May 2017, several Dordt employees discussed sexual assault on college campuses in an article published by the Diamond, Dordt's school newspaper, in which they focused on examples of female victims. (Docs. 58-2, at 12; 67-1, at 26). Chair Olson referred to rape culture as an environment "where rape is the norm or the language we use to talk about sex or women." (Docs. 58-2, at 12; 67-1, at 27). Chair Olson also opined that sexual assault at Dordt "is happening more often than it is reported." (Docs. 58-2, at 13; 67-1, at 29). Notably, the article mentioned that Coordinator Wilson's February 2017 comments that rape culture does not exist at Dordt "may have caused some raised eyebrows among part of the Dordt community." (Docs. 58-2, at 13; 67-1, at 28). The article also highlighted "a student research project" from a prior year that found "38.9 percent of women surveyed at northwest Iowa colleges reported that they had experienced sexual harassment either on campus or at some point in their lives." (Docs. 58-2, at 13; 67-1, at 29).

In September 2017, the OCR rescinded the 2011 DCL and the 2014 Q&A and put in place interim guidance on how schools should address sexual misconduct in compliance with Title IX regulations ("the 2017 Q&A"). (Docs. 58-2, at 6; 67-1, at 11). The same month, then-Secretary of Education Betsy DeVos gave a speech on Title IX enforcement in which she characterized the previous administration's guidance as "fail[ing] too many students," including both alleged perpetrators and victims. (Docs. 58-2, at 6; 67-1, at 11–12; 60-1, at 73).

11

In October 2017, several Dordt officials discussed sexual assault and related policies in another Diamond article. (Docs. 58-2, at 6; 67-1, at 16–17). Dordt President Erik Hoekstra ("President Hoekstra") was quoted as stating: "There is no place on a Christian college campus for sexual assault. . . . [Dordt's] policy is going to be, first of all, biblical, and second legal. We take sexual assault very seriously at Dordt." (Docs. 58-2, at 8; 67-1, at 17). Dordt Associate Provost and Title IX investigator Leah Zuidema ("Provost Zuidema") was also quoted in support of the 2017 Q&A placing "additional emphasis on due process" on both sides of the investigation. (Docs. 58-2, at 9; 67-1, at 17–18).

Sometime during 2017, a Dordt student club organized a viewing of the movie "The Hunting Ground," which criticizes American universities' response to allegations of sexual assault and approximates that one in five female college students will be the victim of rape. (Docs. 58-2, at 14; 67-1, at 31).

### E.    Facts Underlying Doe's Title IX Investigation

On the night of February 2, 2018, Roe and A.D. met Doe at a concert. (Docs. 51-1, at 13; 58-1, at 22). After leaving the concert, A.D. drove Doe to Walmart, where he purchased a bottle of vodka; A.D. then drove to Doe and J.B.'s apartment, where Roe later met them. (Docs. 51-1, at 13; 58-1, at 22–23). There, Doe, Roe, and A.D. consumed the vodka Doe had purchased. (Docs. 51-1, at 13; 58-1, at 23–24). Roe drank multiple drinks mixed with vodka. (Docs. 51-1, at 13; 58-1, at 24). According to a police report, Roe was five feet six inches tall and weighed 145 pounds, while Doe was six feet tall and weighed 135 pounds; thus, Roe's body mass index was approximately five points higher than Doe's. (Docs. 58-2, at 34; 67-1, at 70–71).

At some point, Doe walked A.D. back to her dorm while Roe stayed in the apartment with J.B. and watched television. (Docs. 51-1, at 13; 58-1, at 26). When Doe returned, he joined Roe and J.B. on the couch. (Docs. 51-1, at 14; 58-1, at 26). Roe

tried to reach into Doe's pants under the blanket, but he pushed her hands away. (Docs. 51-1, at 14; 58-1, at 28). Doe soon walked Roe home, although A.D. was concerned about this arrangement as she knew Roe had been drinking. (Docs. 51-1, at 14–15; 58-1, at 30). Roe stated that she told Doe that she did not want him driving her home because she "thought he was just as drunk as she was." (Docs. 58-2, at 36; 67-1, at 75).

Doe and Roe then began kissing outside Doe and J.B.'s apartment. (Docs. 51-1, at 15; 58-1, at 30–31). Doe noticed Roe stumble outside of the dorm building. (Docs. 51-1, at 15; 58-1, at 30–31). Doe asked Roe if she wanted to go to his car to continue their physical interaction; Roe said yes. (Docs. 51-1, at 15; 58-1, at 31). Doe asked Roe for her affirmative, verbal consent at each stage of the interaction. (Docs. 51-1, at 15; 58-1, at 31). Doe and Roe had sexual intercourse in Roe's car. (Docs. 51-1, at 15; 58-1, at 32). Roe reported that she was not passed out or blacked out during the sexual encounter. (Docs. 58-2, at 41–42; 67-1, at 74). After their encounter, Doe then drove Roe back to her dorm. (Docs. 51-1, at 15; 58-1, at 32). A.D. was present when Doe dropped off Roe, and watched Roe walk into the dorm building and up to her dorm room without assistance. (Docs. 58-2, at 36; 67-1, at 76).

Doe, A.D., Roe, and J.B. all reported relevant phone call and text message exchanges throughout the evening, including during the sexual encounter. (Docs. 58-2, at 40–41; 67-1, at 85).

### F. Title IX Investigation

On February 5, 2018, Dordt received Title IX Report Forms from a staff member and a resident advisor; in each, S.S. told the reporter that Roe had been raped. (Docs. 51-1, at 15; 58-1, at 33). This report took place while S.S. and the other friend were taking Roe to the hospital. (Docs. 58-2, at 37; 67-1, at 78–79). At the hospital, a staff member contacted the police. (Docs. 58-2, at 37; 67-1, at 79). Roe never filed a complaint with Dordt against Doe. (Docs. 58-2, at 37; 67-1, at 79).

Coordinator Wilson initiated a formal investigation and assigned Dean Taylor and Chair Olson as Title IX investigators. (Docs. 51-1, at 16; 58-1, at 33). Director Buteyn became involved because Chair Olson was sometimes unable to participate in the interviews. (Docs. 51-1, at 16; 58-1, at 33).

Dean Taylor and Chair Olson began by interviewing Roe first on February 9, 2018, (Docs. 51-1, at 16; 58-1, at 36), and again on March 5, 2018, (Doc. 51-5, at 12). Dean Taylor testified that he did not keep notes from the February 9, 2018, interview because he conducted that meeting in his role as a caretaker for Jane Roe, as part of his Dean of Students role, rather than in his role as a Title IX investigator. (Docs. 58-2, at 39–40; 67-1, at 83). Instead, Chair Olson took notes during the first meeting with Roe, but she did not record the questions asked by Dean Taylor. (Docs. 58-2, at 40; 67-1, at 84). The investigators did not ask Roe details as to Doe's level of intoxication, including whether he was slurring his words, what he drank or ate, how much time transpired between A.D. leaving Doe' apartment and the sexual encounter with Roe, or what time Roe returned home that night. (Docs. 58-2, at 42; 67-1, at 87–88).

During her interview with investigators, Roe stated she did not say "no" during the sexual encounter. (Docs. 58-2, at 41–42; 67-1, at 86–87). Roe initially thought the intercourse was consensual, but friends later told her what transpired was "not good." (Docs. 58-2, at 41–42; 67-1, at 86–87).

After Roe's initial interview, Dean Taylor and Director Buteyn located Doe on campus on February 9, 2018. (Docs. 51-1, at 17; 58-1, at 39). Doe met with Dean Taylor in his office, where Dean Taylor told Doe that a Title IX complaint had been filed "involving him." (Docs. 51-1, at 17; 58-1, at 40). Director Buteyn attended the meeting to take notes. (Docs. 51-1, at 17; 58-1, at 40). As he was questioned, Doe understood that he was being questioned about his sexual encounter with Jane Roe. (Docs. 51-1, at 17; 58-1, at 40–41). Dean Taylor later informed Doe that he was being accused of

14

nonconsensual sex and providing alcohol to a minor. (Docs. 51-1, at 17; 58-1, at 41). The parties dispute when Dean Taylor disclosed this; defendants say it was during the interview (Doc. 51-1, at 17), and plaintiff says it was after the interview, (Doc. 58-1, at 41). Doe asked to hear Roe's version of the events but was not told it. (Docs. 51-1, at 18; 58-1, at 41–42).

In his interview, Doe admitted to having sex with Roe, which he described as consensual. (Doc. 51-1, at 18; 58-1, at 43). Doe has never wavered in his belief that all sexual contact between he and Roe was consensual. (Doc. 51-1, at 18; 58-1, at 43). Doe told Dean Taylor that Roe had touched his thigh earlier in the evening the night of the sexual encounter, and that he had provide alcohol to Roe and A.D. but did not know how many drinks Roe had consumed. (Docs. 51-1, at 18; 58-1, at 43). Doe admitted that he had had prior consensual sex with two other Dordt students and had prior sexual encounters involving alcohol. (Docs. 51-1, at 18–19; 58-1, at 45). Doe never claimed incapacity during his interviews with Dordt's investigators. (Docs. 51-1, at 19; 58-1, at 46). After Doe's initial interview, he informed his mother about the accusations against him. (Docs. 51-1, at 20; 58-1, at 49).

After consulting a professor, Doe requested a second interview with investigators to share more information. (Docs. 51-1, at 19; 58-1, at 47–48). There, on February 12, 2018, he disclosed that Roe tried to put her hands down his pants. (Docs. 51-1, at 20; 58-1, at 48). He also shared that he thought S.S., who had reported that Roe was raped, had an agenda against him and had instructed J.B. not to speak with Doe. (Docs. 51-1, at 20; 58-1, at 49).

Investigators interviewed J.B., A.D., S.S., and L.P. between February 9, 2018, and February 12, 2018. (Docs. 20–22; 58-1, at 50–56). S.S. volunteered that she wanted Doe removed from campus due to his "alcohol problem." (Docs. 51-1, at 22; 58-1, at

57). She did not have first-hand knowledge of the sexual encounter between Doe and Roe. (Docs. 51-1, at 22; 58-1, at 57).

At the time of the investigation, S.S. was one of Chair Olson's students. (Docs. 58-2, at 42–43; 67-1, at 89–90). Chair Olson did not disclose this information to Doe. (Docs. 58-2, at 42–43; 67-1, at 89–90). Chair Olson and S.S. had a conversation about the incident and the Title IX investigation prior to S.S.'s interview on February 12, 2018; Chair Olson mentioned to S.S. that it might be best not to mention their conversation at the interview. (Docs. 58-2, at 43; 67-1, at 90–91).

At some point after Doe's interview on February 9, 2018, Doe spoke with his roommate, J.B., and told him Doe's side of the story. (Docs. 51-1, at 22–23; 58-1, at 59). Doe said J.B. told him that S.S. threatened to report J.B.'s marijuana use if J.B. did not testify against Doe in the Title IX investigation. (Docs. 51-1, at 23; 58-1, at 59).[5] Doe stated that S.S. "kn[ew] something about" J.B. and would report it if J.B. showed "sensitive" text messages in his possession because S.S. had a plan to make Doe "go down" for drinking. (Docs. 58-2, at 43; 67-1, at 91). A.D. emailed Dean Taylor that she had been "made aware of the fact that [S.S.] has been blackmailing someone who is involved in the investigation" and asked to meet with Dean Taylor. (Docs. 51-1, at 23; 58-1, at 60). A.D. expressed to Dean Taylor that S.S. "has an agenda" and she was "very uneasy about everything going on." (Docs. 58-2, at 42–43; 67-1, at 92–93). A.D. characterized Dean Taylor's attitude about the blackmail as that she should not "worry about it." (Docs. 58-2, at 44; 67-1, at 92–93). Dean Taylor stated he was aware that

---

[5] Defendant argues that this is hearsay (Doc. 51, at 8), but also includes this in their own statement of material facts (Doc. 51-1, at 23). This is not hearsay because it is not being offered for the truth of the matter asserted—that S.S. was threatening to report J.B.'s marijuana use— but rather, it is being offered because it raises a question about whether defendants properly investigated and considered the possibility that it was true and therefore affected S.S.'s credibility.

S.S. had convinced J.B. to participate in the investigation after he initially did not want to. (Docs. 51-1, at 23; 58-1, at 62). Dean Taylor testified that blackmail might mean a respondent was innocent, but did not recall taking any further steps to investigate the blackmail issue after the meeting with A.D. (Docs. 58-2, at 44; 67-1, at 94). No notes from Dean Taylor's meeting with A.D. have been produced in this case. (Docs. 58-2, at 44; 67-1, at 94).

On February 20, 2018, Dean Taylor emailed Roe's professors, including Professor Mark Volkers—who would later be named a member of Doe's SLC—to inform them that Roe "recently went through a traumatic experience." (Docs. 58-2, at 56; 67-1, at 79–80).

Sometime during Doe's investigation, Dordt received a subpoena from the Sioux County District Attorney for Dordt's records. (Docs. 58-2, at 46, 65; 67-1, at 97, 136–37). Dordt's notification to Roe about the subpoena provided additional legal citations than its notification to Doe, though Coordinator Wilson drafted both letters. (Docs. 58-2, at 46; 67-1, at 97). After being notified of the subpoena, Coordinator Wilson told Dean Taylor that he hoped it "would scare the wee out of [Doe.]" (Docs. 58-2, at 46; 67-1, at 98).

On March 14, 2018, Coordinator Wilson informed Doe via email that he expected the Investigative Summary within a few days. (Docs. 51-1, at 24; 58-1, at 65). On March 29, 2018, Dean Taylor emailed Coordinator Wilson the Investigative Summary prepared with Chair Olson. (Docs. 51-1, at 24–25; 58-1, at 65). The Summary was supposed to include exculpatory testimony and evidence and present both sides of conflicting witness accounts. (Docs. 58-2, at 47; 67-1, at 99).

The Investigative Summary began by stating: "The reporting party [Jane Roe] submitted a Title IX Report stating she was sexually assaulted." (Docs. 58-2, at 47; 67-1, at 100). The Summary did not mention how much alcohol Doe consumed during the night of the incident, though it included details about A.D.'s and Roe's consumption

of alcohol. (Docs. 58-2, at 47–48; 67-1, at 100–101). The Summary stated that both Roe and J.B. mentioned that Doe woke Roe up by putting on her shoes when she was sitting on the couch, even though the notes from J.B.'s interview do not reflect this. (Docs. 58-2, at 48–49; 67-1, at 103). Conversely, the Summary did not state that Roe thought Doe was "just as drunk as she was" at the time of the sexual encounter, though Roe did make that statement. (Docs. 58-2, at 49; 67-1, at 104–105). The Summary made no mention whatsoever of S.S.'s involvement or the blackmail issue reported by Doe and A.D. (Docs. 58-2, at 49; 67-1, at 105).

Coordinator Wilson told Dean Taylor that he found the Investigative Summary showed, on the preponderance of the evidence, that Doe had sexually assaulted Roe and Doe had also repeatedly violated Dordt's misuse of alcohol and sexual misconduct policies. (Docs. 51-1, at 25; 58-1, at 65–66). Coordinator Wilson asked Dean Taylor to arrange for a hearing before the SLC, which was scheduled for April 6, 2018. (Docs. 51-1, at 25; 58-1, at 66–67).

Coordinator Wilson drafted his written Title IX Review and Conclusions on March 31, 2018, (Docs. 58-2, at 45–46; 67-1, at 107–108), and finished it on April 2, 2018—before the SLC hearing. (Docs. 51-1, at 25; 58-1, at 67). Coordinator Wilson stated that once he rendered his findings, it was "not possible for me to be impartial" with respect to Doe. (Docs.58-2, at 51; 67-1, at 109; 61, at 77–78).

### G. SLC Hearing and Findings

On April 2, 2018, available SLC members met to review Coordinator Wilson's draft Title IX Review and Conclusions. (Docs. 51-1, at 25–26; 58-1, at 68). The parties dispute what occurred at the April 2, 2018, meeting, but the email scheduling it did not mention training or standards. (Docs. 58-2, at 51; 67-1, at 109). Chair Olson testified that she could not recall any Title IX specific training provided to SLC members during the 2017–2018 academic year or any certification requirement, (Docs. 58-2, at 53; 67-1,

at 112), although at least one SLC member—Tony Jelsma—had never participated in an SLC hearing for a Title IX case before. (Docs. 58-2, at 53; 67-1, at 112).

On April 4, 2018, Coordinator Wilson emailed Dean Taylor asking him "Where do we have our Title IX investigation procedures defined in our handbooks?" Dean Taylor replied, "[t]his is not very prescriptive, but this is what we have," and pasted in the section of the Handbook laying out reporting options and support resources for complainants, but not actual investigation or adjudication procedures. (Docs. 58-2, at 54; 67-1, at 113).

On April 4, 2018, at 8:12 p.m., Coordinator Wilson emailed Doe to inform him that he must appear before the SLC on April 6, 2018, at 3:30 p.m. (Docs. 51-1, at 26; 58-1, at 68; 51-6, at 16). The email did not reference any procedures that would apply at the hearing, did not identify who the SLC members were, and did not identify any of Doe's rights with respect to the hearing. (Docs. 58-2, at 54; 67-1, at 114). Doe responded and confirmed he would attend, then asked to have a family friend attend as a support person, which Coordinator Wilson allowed. (Docs. 51-1, at 26; 58-1, at 69). Doe was not provided a copy of the witness statements or the Investigative Summary. (Docs. 51-1, at 25; 58-1, at 67).

Before the hearing, Coordinator Wilson had his assistant print out two versions of a decision letter for the SLC's consideration, each finding Doe responsible for sexual assault of an incapacitated individual and ordering his immediate dismissal—the only difference was when Doe would be allowed to apply for readmission. (Docs. 58-2, at 56; 67-1, at 117).

The SLC members present for Doe's hearing were Dean Taylor, Chair Olson, Tony Jelsma, Glenn Bouma, Mark Volkers, Director Buteyn, and a student, M.V. (Docs. 51-1, at 26–27; 58-1, at 71; 51-2, at 93). M.V. was a student in a class for which Doe served as a teaching assistant the prior semester. (Docs. 51-1, at 27; 58-1, at 72–

19

73). Dean Taylor testified that he could not recall whether SLC members received Title IX materials. (Docs. 58-2, at 42; 67-1, at 65).

The SLC hearing took place as scheduled. (Docs. 51-1, at 26; 58-1, at 70). On behalf of the SLC, Chair Olson asked Doe fifteen questions, which were prepared by Coordinator Wilson and Dean Taylor in advance. (Docs. 51-1, at 27–28; 58-1, at 73). Chair Olson stated that a witness's motive to testify would be relevant in assessing their credibility. (Docs. 58-2, at 42; 67-1, at 89). But, according to Chair Olson, neither the SLC nor a responding party could call witnesses at an SLC hearing during the 2017–2018 academic year. (Docs. 58-2, at 54; 67-1, at 114).

Coordinator Wilson controlled what materials were provided to the SLC in Doe's case; he chose to provide his report/finding letter, a list of questions to Doe, and the two pre-written dismissal notices—again, both dismissing Doe. (Docs. 58-2, at 57; 67-1, at 121). The SLC received no information about Roe not initiating her complaint, the amount of alcohol Doe consumed, the blackmail allegations, and Roe's statement that she did not want Doe to drive her home because she believed he was drunk and should not drive. (Docs. 58-2, at 57; 67-1, at 122–123).

Director Buteyn, Coordinator Wilson, and Tony Jelsma each testified that there was no particular policy on handling conflicts occurring between SLC members and Title IX participants. (Docs. 58-2, at 56; 67-1, at 118). Each also testified that there was no discussion of conflicts of interest pertaining to Doe's hearing specifically. (Docs. 58-2, at 56; 67-1, at 118). Dean Taylor stated that he was not sure if he participated in Doe's hearing as a Title IX investigator or as an advisor to the SLC. (Docs. 58-2, at 56; 67-1, at 119).

Chair Olson testified that in her nine years on the SLC, Doe's case was the only Title IX matter that ever came to a hearing before her. (Docs. 58-2, at 54; 67-1, at 115).

Coordinator Wilson testified that Doe's case was the only Title IX case to ever proceed to a hearing before the SLC. (Docs. 58-2, at 55; 67-1, at 115).

During the hearing, Doe admitted to providing Roe alcohol and stated Roe was drunk, but denied that Roe was incapacitated. (Docs. 51-1, at 28; 58-1, at 74). Doe also admitted to providing alcohol to other underage women and that he had engaged in extramarital sex with other women. (Docs. 51-1, at 28; 58-1, at 75). Doe was given the opportunity to ask questions. (Docs. 51-1, at 28; 58-1, at 75). He asked the SLC to consider J.B.'s statement that Roe attempted to stick her hand down Doe's pants, and asked whether Dordt had looked into S.S.'s involvement with the Title IX report and investigation. (Docs. 51-1, at 28; 58-1, at 75).

SLC member Tony Jelsma testified that the SLC was not informed about any potential blackmail issue by Coordinator Wilson or the investigators. (Docs. 58-2, at 58; 67-1, at 96). Jelsma also testified that the SLC's view of Roe's capacity to consent was based on the statement provided by Coordinator Wilson that she was "drifting in and out of consciousness," and that the SLC was not provided any information about how many drinks Roe had, her weight, or the timeline of her alcohol consumption leading up to the sexual encounter. (Docs. 58-2, at 58–59; 67-1, at 122). Further, Jelsma testified that he was not aware of any prior sexual assault cases at Dordt and thus believed there was no applicable precedent for assessing the appropriate sanction. (Docs. 58-2, at 58–59; 67-1, at 123).

After the hearing, the SLC deliberated briefly and then dismissed Doe from Dordt based on violations of Dordt's misuse of alcohol, sexual misconduct, and sexual assault policies. (Docs. 51-1, at 29; 58-1, at 77). Coordinator Wilson delivered a prepared letter memorializing the decision to Doe, along with a written document outlining the process for an appeal. (Docs. 51-1, at 29; 58-1, at 77–78). Coordinator Wilson told Doe redemption was possible. (Docs. 51-1, at 29; 58-1, at 79).

## H. *Appeal*

On the morning of Doe's SLC hearing, Coordinator Wilson drafted a new appeal procedure ("Appeal Document") to be used in Doe's case, which differed from the procedure set forth in the Handbook. (Docs. 58-2, at 59; 67-1, at 123). The Appeal Document gave Doe an appeal deadline of "seven days" and did not specify business or calendar days. (Docs. 58-2, at 59; 67-1, at 64). The Appeal Document stated that a decision would be made within fifteen days and the parties would be notified of it within 30 days. (Docs. 58-2, at 61; 67-1, at 127).

On April 16, 2018, Doe filed an appeal of the SLC's decision based on four grounds: (1) his rights were substantially violated; (2) the procedures used were contrary to Dordt's policies; (3) there was not substantial evidence to support the conclusions; and (4) the sanction imposed was too severe. (Docs. 51-1, at 29; 58-1, at 79). Doe appealed only as to the sexual assault finding. (Docs. 51-1, at 29–30; 58-1, at 79).

Upon receiving the appeal, Coordinator Wilson told Doe it was untimely. (Docs. 51-1, at 30; 58-1, at 80). When discussing the timeliness issue on April 17, 2018, Coordinator Wilson wrote Provost Zuidema: "I think it's important that we maintain leverage here. [John Doe] is trying to go the quasi-legal route, and we will need to do the same to contain him." (Docs. 58-2, at 60; 67-1, at 125). President Hoekstra advised Coordinator Wilson that given the confusion on the deadline, "we *need* to at least say that it was a validly submitted appeal." (Docs. 58-2, at 60; 67-1, at 125–26). While discussing whether to accept the appeal as timely filed, Coordinator Wilson was also engaged in substantive discussions about the appeal, its merits, and how the appeal procedure should play out. (Docs.58-2, at 65; 67-1, at 128).

On April 25, 2018, Wilson conducted a meeting with some—but not all—of the SLC members from Doe's hearing, with the purpose of reconstructing the hearing testimony because all of the hearing notes had been shredded. (Docs. 58-2, at 62; 67-1,

22

at 128). Jelsma did not remember attending this meeting, but his name was listed as a participant. (Docs. 58-2, at 62; 67-1, at 128). The notes from the meeting indicate that its participants could not accurately recall all of Doe's testimony, but neither Doe nor the missing SLC members were consulted as to what testimony was missing. (Docs. 58-2, at 62; 67-1, at 129).

On April 27, 2018, Coordinator Wilson told Doe that Dordt was carefully considering his request and deciding whether to submit the appeal to the Appeals Committee by May 1, 2018. (Docs. 51-1, at 30; 58-1, at 81). On May 11, 2018, Coordinator Wilson told Doe that Doe's appeal had been sent to the Appeals Committee. (Docs. 51-1, at 30; 58-1, at 81).

The Appeals Committee consisted of Chair Timothy Van Soelen ("Chair Van Soelen"), Dordt employee Sue Droog, Trustee John Lee, and student J.S., along with Coordinator Wilson. (Docs. 51-1, at 8, 30; 58-1, at 81–82). Chair Van Soelen testified that he did not receive any particular guidance or training from Dordt on conducting Title IX appeals, and did not know what federal regulations required. (Docs. 58-2, at 63; 67-1, at 130–31). Chair Van Soelen testified that he did not know whether Doe had a right to access information that would be used against him in the hearing process. (Docs. 58-2, at 67; 67-1, at 139). Although Coordinator Wilson was incapable of impartiality by the time Doe appealed, he compiled the appeal packet for the Appeals Committee. (Docs. 58-2, at 63; 67-1, at 132).

Chair Van Soelen stated the Appeals Committee did not consider whether Doe had threatened litigation when making their decision because it was irrelevant. (Docs. 51-1, at 31; 58-1, at 82). Chair Van Soelen received an initial set of documents gathered by Coordinator Wilson and decided which documents the Appeals Committee would Review. (Docs. 51-1, at 31; 58-1, at 82). Dordt did not have standard documents for the Appeals Committee to consider. (Docs. 51-1, at 31; 58-1, at 83).

Relying on Coordinator Wilson's guidance, Chair Van Soelen sent the Appeals Committee the same packet Coordinator Wilson prepared, with the 2011 Dear Colleague Letter added in. (Docs. 58-2, at 64; 67-1, at 132–33). The final appeal packet did *not* contain: witness statements, a copy of Dordt's sexual misconduct policy, or a copy of any applicable Title IX policy or procedure at Dordt, other than the Appeal Document. (Docs. 58-2, at 64; 67-1, at 133). The final appeal packet did contain Coordinator Wilson's markup of John Doe's appeal, which included an "aide-memoir" indicating that Doe may be a violent, pattern sexual predator and was an unsuitable candidate for seminary. (Docs. 58-2, at 65; 67-1, at 134–35). Also included was the Sioux County District Attorney's subpoena for Dordt's records pertaining to the investigation. (Docs. 58-2, at 65–66; 67-1, at 136). At the time Coordinator Wilson shared the document with Chair Van Soelen, Coordinator Wilson knew the District Attorney had already dropped the case for lack of corroborating evidence. (Docs. 58-2, at 66; 67-1, at 136–37).

The Appeals Committee met on May 14, 2018, to discuss Doe's appeal. (Docs. 51-1, at 31; 58-1, at 83). Coordinator Wilson and Dean Taylor attended the meeting but left during the official vote, although plaintiff denies that a genuine vote took place. (Docs. 51-1, at 32; 58-1, at 85, 87). Chair Van Soelen testified that although he had participated in three student disciplinary appeals at Dordt, Doe's was the only case where people other than the Appeals Committee were in the room when the appeal was considered and decided. (Docs. 58-2, at 68; 67-1, at 141). Chair Van Soelen testified that the Appeals Committee was not informed about any potential blackmail issue. (Docs. 58-2, at 67; 67-1, at 96–97). The Appeals Committee denied Doe's appeal and Coordinator Wilson informed him of the result. (Docs. 51-1, at 32; 58-1, at 86–87). Upon dismissal from Dordt, Doe received no credit for his spring 2018 courses, which were underway. (Docs. 58-2, at 70; 67-1, at 147). Doe was issued a letter stating that if he returned to Dordt in the future he would be eligible for a "dismissal grant" of $8,110

towards his tuition, though Doe alleges he was only able to use $1,860 of the credit. (Docs. 58-2, at 70; 67-1, at 143, 147).

### I.    *Readmission*

In spring 2019, Doe contacted Coordinator Wilson to confirm the steps needed to reapply to Dordt to finish his degree.  (Docs. 51-1, at 33; 58-1, at 88).  Coordinator Wilson shared that Doe would need to submit an application and interview with him and Dean Taylor.  (Docs. 51-1, at 33; 58-1, at 88).  This interview took place via telephone on April 9, 2019, and also involved Dean of Chapel Aaron Baart ("Dean of Chapel Baart").  (Docs. 51-1, at 33; 58-1, at 88).  Doe was twice asked to reflect on his behavior leading to his dismissal.  (Docs. 51-1, at 33; 58-1, at 89).  Doe confirmed he would abide by Dordt's community standards upon his return.  (Docs. 51-1, at 33; 58-1, at 89).

During the call, Coordinator Wilson asked Doe whether he was pursuing legal action against Dordt.  (Docs. 51-1, at 33; 58-1, at 89–90).  Doe declined to answer. (Docs. 51-1, at 33–34; 58-1, at 89–90).

The same parties had a second call related to Doe's readmission on April 23, 2019. (Docs. 51-1, at 34; 58-1, at 90).  Dean of Chapel Baart stated that he, Dean Taylor, and Coordinator Wilson wanted to discuss a summary statement they had drafted regarding the previous call.  (Docs. 51-1, at 34; 58-1, at 90–91).  When asked, Doe again declined to answer whether he was pursuing legal action against Dordt.  (Docs. 51-1, at 34; 58-1, at 91).

After the call, Coordinator Wilson sent the proposed statement to Doe.  (Docs. 51-1, at 34; 58-1, at 92).  Doe refused to sign the statement as written and stated that he had not committed sexual assault.  (Docs. 51-1, at 34; 58-1, at 92).  Coordinator Wilson told Doe that Dordt needed to determine that Doe's behaviors and attitude had changed and that he would be a responsible member of the community going forward. (Docs. 51-1, at 34; 58-1, at 93).  After Doe refused to sign the statement, Coordinator

25

Wilson deliberately "slow-walked" Doe's readmission application. (Docs. 58-2, at 70; 67-1, at 146). Coordinator Wilson asked Doe if he would be "willing to consider" completing his degree off campus. (Docs. 51-1, at 35; 58-1, at 94). Doe responded that he would be, especially if he could begin over the summer. (Docs. 51-1, at 35; 58-1, at 95).

Doe completed his degree from Dordt online, which enabled him to graduate two semesters sooner than if he attended classes in person. (Docs. 51-1, at 35; 58-1, at 95). Doe graduated Dordt in August 2019. (Docs. 51-1, at 35; 58-1, at 95).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). More specifically, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992). It is also genuine "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v.*

26

*DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395. The plaintiff may not then simply point to allegations made in her complaint but must identify and provide evidence of "specific facts creating a triable controversy." *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir. 1999) (internal quotation marks omitted). When considering a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). Even so, the moving party does not meet its burden by simply providing a massive record, and the Court "will not sort through a voluminous record in an effort to find support for the plaintiff's allegations." *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004).

The moving party's burden of production turns on its burden of persuasion at trial. If the moving party bears the burden of persuasion on the relevant issue at trial, it must support its motion with credible evidence available under Rule 56(c) that would entitle it to a directed verdict if not challenged at trial. *Celotex Corp.*, 477 U.S. at 331; *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993). But, if the moving party does not bear the burden of persuasion at trial, it has two options to satisfy its Rule 56

burden of production. First, it may submit affirmative evidence that negates an essential element of the nonmoving party's claim. *Celotex Corp.*, 477 U.S. at 331 (1986); *see also Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018). Second, it may show that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Celotex Corp.*, 477 U.S. at 331 (1986); *see also Bedford v. Doe*, 880 F.3d at 996.

Once the moving party meets its burden of production, the nonmoving party must go beyond the pleadings and show by depositions, affidavits, or other evidence "specific facts which create a genuine issue for trial." *See Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (internal quotation marks omitted). In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587–88 (citation omitted); *see also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather, a "court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

Here, plaintiff bears the burden of persuasion on all claims asserted. Defendants, as movants for summary judgment, bear the burden of production. Thus, in each part of its analysis, the Court will begin by determining whether defendants meet their initial burden. If not, the Court must deny summary judgment. If so, the Court will then determine whether plaintiff raises a genuine dispute of material fact.

### III.    DISCUSSION

Plaintiff sued defendant in an eight-count complaint. (Doc. 1). Specifically, in Counts 1 and 2, plaintiff alleged that Dordt violated Title IX based on gender bias,[6] (*Id.*), and in Count 3 that Dordt violated the same statute based on retaliation. (*Id.*). In Count 4, plaintiff alleged Dordt violated his common-law due process under Iowa law. (*Id.*). In Count 5, plaintiff alleged breach of contract, and in Count 6 breach of implied contract/quasi contract against Dordt. (*Id.*). In Count 7, plaintiff alleged negligence by Dordt, Coordinator Wilson, Dean Taylor, Director Buteyn, and Chair Olson. In Count 8, plaintiff alleged vicarious liability by Dordt and the Board for the actions of Coordinator Wilson, Dean Taylor, Director Buteyn, and Chair Olson. The Court will address defendants' argument for summary judgment on each count in turn.[7]

The parties' arguments in support and in resistance of defendants' motion, both in their written briefing and at oral argument (*See* Doc. 69), are fact-intensive. The Court's discussion of facts at this stage is not intended to be exhaustive. The Court analyzes the undisputed facts or disputed facts, as appropriate, to determine the claims on which a reasonable jury could find in plaintiff's favor. As such, the Court does not discuss or reach all of plaintiff's arguments or evidence in support thereof.

---

[6] Although plaintiff alleged a Title IX violation based on gender bias in two separate counts, these counts represent two theories of the same claim. In discussing this claim and others, the Court uses the terms "gender bias" and "sex discrimination" interchangeably.

[7] The Court notes defendants' argument that plaintiff failed to comply with Local Rule 56(b) in his Statement of Additional Material Facts and Local Rule 56(e) in his supplemental appendix, thereby "improperly expand[ing] the record." (Doc. 67, at 2–3). The Court will only consider those facts which are material to the issues raised and those materials necessary for the determination of defendants' motion, as guided by the parties' citations.

## A.  Title IX Gender Bias (Counts 1 & 2)

Defendants argue plaintiff's Title IX gender-bias claim fails for three reasons. (Doc. 51, at 6–18).  First, defendants argue plaintiff cannot show gender bias, whether relying on an erroneous-outcome theory or selective-enforcement violation theory, because he cannot show he was disciplined because he was male.  Second, defendants argue plaintiff cannot show selective enforcement because he cannot show that a similarly situated female was treated more favorably in an analogous disciplinary decision.  Third, insofar as plaintiff relies on a religious foundation for discrimination, defendants argue the First Amendment insulates Dordt from liability.

For the following reasons, the Court finds (1) defendants fail to meet their initial burden as to Count 1, and (2) defendants meet their initial burden as to Count 2 and plaintiff fails to show a genuine dispute of material fact.

### 1.  Applicable Law

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"   20 U.S.C. § 1681(a).   Congress enacted Title IX to combat "discrimination on the basis of sex in any educational program that receives federal funding."  *Roe v. St. Louis Univ.*, 746 F.3d 874, 881 (8th Cir. 2014).  "Individuals whose Title IX rights have been violated have a private right of action."  *Id.* (citing *Cannon v. Univ. of Chic.*, 441 U.S. 677, 717 (1979)).

Title IX claims based on alleged sex discrimination in disciplinary proceedings are analyzed, among others, under the erroneous-outcome and selective-enforcement theories, as asserted by plaintiff here.  *See Does 1–2 v. Regents of Univ. of Minn.*, 999 F.3d 571, 577 (8th Cir. 2021) (mentioning four alternative theories); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) (describing erroneous outcome and selective

30

enforcement).  The Eighth Circuit Court of Appeals recently held, however, that a male plaintiff alleging sex discrimination in disciplinary proceedings faces a more straightforward requirement when pleading his Title IX claim: he must allege that the University disciplined him on the basis of sex—that is, because he is a male.  *Does 1–2*, 999 F.3d at 577 (citing *Doe v. Univ. of Ark.–Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020); *Doe v. Purdue Univ.*, 928 F.3d 652, 667-68 (7th Cir. 2019)).  The parties interpret this holding as clarifying that the various theories are individual arguments and not individual causes of action.  (Docs. 51, at 5 n.1; 58, at 8 n.1).  Thus, this clarification does not change plaintiff's burden here.  (Docs. 51, at 5 n.1; 58, at 8 n.1).  The Court agrees.  Accordingly, the Court will determine whether plaintiff shows gender bias under an erroneous-outcome theory or selective-enforcement theory before addressing defendants' First Amendment Argument.

### 2.    *Can plaintiff show he was disciplined because of his gender?*

To establish a violation of Title IX under the erroneous-outcome theory, a plaintiff must show: (1) evidence illustrating an articulable doubt as to the accuracy of proceeding's outcome; and (2) particular circumstances showing gender bias was a motivating factor in the erroneous outcome.  *Doe v. Grinnell College*, 473 F. Supp.3d 909, 923 (S.D. Iowa 2019); *Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 924 (S.D. Iowa 2018); *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018); *see Yusuf*, 35 F.3d at 715.  To show an articulable doubt, a plaintiff may point to "particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense" or "particular procedural flaws affecting the proof."  *Yusuf*, 35 F.3d at 715.  A plaintiff may show gender bias by identifying "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."  *Id.*

31

Defendants fails to meet their initial burden as to plaintiff's erroneous-outcome theory.

### a.    *Accuracy of Outcome*

First, a reasonable jury could find that the undisputed evidence shows an articulable doubt as to the accuracy of proceeding's outcome based on the finding of sexual assault.[8]  "Courts should not second guess the disciplinary decisions that school administrators make." *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000).  But Title IX precludes school administrators from rooting those disciplinary decisions in a gender-biased policies and procedures.  It is undisputed that A.D., a witness in Doe's proceeding, told Dean Taylor that she had been "made aware of the fact that [S.S.]," another witness, "ha[d] been blackmailing [another witness] involved in the investigation" and asked to meet with Dean Taylor.  (Docs. 51-1, at 23; 58-1, at 60). Doe also shared with investigators, including Dean Taylor, that he thought S.S. had an agenda against him and had instructed J.B. not to speak with him.  (Docs. 51-1, at 20; 58-1, at 49).  Doe stated that J.B. told him that S.S. threatened to report J.B.'s marijuana use if he did not testify against Doe in the Title IX investigation.  (Docs. 51-1, at 23; 58-1, at 59).  Dean Taylor was also aware that S.S. had convinced J.B. to participate in the investigation after he initially did not want to.  (Docs. 51-1, at 23; 58-1, at 62).

Nevertheless, based on the undisputed evidence, the allegations of blackmail were not prioritized.  Dean Taylor did not appear concerned with the blackmail reports, (Docs. 58-2, at 44; 67-1, at 92–93), though he stated that blackmail might mean an innocent respondent, and did not recall taking any further steps to investigate the blackmail issue

---

[8] Doe's Level IV sanction was based on findings of violations of Dordt's misuse of alcohol, sexual misconduct, and sexual assault policies.  (Docs. 51-1, at 29; 58-1, at 77).  Doe does not dispute the accuracy of the proceeding as to his misuse of alcohol or sexual misconduct—that is, his engaging in extramarital sex.  He does, however, dispute the accuracy of the sexual assault finding.

after the meeting with A.D. (Docs. 58-2, at 44; 67-1, at 94). Further, the information about Doe's and A.D.'s disclosures were not included in the Investigative Summary or otherwise shared with the SLC for their consideration during deliberation. (Docs. 58-2, at 49, 57–58; 67-1, at 96, 105, 122–23). Additionally, because the investigators did not investigate the blackmail allegations and report their findings, Coordinator Wilson could not consider this information or mention it in his recommendations to the SLC.

Defendants argue that S.S.'s alleged blackmail was inconsequential to Doe's investigation and proceedings because S.S. only wanted J.B. to tell the truth. (Doc. 51, at 8). Defendants also argue that S.S. wanted Doe to be punished for his alcohol use. (*Id.*). Given that S.S. gave the initial report that Doe sexually assaulted Roe, (Docs. 51-1, at 15; 58-1, at 33), however, it is apparent that she knew his discipline would, at least possibly, be for violations other than alcohol. And because investigators did not mention the blackmail reports in the Investigative Summary, the SLC was not provided with reasons to believe that S.S. only wanted J.B. to tell the truth. Further, the SLC did not have the opportunity to ask Doe or anyone else about the blackmail. Although defendants argue that plaintiff has no evidence that S.S. pressured J.B. to lie to investigators, (Doc. 51, at 8),[9] a reasonable jury could find that the very nature of blackmail implies that the person being blackmailed must do something the blackmailer wants or face negative consequences and that the circumstances thus call the accuracy of the investigation and Doe's discipline into question. This fact is particularly troublesome in light of the undisputed fact that J.B. was the last person to see Doe and Roe before their sexual

---

[9] Further, plaintiff does present evidence that would support that J.B. had reason to cooperate with S.S.'s blackmail. For instance, citing investigators' interview notes with Doe, plaintiff shows that Doe reported that "[J.B.] has sensitive information in text messages, [S.S.] knows something about [J.B.], says she would report it if [J.B.] showed the text messages." (Doc. 51-5, at 23). The Court, however, does not reach this evidence when determining whether defendants meet their initial burden.

encounter and, thus, had key insight into Roe's level of intoxication. (*See* Docs. 51-1, at 14; 58-1, at 26). A reasonable jury could further find that a blackmailed party, faced with these negative consequences, might have a motive to state what the blackmailer wanted him to say, whether that statement was true, partially true, or entirely false.

Thus, a reasonable jury could find S.S.'s alleged blackmail of J.B. caused J.B. to possibly have a motive to lie during Doe's proceedings and that the SLC's inability to review this information creates an articulable doubt as to the accuracy of the proceeding's outcome.[10] *See Yusuf*, 35 F.3d at 715.

Further, although defendants argue it is merely speculative that Roe had a motive to lie, (Doc. 69, at 63), the jury could reasonably infer from the undisputed facts that Roe possessed such a motive. According to the Handbook, violations of the sexual misconduct policy could constitute grounds for dismissal. (Docs. 58-2, at 15–16; 67-1, at 32–33). The Handbook also made it a conduct violation for students under the age of 21 to consume alcohol, meaning Roe could face discipline for her underage alcohol consumption in addition to sexual misconduct if the encounter was consensual. (*See* Docs. 58-2, at 16; 67-1, at 34). But it also provided amnesty for an alcohol violation for any student making a good faith report of sexual misconduct, whether as a student with a complaint or a witness. (Docs. 58-2, at 16; 67-1, at 34; 60-3, at 38–40). It is also undisputed Roe did not initially believe she was raped, (Docs. 58-2, at 41–42; 67-1, at 86–87), and did not report her rape, (Docs. 51-1, at 15; 58-1, at 33), though she did proceed with the investigation as the reporting party. According to the Handbook's

---

[10] The Court finds unavailing defendants' argument that Doe failed to mention the blackmail in his hearing or in his appeal. (Doc. 51, at 9). The undisputed evidence supports that information about respondents' rights and hearing procedures were not easily accessible, (Docs. 58-2, at 54; 67-1, at 113), and Doe could not call witnesses in his hearing (Docs. 58-2, at 54; 67-1, at 114). Further, Doe expressed his concerns about the blackmail to investigators directly, (Docs. 51-1, at 23; 58-1, at 59; 58-2, at 43; 67-1, at 91), and asked whether Dordt had looked into S.S.'s involvement with the Title IX report and investigation. (Docs. 51-1, at 28; 58-1, at 75).

provisions, however, had she not reported or shared information about the sexual assault, she would be at risk for a misconduct violation that could get her dismissed from Dordt.

A reasonable jury could also find particular procedural flaws call into question the accuracy of Doe's sexual assault finding. *See Yusuf*, 35 F.3d at 715. For instance, Dean Taylor testified that Dordt's policies did not distinguish between inebriation, intoxication, and incapacitation, (Docs. 58-2, at 23; 67-1, at 48), although Roe's alleged incapacity due to her consumption of alcohol was the only enumerated reason that would render her verbal consent invalid. (*See* Docs. 51-1, at 6–7; 58-1, at 8–9; 60-3, at 71). Relevant factors to incapacity, including food consumption, intake of non-alcoholic fluids, timeline of consumption, and body weight, (Docs. 58-2, at 23; 67-1, at 47–49), were also not considered during the process.

Additionally, several conflicts of interest were either not discussed at all or not shared with the SLC. Dean Taylor, who would become a lead investigator in Doe's case, informed Mark Volkers, who taught Roe, that Roe had been involved in a "traumatic incident" before Volkers was named as a member of Doe's SLC.[11] (Docs. 58-2, at 56; 67-1, at 79–80). During Roe's first interview, Dean Taylor believed he was serving in capacity as dean, making him Roe's caretaker, even though this interview was part of the active investigation in which Dean Taylor was an investigator. (Docs. 58-2, at 39–40; 67-1, at 83). Finally, S.S. was Chair Olson's student. (Docs. 58-2, at 42–43; 67-1, at 89–90). Before S.S.'s former interview, S.S. and Chair Olson had a "vague" conversation about Roe's assault and the allegations against Doe, a conversation Chair Olson told S.S. was best not to mention at her formal interview. (Docs. 58-2, at 43; 67-1, at 90–91). Considering S.S. was the student A.D. and Doe believed was blackmailing J.B., a reasonable jury could find Chair Olson's failure to disclose her relationship with

---

[11] Calling it a "traumatic incident" implies, of course, that it was not consensual sex.

S.S., this conversation, and her suggestion to not mention the conversation, were procedural conflicts and concerns that further call into question the accuracy of Doe's sexual assault finding.

In sum, the undisputed evidence could support a jury finding of articulable doubt as to the accuracy of the outcome of Doe's Title IX proceeding based on the finding of sexual assault.

### b. *Gender Bias as a Motivating Factor*

Second, a reasonable jury could find that the undisputed evidence shows particular circumstances showing gender bias were a motivating factor in the erroneous outcome. The Court begins its analysis by noting that a reasonable jury may properly find gender bias based on multiple categories of evidence which collectively could show gender bias was a motivating factor in Dordt's erroneous outcome. *See Moe v. Grinnell Coll.*, 556 F. Supp. 3d 916, 933 (S.D. Iowa 2021); *Does 1–2*, 999 F.3d at 578–79; *Doe v. Univ. of Denver*, 1 F.4th 822, 831–36 (10th Cir. 2021). Here, however, the Court finds the undisputed evidence shows one theory which is sufficient in itself—specifically, the procedural and substantive deficiencies in Doe's Title IX process—and also shows multiple additional theories which would not be sufficient to show gender bias alone. Viewed collectively, however, the undisputed evidence on these additional theories could further support a finding that gender bias was a motivating factor in the erroneous outcome of Doe's Title IX proceedings. *See Moe*, 556 F. Supp. 3d at 933; *Doe*, 473 F. Supp. 3d at 930–31; *see also Yusuf*, 35 F.3d at 715; *Does 1–2*, 999 F.3d at 578–79; *Univ. of Ark.-Fayetteville*, 974 F.3d at 865.

To start, a reasonable jury could find, based on undisputed evidence, that Dordt's Title IX disciplinary process as applied to Doe disfavored Doe, the male student. "A university's procedural deficiencies in a Title IX investigation and adjudication may . . . indicate sex bias." *See Moe*, 556 F. Supp. 3d at 930. In *Rossley v. Drake University*,

979 F. 3d 1184, 1193–94 (8th Cir. 2020), the court discussed that procedural and substantive deficiencies in a university's actions during a disciplinary process could "raise a plausible inference of gender bias," but found no plausible inference where plaintiff's "alleged deficiencies did not rise to the level of the 'clear procedural irregularities'" in *Menaker v. Hofstra University*, 935 F.3d 20, 35 (2nd Cir. 2019). There, Menaker alleged the following procedural irregularities: (1) "Hofstra's failure to interview relevant witnesses who he brought to the University's attention"; (2) "he was terminated despite the fact that [the] Hofstra Vice President . . . *knew* that at least one of the accusations against him was false and believed the complaint to be a 'ploy'; (3) he was promised "a report based on Hofstra's investigation," but did not receive one; and (4) "Hofstra completely disregarded the process provided for in its written 'Harassment Policy.'" *Id.* at 34–35.

Here, the undisputed facts show procedural and substantive deficiencies including clear procedural irregularities from which a reasonable jury could infer gender bias. As discussed, although the possibility of blackmail affecting the investigation and information offered to the SLC was made apparent to investigators, investigators did not look into it and information about the blackmail allegations was neither included in the Investigative Summary nor otherwise shared with the SLC. Also, the standard for incapacitation—versus inebriation or intoxication—was not distinguished in Dordt's policies, even though Roe's verbal consent would be invalid—thus, preventing a finding of sexual assault—only if she were incapacitated. Further, evidence of relevant factors to incapacity were also not considered during the investigation or proceedings. Several conflicts of interest between witnesses and committee members were also either not discussed at all, or not shared with the SLC members. The undisputed evidence also supports that certain exculpatory evidence was not considered during the investigation, nor included in materials for the SLC's review. For instance, investigators did not

consult social media or phone records around the time of the sexual encounter to aid their determination of Roe's incapacitation and thus inability to consent, though such records were available to them and mentioned in witness interviews. (Docs. 58-2, at 33; 67-1, at 67–68).

The undisputed facts also support a finding of deficiencies surrounding the SLC hearing and appeal hearing and the materials therein. For instance, Coordinator Wilson provided the SLC with two versions of a decision letter, each finding Doe responsible for sexual assault of an incapacitated individual and ordering his immediate dismissal— the only difference was when Doe would be allowed to apply for readmission. (Docs. 58 2, at 56; 67-1, at 117). Coordinator Wilson controlled what was provided to the SLC in Doe's case; he chose to provide his report/finding letter, a list of questions to Doe, and the two pre-written dismissal notices—again, both dismissing Doe. (Docs. 58 2, at 57; 67-1, at 121). Additionally, the undisputed evidence supports that no Title IX specific training was provided to SLC members during the 2017–2018 academic year, nor was any certification required, (Docs. 58-2, at 53; 67-1, at 112), even though at least one SLC member had never participated in an SLC hearing for a Title IX case before. (Docs. 58-2, at 53; 67-1, at 112). A reasonable jury could find the SLC materials collectively presented dismissal based in part on a finding of sexual assault as a foregone conclusion requiring the SLC's stamp of approval. This is particularly so in light of the fact that Doe was not informed that he could present witnesses and evidence in his favor, such that he could present evidence contrary to these materials at the SLC hearing.

After Doe appealed the SLC decision, Coordinator Wilson compiled the appeal packet for the Appeals Committee, even though he stated that he was incapable of being impartial at that time. (Docs. 58-2, at 63; 67-1, at 132). Appeals Committee Chair Van Soelen was untrained in Title IX requirements and regulations, (Docs. 58-2, at 63, 67; 67-1, at 130–31, 139), and relied on Coordinator Wilson's recommendations.

(Docs. 51-1, at 31; 58-1, at 82).  The final appeal packet did *not* contain a copy of Dordt's sexual misconduct policy, or a copy of any applicable Title IX policy or procedure at Dordt, other than the newly-drafted Appeal Document.  (Docs. 58-2, at 64; 67-1, at 133). The final appeal packet did contain Coordinator Wilson's markup of Doe's appeal, which included an "aide-memoir" indicating that Doe may be a violent, pattern sexual predator, again, even though Coordinator Wilson testified he could not be impartial towards Doe at this point.  (Docs. 58-2, at 65; 67-1, at 134–35).  Also included was the Sioux County District Attorney's subpoena for Dordt's records pertaining to the investigation, (Docs. 58-2, at 65–66; 67-1, at 136), even though Coordinator Wilson knew the District Attorney had already dropped the case for lack of corroborating evidence.  (Docs. 58-2, at 66; 67-1, at 136–37).

Finally, because Dordt had shredded notes from the SLC hearing, Coordinator Wilson led a group meeting with SLC members for the purpose of compiling notes reflecting what was discussed there.  (Docs. 58-2, at 62; 67-1, at 128).  But even though the notes from the meeting indicate that its participants could not accurately recall all of Doe's testimony, neither Doe nor the missing SLC members were consulted as to what testimony was missing.  (Docs. 58-2, at 62; 67-1, at 129).  Additionally, the undisputed evidence raises questions about who participated in the meeting to compile notes; for instance, Jelsma did not remember attending this meeting, but his name was listed as a participant.  (Docs. 58-2, at 62; 67-1, at 128).

In sum, a reasonable jury could find based on these undisputed facts that, guided by a biased Dordt administrator, the Appeals Committee considered materials that predisposed them to deny Doe's appeal based on reasons not founded in Dordt's policies or Doe's appeal.

Based on the undisputed evidence of these and other[12] procedural and substantive deficiencies, which all disfavored the male plaintiff, a reasonable jury could find gender bias. *See Rossley*, 979 F. 3d at 1193–94; *Menaker*, 935 F.3d at 35.

A reasonable jury could also find, based on undisputed evidence, Dordt administrators, students, and community members were concerned about sexual assault at Dordt and other campuses, resulting in pressure on Dordt to take a firmer stance on sexual assault. It is undisputed that in early 2017, Coordinator Wilson denied that a rape culture existed on Dordt's campus, (Docs. 58-2, at 12; 67-1, at 27), though Chair Olson's observation that sexual assault at Dordt was happening more often than reported. (Docs. 58-2, at 13; 67-1, at 29). Around this time, a Dordt student club organized a viewing of the documentary movie "The Hunting Ground," which criticizes American universities' response to allegations of sexual assault and approximates that one in five female college students will be the victim of rape. (Docs. 58-2, at 14; 67-1, at 31). The campus newspaper noted that Coordinator Wilson's comments that rape culture does not exist at Dordt "may have caused some raised eyebrows among part of the Dordt community." (Docs. 58-2, at 13; 67-1, at 28). Coordinator Wilson, however, stated he was committed to Dordt "hav[ing] more proactive action on Title IX." (Docs. 58-2, at 32; 67-1, at 19; 61, at 13–14).

A reasonable jury could further find, based on undisputed evidence, simultaneous legal guidance and cultural influences also pressured Dordt to take a harsher stance on sexual assault. For instance, in the years leading up to Doe's investigation, DCL guidance urged schools receiving federal funding, such as Dordt, that they needed to take immediate action to eliminate sexual harassment, prevent its recurrence, and address its

---

[12] The Court does not intend to capture all procedural and substantive deficiencies based on undisputed evidence here. Those mentioned, however, would support a jury's reasonable finding of gender bias.

effects where student-on-student harassment creates a hostile environment, (Docs. 58-2, at 2, 67-1, at 2), and provided that "a single instance of rape is sufficiently severe to create a hostile environment." (Doc. 60, at 4). Dordt could lose funding if it was found in violation of Title IX. (Docs. 58-2, at 4; 67-1, at 7). Although guidance began to shift in September 2017 to account for previous policies "fail[ing] too many students," including both alleged perpetrators and victims, (Docs. 58-2, at 6; 67-1, at 11–12; 60-1, at 73), as defendants note, the 2017 interim guidance was not yet law during Doe's hearing or appeal. (Doc. 67-1, at 33).

A reasonable jury could also find, based on undisputed evidence, Dordt's policies associated women with being victims of sexual assault. Biases based on stereotypes about women's and men's sexual behavior may provide sufficient evidence to demonstrate sex bias in a Title IX adjudication. *See Moe*, 556 F. Supp. 3d at 930. Dordt provided its policies to its students through the Handbook. Although the Handbook's discussion of sexual assault was largely discussed in gender neutral terms, (Docs. 51-1, at 6–7; 58-1, at 6–9), the Handbook provided examples of only female victims of sexual assault. (*See, e.g.*, Docs. 58-2, at 16–17; 67-1, at 35).

Viewing the undisputed evidence on plaintiff's various theories collectively, a reasonable jury could find that gender bias was a motivating factor in the erroneous outcome of Doe's sexual assault finding and thus his Title IX proceeding. *See Moe*, 556 F. Supp. 3d at 933; *Doe*, 473 F. Supp. 3d at 930–31; *see also Yusuf*, 35 F.3d at 715; *Does 1–2*, 999 F.3d at 578–79; *Univ. of Ark.-Fayetteville*, 974 F.3d at 865.

For these reasons, the Court **denies** summary judgment as to plaintiff's erroneous-outcome theory.

### 3. Can plaintiff show a similarly-situated female was treated more favorably?

In Count 2 of his complaint, Doe asserts a selective-enforcement claim. A Title IX selective-enforcement theory is premised on the allegation that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715. To show selective enforcement, a male plaintiff must show (1) a female who was in circumstances sufficiently similar to his own, and (2) that the defendant treated this female more favorably. *Doe v. Washington Univ.*, 434 F. Supp. 3d 735, 757 (E.D. Mo. 2020); *Rossley*, 342 F. Supp. 3d at 931.

Here, defendants meet their initial burden because they submit affirmative evidence that negates an essential element of the nonmoving party's claim. *Celotex Corp.*, 477 U.S. at 331 (1986); *see also Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018). Defendants' evidence supports that Dordt has only received one Title IX violation against a female respondent before, and it was for hazing—not sexual assault. (Doc. 51, at 16–17). Thus, defendants show affirmative evidence negating plaintiff's ability to show a female respondent in comparable circumstances, much less that she was treated more favorably than he was.

Plaintiff, however, reveals issues with defendants' evidence. (Doc. 58-1, at 96–97). Plaintiff asserts that defendants' declaration from Coordinator Wilson supporting a lack of a comparable female respondent does not align with Dordt's filings about sexual assault on campus as included elsewhere in the record. (*Id.*). Specifically, plaintiff cites conflicts with Coordinator Wilson's deposition, in which he states that a male student filed a sexual misconduct complaint against a female student (Doc. 61, at 8–9), which is not listed in the declaration chart. (*See* Doc. 51-4, at 35).

42

Although the Court agrees with plaintiff that Coordinator Wilson's declaration conflicts with other evidence on the record, thus calling the reliability of the declaration into question, this inconsistency does not in itself show a genuine dispute of material fact as to whether Doe can show that Dordt treated similarly-situated females more favorably. Plaintiff presents no evidence supporting that a female student was accused of or found to have violated Dordt's sexual *assault* policy, as opposed to Dordt's sexual *misconduct* policy, or Dordt's alcohol policy.

At oral argument, plaintiff clarified his argument as to comparators for purposes of selective enforcement. (Doc. 69, at 29–31). Plaintiff argued that each of the following three women were similarly situated to Doe: (1) Jane Roe, (2) A.D., and (3) Doe's ex-fiancée. (*Id.*). The common thread uniting all three of these women is testimony that Doe engaged in extramarital sexual encounters with each of them. (Docs. 51-1, at 15; 58-1, at 32 (Roe); 51-5, at 19; 61-4, at 54–55 (A.D.); 51-5, at 19 (Doe's ex-fiancée)). Further, the record does not support that Dordt disciplined any of these women, much less dismissed them. Plaintiff argues the Court can find a genuine dispute of material fact as to the existence of a female comparator because none of these women were disciplined by Dordt for violations similar to Doe's.

In determining whether an individual is a proper comparator, the jury will determine whether the circumstances of that individual make her similarly situated to Doe in the context of Dordt's discipline. *Washington Univ.*, 434 F. Supp. 3d at 757; *Rossley*, 342 F. Supp. 3d at 931. For the following reasons, none of the three comparators offered by plaintiff are similarly situated, and thus, plaintiff's Title IX gender bias claim based on a selective-enforcement theory must fail.

A reasonable jury could not find that Jane Roe was a proper comparator to John Doe for several reasons. First, as defendants noted at the summary judgment hearing, as stated in the Handbook, Dort has a policy of declining to impose discipline based on

a student's "own alcohol or drug use, or other prohibited activity [that was] involved" in the sexual misconduct if that student was a "student with a complaint [of sexual misconduct] or a witness." (Doc. 49-5, at 13–14). This amnesty policy prevented Dordt from disciplining Roe for an alcohol violation. Second, because Roe maintained her sexual encounter with Doe was nonconsensual, it was illogical for Dordt to discipline Roe for a sexual misconduct. Further, because any sexual encounter with Doe was "prohibited activity" that was "involved" with Doe's alleged sexual assault of Roe, this, too, seems to fall under Dordt's amnesty policy. (*Id.*, at 13).

Third, no report of sexual assault was filed against Roe. Plaintiff's additional argument that Roe is a proper comparator because Chair Olson recognized Roe's putting her hand down Doe's pants as a possible sexual assault, (Doc. 61-1, at 90), is likewise unavailing. Regardless of Chair Olson's interpretation, Doe never complained that Roe sexually assaulted him. Neither did another person report that Roe sexually assaulted Doe. Thus, Doe never participated in Roe's Title IX investigation because no Title IX investigation was filed. And while Roe did not report Doe's sexual assault of her, she participated in Doe's Title IX investigation as the complaining party.

In sum, for these reasons, no reasonable jury could conclude that Roe was, based on her circumstances and the discipline she faced, similarly-situated to Doe, who was investigated and ultimately disciplined for a sexual assault violation, along with alcohol and sexual misconduct violations. *Washington Univ.*, 434 F. Supp. 3d at 757; *Rossley*, 342 F. Supp. 3d at 931; (Docs. 51-1, at 25, 29; 58-1, at 65–66, 77).

For similar reasons, a reasonable jury could not find that A.D. was a proper comparator. First, as stated previously, Dort has a policy of declining to impose discipline based on misuse of alcohol policy violations on a "student with a complaint [of sexual misconduct] or a witness." (Doc. 49-5, at 13–14). This amnesty policy prevented Dordt from disciplining A.D. for an alcohol violation. Second, there are no facts in the

44

record supporting that A.D. sexually assaulted anyone or that A.D. was a respondent to a report of the sexual assault.

Thus, in the context of discipline, the only comparable circumstances that remain between A.D. and Doe are that the records support that they each previously violated Dordt's sexual misconduct policy. But no reasonable jury could find that A.D.'s apparent admitted sexual misconduct violation made her a proper comparator to Doe, who, on the record, was investigated for and found to have committed sexual assault and admitted to violating Dordt's misuse of alcohol and sexual misconduct policies multiple times. *Washington Univ.*, 434 F. Supp. 3d at 757; *Rossley*, 342 F. Supp. 3d at 931; (Docs. 51-1, at 25, 29; 58-1, at 65–66, 77).

Finally, the Court can easily dispense with Doe's ex-fiancée as a comparator. The Court finds no evidence on the record—and plaintiff points to none—that supports Doe's ex-fiancée was a student at Dordt at the time of Doe's investigation or that she was a student there at the time of her sexual encounter with Doe. Because the evidence does not support that Doe's ex-fiancée was subject to Dordt's policies, much less that Dordt failed to equitably apply them, a reasonable jury could not find that Doe's ex-fiancée was a similarly-situated female. *See Washington Univ.*, 434 F. Supp. 3d at 757; *Rossley*, 342 F. Supp. 3d at 931.

A genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute," such that a fact-finder need "resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. The Court finds plaintiff presents no evidence showing that a similarly-situated female exists, much less that Dordt treated that female more favorably.

For these reasons, the Court **grants** summary judgment as to plaintiff's selective-enforcement theory.

45

#### 4. Does the First Amendment Insulate Dordt University?

Defendants cite the recent Supreme Court case *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020), for the principle that First Amendment insulates Dordt from incurring liability for discrimination when that alleged discrimination is founded on the university's religious beliefs and corresponding practices and policies. (Doc. 51, at 18). Plaintiff strongly resists this interpretation of *Our Lady of Guadalupe*, arguing its application is limited to the ministerial exception, which does not apply here, in the context of student discipline. (Doc. 58, at 23).

The Court finds *Our Lady of Guadalupe* is inapposite to the case at issue here. There, the issue was employment discrimination and whether the teachers in question could be considered ministers for purposes of the ministerial exception to the First Amendment. The ministerial exception provides that "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Id.* at 2060. Here, the issue is sexual discrimination based on student discipline—not an employment dispute. Thus, the Court declines to find that *Our Lady of Guadalupe* shields defendants from liability as to its discrimination of Doe.

For these reasons, the Court **denies** defendants' motion as to Count 1 and **grants** defendants' motion as to Count 2.

#### B. Title IX Retaliation (Count 3)

Defendants argue plaintiff's retaliation claim fails for two reasons. (Doc. 51, at 19–21). First, defendants argue plaintiff cannot show he engaged in protected activity because he did not complain of discrimination prior to this action. Second, defendants argue plaintiff cannot show a causal connection between his retaining an attorney and his readmission decision, and thus cannot show that he was injured.

46

For the following reasons, the Court finds defendants meet their initial burden as to plaintiff's engagement in a protected activity, but plaintiff fails to show a genuine dispute of material fact. Thus, the Court **grants** defendants' motion for summary judgment on this claim.

### 1.    *Applicable Law*

To establish a prima facie case of retaliation, a plaintiff must show (1) he engaged in a protected activity; (2) the defendant took an adverse action against him; and (3) the adverse action is causally linked to the protected activity. *See Does 1-2*, 999 F.3d at 579; *see also Du Bois v. Bd. of Regents*, 987 F.3d 1199, 1203–204 (8th Cir. 2021); *Emeldi v. Univ. of Or.*, 698 F.3d 715, 724–25 (9th Cir. 2012) (discussing Supreme Court guidance that Title VII interpretations of claims including retaliation informs interpretation of same claims under Title IX); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (detailing burden-shifting framework applied in Title VII cases which mirrors prima facie requirements here).

"[O]ther circuits also require the plaintiff to demonstrate that the defendant knew of the protected activity"; the Eighth Circuit, however, has not adopted this additional requirement. *Du Bois*, 987 F.3d at 1204 (discussing cases from the First, Second, and Sixth Circuit Courts of Appeal); *see also Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 756 (M.D. Tenn. 2019).

"[T]he 'protected activity' that forms the basis of a Title IX retaliation claim is actively complaining of or opposing alleged discrimination on the basis of sex under Title IX." *Belmont Univ.*, 367 F. Supp. 3d at 756–57 (citing *Jackson*, 544 U.S. at 183). A respondents' participation in a Title IX investigation is not protected activity. *Du Bois*, 987 F.3d at 1205 ("No part of Title IX designates participation in a sexual harassment investigation on the side of the accused as protected activity.").

At least one court has held that filing a lawsuit for Title IX violations can be a protected activity under Title IX. *See Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1113 (S.D. Cal. 2012) *aff'd*, 768 F.3d 843 (9th Cir. 2014). This holding is in keeping with the Supreme Court's guidance that "the text of Title IX . . . broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex'" and when "retaliation occurs because the complainant speaks out about sex discrimination, [Title IX's] 'on the basis of sex' requirement is satisfied." *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173, 179 (2005); *see also* 20 U.S.C. 1681(a).

## 2. *Can plaintiff show a protected activity?*

Here, defendants meet their initial burden because they submit affirmative evidence supporting that plaintiff cannot show he engaged in a protected activity. (Doc. 51, at 20); *Celotex Corp.*, 477 U.S. at 331 (1986); *Bedford*, 880 F.3d at 996. Specifically, it is undisputed that plaintiff did not complain of sex discrimination during his Title IX proceedings, including his appeal. (*See* Docs. 51 at 20; 51-1, at 29; 58-1, at 79 (listing grounds for appeal)). Further, Doe's mere participation in a Title IX investigation is not protected activity. *Du Bois*, 987 F.3d at 1205.

In response, plaintiff fails to show a genuine dispute of material fact. Although Eighth Circuit precedent does not require that plaintiff show *defendant had notice* of plaintiff's protected activity, it nevertheless requires that plaintiff must complain of sex discrimination to show a protected activity.[13] *See Du Bois*, 987 F.3d at 1204. So,

---

[13] The Court notes that although the *Du Bois* opinion initially states that "*Jackson* makes clear that Title IX retaliation claims must arise from a protected activity, *like* complaining of sex discrimination," 987 F.3d at 1204 (emphasis added), the opinion goes on to find that a plaintiff *must* complain of sex discrimination to show a protected activity, *id*. Further, the Supreme Court's *Jackson* opinion states that a plaintiff must complain of sex discrimination to show a protected activity. *See* 544 U.S. at 174.

although Dordt knew that plaintiff had obtained an attorney to represent him and was considering litigation, that activity is only protected if Doe was "complaining of sex discrimination," by doing so. *See id.*; *Jackson*, 544 U.S. at 173–74. There are no "magic words" someone must say to complain of sex discrimination. *See Mumm v. Charter Twp.*, 727 Fed. App'x 110, 113 (6th Cir. 2018). If plaintiff shows evidence supporting that he spoke out about sex discrimination, by actively complaining of or opposing alleged discrimination on the basis of sex, then that is enough to show he engaged in a protected activity.

Plaintiff relies on *Ollier* in support of his argument that he has shown evidence of a protected activity; that decision, however, has limited persuasiveness here because the facts show the defendant in *Ollier* already knew of the plaintiff's gender-bias complaint. In *Ollier*, the court found that filing a lawsuit for sex discrimination under Title IX was a protected activity. 858 F. Supp. 2d at 1113. Before the lawsuit was filed, the *Ollier* plaintiffs complained of Title IX violations to both the school's athletic director and principal, and their counsel sent a letter about the school's Title IX violations to the school, its board, the interim superintendent, the principal, and athletic director. *Id.* One can infer from the context of the *Ollier* plaintiffs' complaints and their counsel's follow-up letter that any subsequent litigation would concern Title IX violations, and thus properly considered a protected activity.

Here, however, plaintiff does not show evidence that he was complaining of sex discrimination—only that he had retained an attorney and was at least considering engaging in some kind of litigation. It is undisputed that when discussing the timeliness issue on April 17, 2018, Coordinator Wilson wrote Provost Zuidema: "I think it's important that we maintain leverage here. [John Doe] is trying to go the quasi-legal route, and we will need to do the same to contain him." (Docs. 58-2, at 60; 67-1, at 125). This suggests that, at this time, Coordinator Wilson interpreted Doe's actions as

at least considering engaging in litigation. Further, Coordinator Wilson's notes show Doe told him he intended to pursue litigation against Dordt and had already retained an attorney. (Doc. 61-6, at 55 (notes dated May 8, 2018), 68 (letter discussing April 17, 2018, phone call), 70 (notes from April 17, 2018, phone call), 92-95 (discussions between Doe and Coordinator Wilson about attorney supporter)). Thus, plaintiff has shown evidence that he was considering engaging in litigation prior to Dordt's appeal decision and readmission decision.

Plaintiff, however, fails to show sufficient evidence supporting that by engaging in litigation he was complaining of discrimination on the basis of sex.

Plaintiff argues "[d]efendants' notes from the [May 14, 2018] Appeal Committee meeting for John Doe indicate their understanding that Plaintiff's intended lawsuit would be pursuant to Title IX." (Doc. 58, at 24 (citing Doc. 51-7, at 9)). The only mention of legal recourse in the notes cited, however, is: "[Doe] has *the right* to pursue legal recourse on the process and on being denied access." (Doc. 51-7, at 9 (emphasis added)). "Access" is not mentioned in Doe's notice of appeal. (Doc. 51-6, at 36–40). As plaintiff points out, however, "the crux of Title IX litigation is *denial of access* to education *based upon gender*." (Doc. 58, at 24 (citing 20 U.S.C. § 1681(a) (emphasis added))). But, even in the light most favorable to the plaintiff, the note is at best unclear whether it reflects awareness of Doe's decision to exercise this right, or whether it is anticipatory in nature.

Plaintiff alleges that Coordinator Wilson's knowledge of Doe's obtaining counsel was "in the context of, and in conjunction with, Plaintiff's Appeal, which expressly stated that Dordt University violated Title IX throughout the disciplinary process," and thus put Dordt on notice that Doe was going to file a lawsuit based on Title IX violations. (Doc. 1, at 79–80). Because notice is not a requirement in the Eighth Circuit, the Court takes plaintiff's allegation as asserting that it was inferable from the context of plaintiff's appeal

50

that any subsequent litigation would be about Title IX violations, thereby making plaintiff's retaining counsel or otherwise pursuing litigation a protected activity.

It is undisputed that Doe filed an appeal of the SLC's decision based on four grounds: (1) his rights were substantially violated; (2) the procedures used were contrary to Dordt's policies; (3) there was not substantial evidence to support the conclusions; and (4) the sanction imposed was too severe. (Docs. 51-1, at 29; 58-1, at 79). But the text of Doe's appeal does not support that any of these grounds was based on violations of his rights under Title IX. (*See* Doc. 43). Instead, it supports that Doe might instigate litigation based on breach of contract or due process violations. Further, just because plaintiff's discipline was based on a Title IX investigation and proceedings does not mean his impending litigation would advance a cause of action sounding in Title IX.

Finally, although plaintiff's complaint includes a Title IX claim of discrimination on the basis of sex, it was not filed until December 5, 2019. (Doc. 1). Thus, plaintiff did not speak out on the basis of sex discrimination until after he had been readmitted and graduated; as a practical matter, Dordt could not have retaliated during the readmission process based on that protected activity because it had yet to occur. (*See* Docs. 51-1, at 35; 58-1, at 95).

In sum, viewing the evidence collectively, a reasonable jury could not find plaintiff was complaining of discrimination on the basis of sex. Thus, plaintiff fails to show a genuine dispute of material fact that he was engaged in a protected activity. For this reason, his Title IX retaliation claim must fail. Nevertheless, the Court continues its analysis.

### 3. Can plaintiff show a causal connection?

Here, defendants meet their initial burden by showing evidence negating a causal connection between Doe's retaining an attorney and engaging in litigation, and his readmission decision. *See Celotex Corp.*, 477 U.S. at 331 (1986); *see also Bedford*, 880

F.3d at 996. Specifically, defendants assert that Dordt not only readmitted Doe and allowed him to finish his degree, (Docs. 51-1, at 35; 58-1, at 95), but also helped Doe achieve his goal of finishing his degree as soon as possible by offering him the option to finish his degree via online courses, which enabled Doe to graduate two semesters earlier than otherwise possible. (Docs. 51-1, at 35; 58-1, at 95). Thus, the burden shifts to plaintiff to show a genuine dispute of material fact as to causal connection.

Assuming plaintiff could show a protected activity as argued, plaintiff shows a genuine dispute of material fact that Doe's protected activity caused Dordt to retaliate by taking an adverse action against Doe. Defendants do not expressly argue that plaintiff cannot show an adverse action, but that requirement is implied in the causal connection requirement. *See Does 1-2*, 999 F.3d at 579 (describing causal connection as linking an adverse action to the protected activity). Notably, plaintiff's complaint alleges only that Dordt retaliated in the readmission process—not that it retaliated in the appeals process.[14] (*See* Doc. 1, at 79–80). Thus, the Court analyzes whether plaintiff can show a causal connection linking an adverse action related to plaintiff's readmission to his protected activity of engaging in litigation.

Plaintiff's resistance alleges adverse actions in the form of Doe's readmission being slow-walked and Doe not being granted "full readmission," such that he needed to supplement with classes at other schools and could not redeem the full value of his full dismissal grant.[15] So, plaintiff must show a genuine dispute of material fact that one or

---

[14] The Court notes that, in his resistance, plaintiff describes Dordt's alleged adverse actions based on the appeals process. (Doc. 58, at 24–25). The Court cannot consider these arguments, however, when they do not fall within the scope of the claim as made in the complaint. (*See* Doc. 1, at 79–80).

[15] Plaintiff also alleges adverse actions based on the appeal process but, as discussed, the Court cannot consider these arguments. (*See* Doc. 1, at 79–80).

more of these adverse actions was causally linked to his protected activity of engaging in litigation. Here, plaintiff shows a genuine dispute.

It is undisputed that plaintiff's readmission application was "slow-walked," (Docs. 58-2, at 70; 67-1, at 146), but it is also undisputed that Doe nevertheless enrolled on time for summer classes, (Docs. 51-1, at 35; 58-1, at 95). Further, it is undisputed that Doe graduated earlier than expected, (Docs. 51-1, at 35; 58-1, at 95), which Doe said that was important to him, (Docs. 51-1, at 35; 58-1, at 95), despite the slow-walking. Thus, the evidence does not show a genuine dispute of material fact that the slow-walking of plaintiff's readmission was an adverse action, as required to establish the causal link to his protected activity.

Plaintiff also argues Dordt's failure to grant Doe "full readmission" was an adverse action, and that adverse action was causally linked to Doe's protected activity because Doe "would not agree to functionally waive his claims against Dordt." (Doc. 58, at 26). The undisputed evidence shows Coordinator Wilson told Doe he needed to sign a statement that Doe interpreted as admitting he sexually assaulted Roe, and Doe refused to sign it. (Docs. 51-1, at 34; 58-1, at 92). Plaintiff also shows evidence that Coordinator Wilson told Doe that signing the statement was "not a negotiation." (Doc. 51-7, at 44). Plaintiff argues that after slow-walking Doe's readmission process following this exchange, Dordt "denied [him] a full readmission: instead, he could take two online courses with Dordt, but would need to complete the rest of his requirements elsewhere." (Doc. 58, at 27 (citing Doc. 51-7, at 39)). Although Doe was eligible for a dismissal grant of $8,110 towards his tuition, he was only able to use $1,860 of the credit. (Docs. 58-2, at 70; 67-1, at 143, 147). Plaintiff argues this was "because Dordt refused to grant Plaintiff a full readmission," and thus "was forced to forfeit most of that credit

53

and to expend additional sums taking the rest of his courses at other institutions."[16] (Doc. 58, at 26–27).

Plaintiff shows evidence that he enrolled in two classes at a community college in summer 2019 and received credit for those classes. (Doc. 61-6, at 164). The record also supports that plaintiff took two classes at Dordt that summer. (Doc. 61-6, at 167).

It is undisputed, however, that Doe graduated early—at the end of summer 2019— two semesters sooner than if he attended classes in person. (Docs. 51-1, at 35; 58-1, at 95). The evidence does not show that Doe was forced to take classes at another institution. Doe's cited conversations with Coordinator Wilson do not, for instance, put a limit on the amount of credits he could take. The record also supports that plaintiff was willing to take classes online to complete his degree, particularly because it meant he could start taking classes sooner. (Docs. 51-1, at 35; 58-1, at 95). Further, Doe's ability to use his dismissal grant turns on the number of credits he took at Dordt. The record, however, supports that Doe chose to supplement his credits at Dordt by taking classes at other institutions, which means that Doe, at the very least, contributed to the full value of his dismissal grant not being redeemable because he chose to get the credits he needed from elsewhere so he could graduate earlier.

Still, a reasonable jury could find Dordt's refusal to grant Doe full readmission was an adverse action, and that it was casually linked to Doe's engaging in litigation. A jury could reasonably find that Dordt took an adverse action against Doe by allowing him to take only online classes upon readmission. Because Dordt offers both online and in-person classes, (See Docs. 51-1, at 35; 58-1, at 94), a jury could reasonably find that Dordt limited the classes Doe could take, thereby prompting Doe to choose to take classes elsewhere to accumulate credit hours and thus graduate more quickly. In so doing, Doe

---

[16] Plaintiff also asserts that he received no credit for his spring 2018 courses upon his dismissal, (Doc. 58, at 26–27), but this is not attributable to Dordt's readmission decision.

recovered only $1,860 of his $8,110 dismissal grant. (Docs. 58-2, at 70; 67-1, at 143, 147). Further, a reasonable jury could also find Dordt took this adverse action because Doe did not sign the statement, which he interpreted as foreclosing his bringing an action challenging Dordt's sexual assault finding. Thus, a jury could reasonably find that Dordt's adverse action was casually connected to Doe's alleged protected activity. In sum, plaintiff shows a genuine dispute of material fact that defendant took an adverse action against Doe, and that this adverse action was causally linked to his protected activity of engaging in litigation, assuming plaintiff could show that protected activity.

Because, however, the Court has already found plaintiff fails to show a genuine dispute of material fact as to whether he engaged in a protected activity, the Court **grants** defendants' motion as to Count 3.

### C. *Common-Law Due Process (Count 4)*

Both parties' arguments on plaintiff's common-law due process claim are rooted in a single case: *Harvey v. Palmer Coll. of Chiropractic*, 363 N.W.2d 443 (Iowa 1984). Defendants argue *Harvey* does not support plaintiff's claim because (1) plaintiff cannot show that Dordt failed to follow its procedures and thus failed to discipline plaintiff appropriately, and (2) plaintiff cannot show Dordt's disciplinary action was arbitrary, unreasonable, or in bad faith because Dordt provided Doe the opportunity to be heard at a meaningful time and in a meaningful manner, as due process requires, as Doe knew the allegations against him and could challenge them. (Doc. 51, at 21–26).

For the following reasons, the Court finds defendants fail to meet their initial burden as to both arguments.

### 1. *Applicable Law*

"Although the due process clause of the fourteenth amendment is applicable only to state action, the requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities." *Harvey*, 363

N.W.2d at 444. The Fourteenth Amendment's Due Process clause "has two components: the procedural due process and the substantive due process." *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999). In the context of university disciplinary dismissals, a university can fail to provide due process by (1) failing to substantially follow its established procedures—that is, failing to comply with procedural due process, or (2) taking disciplinary action against a student that is arbitrary, unreasonable, or in bad faith—that is, failing to comply with substantive due process.[17] *See Harvey*, 363 N.W.2d at 444–46 (citing *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108, 112 (Minn. 1977) (describing second option as taking disciplinary action that is "arbitrary, capricious, or bad-faith"). A university's procedures include, for instance, the terms of its student handbook and honor code. *Warren*, 886 F.2d at 202.

Under either a procedural or substantive theory, "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation omitted); *Does 1-2 v. Regents of the Univ. of Minn.*, 999 F.3d 571, 582 (8th Cir. 2021). Evidence showing that hearing procedures were "imperfect" is not sufficient. *See Does 1–2*, 999 F.3d at 582.

As the Court and parties noted at oral argument, the common-law due-process claim described in *Harvey* has substantial overlap with plaintiff's breach-of-contract claim. (*See, e.g.*, Doc. 69, at 19–20; 48–50); *Compare Moe*, 556 F. Supp. 3d at 934, *and Warren v. Drake Univ.*, 886 F.2d 200, 202 (8th Cir. 1989) (applying Iowa law), *with Cross Over, LLC v. Raph Assocs., Inc.*, No. 19-CV-3040-CJW-MAR, 2020 WL 6531237, at *3 (N.D. Iowa, June 23, 2020) (listing elements of a breach-of-contract

---

[17] To prevail on a due process claim, the plaintiff must have a property interest impinged upon by the defendant's violation. *See Doe v. Univ. of Neb.*, 451 F.Supp.3d 1062, 1100–101 (2020). The parties do not dispute that Doe satisfies this requirement and the Court does not discuss it here.

claim), *and Alta Vista Props., LLC v. Mauer Vision Center, PC*, 855 N.W.2d 722, 730 (Iowa 2014) (finding duty of good faith and fair dealing implied in every contract under Iowa law).

The daylight between these two claims is narrow but illuminating. The common-law due-process claim recognizes a viable contract claim based on due process components in the context of a university disciplinary dismissal. *See Moe*, 556 F. Supp. 3d at 934; *Warren*, 886 F.2d at 202. In a breach-of-contract claim, a defendant could escape liability based on a contract that fails to provide for adequate process because it did not breach that contract. *See Cross Over*, 2020 WL 6531237, at *3. In a common-law due-process claim, a defendant cannot escape liability under these circumstances. *See Moe*, 556 F. Supp. 3d at 934; *Warren*, 886 F.2d at 202. Thus, the Court finds sufficient difference exists between plaintiff's common-law due-process claim and plaintiff's breach-of-contract claim for the Court to consider these claims independently.

### 2. *Can plaintiff show Dordt failed to follow its procedures?*

Defendants argue the Handbook provides only general guidance about how the SLC will adjudicate a Level IV violation, and that it does not delineate specific procedures, notices, or timelines. (Doc. 51, at 22). Instead, defendants argue, procedures are outlined via a list of respondent rights in Dordt's Annual Security Report. (*Id.*). As applied to Doe's proceedings, the Annual Security Report provides that: (1) Dordt will inform Doe of its disciplinary process; (2) Dordt will provide Doe with a written statement of charges; (3) Dordt will inform Doe that he may present witnesses and material evidence relevant to the case; (4) Dordt will inform Doe that he may request an advocate on his behalf; (5) to the best of its ability, Dordt will provide Doe, in advance of the hearing, with all information to be presented at the hearing; and (6) Dordt will inform Doe in writing of the outcome of any institutional disciplinary proceeding,

including the outcome of any appeal. (*See* Docs. 51, at 22–23; 51-1, at 9–10; 58-1, at 16–17; 49-6, at 10). Defendants point to evidence supporting Dordt's compliance with each of these requirements.

But, based on the undisputed evidence, a reasonable jury could find Dordt failed to follow its procedures as outlined in the Annual Security Report.

For instance, the undisputed evidence at best conflicts as to whether Doe could present witnesses and material evidence relevant to the case, which suggests Dordt did not follow its own procedures. The rights of the accused in a Title IX investigation as enumerated in the Annual Security report include: "The college will inform the accused that they may present witnesses and material evidence relevant to the case." (Docs. 51-1, at 9–10; 58-1, at 16–17; 49-6, at 10). Here, it is undisputed that the chair of the SLC, Chair Olson, testified Doe did not have this right. (Docs. 58-2, at 54; 67-1, at 114). In support of their argument that Dordt informed Doe of his right to present witnesses and material evidence relevant to his case, defendants assert "Dean Taylor asked Doe to name any witnesses the investigators should contact, and interviewed L.P. as a result of Doe's suggestion." (Doc. 51, at 22). But this supports only that Dordt asked Doe for names of people with whom they should speak, not that Dordt informed him he could present witnesses and material evidence to the SLC at his hearing. Such a failure is more than evidence of "imperfect" hearing procedures; it is evidence of a deprivation of Doe's right to present evidence in a meaningful time and manner to support his case. *See Does 1–2*, 999 F.3d at 582. Thus, a reasonable jury could find that Dordt failed to follow its own written procedures in failing to inform Doe of his right to present witnesses and material evidence relevant to his case, thereby depriving him of the opportunity to present witnesses and material evidence at his SLC hearing for the SLC's consideration.

Thus, defendants fail to meet their initial burden as to whether plaintiff can show Dordt failed to follow its procedures such that Doe was deprived of the opportunity to be

heard at a meaningful time and in a meaningful manner. *See Mathews*, 424 U.S. at 333; *Does 1-2*, 999 F.3d at 582.

### 3. Can plaintiff show the disciplinary action against him was arbitrary, unreasonable, or in bad faith?

Defendants show evidence that Dordt did not act arbitrarily, unreasonably, or in bad faith in Doe's Title IX investigation and disciplinary process, and therefore provided Doe an opportunity to be heard in a meaningful time and manner. (Doc. 51, at 24–26). Defendants argue Dordt's action was not arbitrary because Doe had a sufficient and meaningful opportunity to participate in the disciplinary process and respond to the complaint against him, as evidenced by Dordt's compliance with its own procedures. (*Id.*). Defendants also point to undisputed evidence supporting that there was no conflict of interest between the student SLC member, who had taken a class in which Doe was the teaching assistant, and Doe. (Docs. 51, at 25–26; 51-1, at 27; 58-1, at 72–73).

But, based on the undisputed evidence, a reasonable jury could still conclude that Dordt's disciplinary action against Doe was arbitrary, unreasonable, or in bad faith.

An action is unreasonable when it is "not guided by reason," and is "irrational or capricious." *Unreasonable*, Black's Law Dictionary (11th ed. 2019). Similarly, an action is arbitrary when it is "made without consideration of or regard for facts, circumstances, fixed rules, or procedures." *Arbitrary*, Black's Law Dictionary (11th ed. 2019).

Bad faith, however, is a contract principle requiring a different showing; specifically, to show bad faith, a plaintiff must show a defendant's intention to evade truth—a "[d]ishonesty of belief, purpose, or motive." *Bad faith*, Black's Law Dictionary (11th ed. 2019).

> A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off,

59

willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d (1979). As a contract principle, bad faith must be rooted in an agreement between the two parties. *See Moe*, 556 F. Supp. 3d at 936–37.

Here, it is undisputed that investigators failed to investigate or document allegations of blackmail in their report or otherwise share them with the SLC. It is undisputed that both A.D. and Doe reported that S.S. was blackmailing J.B., (Docs. 51-1, at 20, 23; 58-1, at 49, 60), the person who last saw Doe and Roe together before the sexual encounter. (*See* Docs. 51-1, at 14; 58-1, at 26). Because a key question in determining whether Doe committed sexual assault was whether Roe was able to consent at the time of the sexual encounter, J.B.'s testimony as to her behavior and control at that time was critical to the outcome of Doe's Title IX proceedings. In effect, evidence that J.B. was blackmailed could function as exculpatory evidence for Doe because it could undermine the reliability of J.B.'s testimony and thus evidence that Roe could not actually consent to a sexual encounter with Doe. For that reason, a jury could reasonably find that Dordt's dismissal of Doe despite failing to investigate the blackmail allegations or report them in any way to the SLC was irrational and made without consideration of or regard for the facts and circumstances.

Again, it is also undisputed that Dordt administrators also failed to disclose conflicts that existed between SLC members and investigators—either to Coordinator Wilson and Title IX investigators or to the SLC, depending on the conflict. First, Mark Volkers, who taught Roe, had been informed that Roe had been involved in a "traumatic incident" before Volkers was named as a member of Doe's SLC group. (Docs. 58-2, at 56; 67-1, at 79–80). Thus, Volkers may have been more likely to find in favor of Roe's

60

version of events, thus finding Doe committed sexual assault. This is so even though, as defendant argued at oral argument, plaintiff points to no statements evidencing that Volkers understood Doe's alleged sexual assault was Roe's traumatic incident. (*See* Doc. 69, at 17). Second, S.S., the student A.D. and Doe believed was blackmailing J.B., was Chair Olson's student. (Docs. 58-2, at 42–43; 67-1, at 89–90). They also had a "vague" conversation about Roe's assault, and thus the allegations against Doe, before Chair Olson interviewed S.S., a conversation which Chair Olson mentioned to S.S. was best that she not mention at her formal interview. (Docs. 58-2, at 43; 67-1, at 90–91). Thus, Chair Olson may have been more likely to believe S.S.'s version of events and not give credence to A.D.'s and Doe's reports that S.S. was blackmailing J.B., thereby making her less likely to investigate the blackmail allegations which were considered exculpatory evidence for Doe. Third, Dean Taylor himself expressed that he believed he was serving in his capacity as dean during an interview with Roe—that is, as her caretaker, not an investigator. (See Docs. 58-2, at 39–40; 67-1, at 83). Thus, Dean Taylor's work as an investigator in search of the truth could be compromised by his alternate role supporting and caring for Roe, the complainant.

Addressing Dean Taylor and Chair Olson's conflicts, defendants argue that they are inconsequential because they did not participate as voting members on either the SLC or Appeals Committee. (Docs. 51, at 25). First, this argument does not resolve Volkers' conflict, because Volkers was a voting member on Doe's SLC. Second, Dean Taylor and Chair Olson were the investigators in Doe's Title IX investigation. Simply because they did not vote as SLC members does not mean their participation was not vital and highly influential. It was their investigation that provided Coordinator Wilson with facts on which to base his recommendations. Thus, without Dean Taylor and Chair Olson's investigation, Coordinator Wilson would have no facts from which to draw his conclusion that Doe committed sexual assault. Further, Chair Olson was the chair of the SLC. She

ran Doe's hearing and asked him the SLC's questions. A jury could reasonably find impropriety involving a person in this position particularly concerning.

At oral argument, defendants further argued that any effects of conflicts are mere speculation. (Doc. 69, at 15–16). But the undisputed evidence supports conflicts about both Title IX investigators on Doe's case, and a jury could infer that these conflicts violated Doe's right to due process based on circumstantial evidence. As discussed, the influence of the Title IX investigators on the outcome of a Title IX investigation cannot be overstated—the investigators wrote the Investigative Summary on which Coordinator Wilson based his recommendations, and the SLC based its determination and sanctions in substantial part on the investigators' findings and Coordinator Wilson's recommendations. Further, both Chair Olson and Dean Taylor admitted to having some type of conflict during their investigation, and Chair Olson's conflict pertains to S.S., the student alleged to have blackmailed J.B. to participate in Doe's case. Given the circumstances, a jury could reasonably infer that it was improper for Dordt to continue with its discipline of Doe based on an investigation by Chair Olson and Dean Taylor. In sum, a jury could reasonably find that Dordt's dismissal of Doe despite these conflicts was irrational and made without consideration of or regard for the facts and circumstances.

A reasonably jury could also find Dordt's disciplinary action in denying Doe's appeal was arbitrary because Coordinator Wilson's appeal materials, chosen when he was incapable of impartiality, led the Appeals Committee to deny the appeal for reasons other than the record before the SLC. For instance, the appeal documents included Coordinator Wilson's "aide-memoir" on Doe, which indicated that Doe may be a violent, pattern sexual predator, even though his previous partners had not alleged their sexual encounters with Doe were nonconsensual. (Docs. 58-2, at 65; 67-1, at 134–35). The appeal materials also included the Sioux County District Attorney's subpoena for Dordt's

62

records pertaining to the investigation, (Docs. 58-2, at 65–66; 67-1, at 136), even though Coordinator Wilson knew the District Attorney had already dropped the case for lack of corroborating evidence. (Docs. 58-2, at 66; 67-1, at 136–37). Because the Appeals Committee considered these materials, which had no bearing on the SLC decision before them, a reasonable jury could find Dordt's disciplinary action in denying Doe's appeal was arbitrary.

Further, a reasonable jury could find Dordt engaged in bad faith. Based on the rights listed in the Annual Security report, a reasonable jury could find the spirit of Doe and Dordt's bargain was to ensure a relatively level playing field between the complaining and the responding parties in an investigation and subsequent proceedings. The jury could find Dordt evaded that spirit by failing to investigate or adequately disclose either the blackmail allegations or conflicts, or by including inflammatory materials such as the aide-memoir and subpoena in Doe's appeal materials. *See* RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d (1979). Further, viewing this collectively with evidence supporting bias and procedural and substantive deficiencies all disfavoring of Doe, a reasonable jury could find Dordt was dishonest in its purpose or motive in its disciplinary action against Doe. *See Bad faith*, BLACK'S LAW DICTIONARY (11th ed. 2019).

Thus, defendants fail to meet their initial burden as to whether plaintiff can show the disciplinary action against him was arbitrary, unreasonable, or in bad faith such that Doe was deprived of the opportunity to be heard in a meaningful manner. *See Mathews*, 424 U.S. at 333; *Does 1-2*, 999 F.3d at 582.

For these reasons, the Court **denies** defendants' motion as to Count 4.

### D.    *Breach of Contract & Breach of Implied Contract (Counts 5 & 6)*

Defendants argue plaintiff's breach-of-contract and breach-of-implied-contract claims fail for two reasons. (Doc. 51, at 26–29). First, defendants argue plaintiff cannot show Dordt breached the contract, whether implied or not, because "Dordt substantially

complied with its policies in adjudicating Doe's policy violations." (*Id.*, at 27–28). Second, defendants argue plaintiff cannot show damages because, regardless of any alleged breach, plaintiff would have been dismissed for his admitted repeated misuse of their alcohol and sexual misconduct policies. (*Id.*, at 28–29).

For the following reasons, the Court finds (1) defendants fail to meet their initial burden as to breach, and (2) defendants meet their initial burden as to damages, but plaintiff shows a genuine dispute of material fact.

### 1.    *Applicable Law*

To prevail in a breach of contract claim under Iowa law, a plaintiff must show:

(1) the existence of a contract; (2) the terms and conditions of the contract; (3) that [the plaintiff] has performed all the terms and conditions required under the contract; (4) the [defendant]'s breach of the contract in some particular way; and (5) that [the plaintiff] has suffered damages as a result of the breach.

*Cross Over*, 2020 WL 6531237, at *3 (quotation omitted).

A contract can be expressed in words or implied from conduct. *Ringland-Johnson-Crowley Co. v. First Central Service Corp.*, 255 N.W.2d 149, 152 (Iowa 1977).

Under Iowa law, all contracts include an implied duty of good faith and fair dealing. *Alta Vista Props.*, 855 N.W.2d at 730; *Fogel v. Trs. of Iowa Coll.*, 446 N.W.2d 451, 456 (1989) (citing RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a.

Under Iowa law, the relationship between a student and a university is contractual in nature. *See Warren*, 886 F.2d at 202. As such, a student can rely upon the university

"'to follow the established procedures it voluntarily promulgated' before a student can be dismissed for disciplinary reasons." *Id.* (quoting *Harvey*, 363 N.W.2d at 446). Established procedures include, for instance, the terms of the Student Handbook and honor code. *Id.* "[T]he issue of what documents constitute a contract is also properly one for the jury to decide." *Id.*

### 2. Can plaintiff show breach?

To meet its initial burden, Dordt must show (1) it substantially followed its written policies and procedures, and (2) it did not violate its duty of good faith and fair dealing, such that plaintiff cannot show breach.

As a preliminary matter, the Court addresses defendants' argument that Dordt need only "substantially comply" with its policies and procedures to evade a finding of breach. (Doc. 51, at 27 (citing *SDG Macerich Props., L.P. v. Stanek, Inc.*, 648 N.W.2d 581, 586 (Iowa 2002); *Union Pac. R.R. Co. v. Cedar Rapids & Iowa City Ry. Co.*, 477 F. Supp. 2d 980, 991 (N.D. Iowa 2007)). Although defendants' statement is correct, the Court finds it appropriate to provide a definition for "substantial compliance," also referred to as "substantial performance." "Substantial performance is that which, despite deviations from the contract requirements, provides the important and essential benefits of the contract to the promisee." *Union Pac. R. R.*, 477 F. Supp. 2d at 991 (quoting *SDG Macerich Props.*, 648 N.W.2d at 586) (internal quotation marks omitted). Thus, to show it substantially followed its written policies procedures, Dordt must show this substantial performance provided the contract's important and essential benefits to Doe. *See id.*

Here, defendants fail to meet their initial burden as to breach based on Dordt's failure to substantially comply with its policies and procedures. Defendants show evidence that Dordt informed Doe of the Title IX process, the charges against him, informed him of the opportunity to present witnesses and evidence on his behalf, and

informed him of his right to have an advocate attend the SLC hearing with him. (Doc. 51, at 22–23, 27–28). Defendants also point to evidence that Dordt provided all information prior to the hearing to the best of its ability and informed Doe as to the outcome of the hearing and the appeal in writing. (*Id.*, at 23, 27–28).

But, as described in the discussion of plaintiff's common-law due-process claim, a reasonable jury could find Dordt failed to substantially follow its written procedures based on the undisputed evidence.[18] Again, the rights of the accused in a Title IX investigation as enumerated in the Annual Security report include: "The college will inform the accused that they may present witnesses and material evidence relevant to the case."[19] (Docs. 51-1, at 9–10; 58-1, at 16–17; 49-6, at 10). Here, it is undisputed that the chair of the SLC, Chair Olson, stated that Doe did not have this right. (Docs. 58-2, at 54; 67-1, at 114). In support of their argument that Dordt informed Doe of his right to present witnesses and material evidence relevant to his case, defendants assert "Dean Taylor asked Doe to name any witnesses the investigators should contact, and interviewed L.P. as a result of Doe's suggestion." (Doc. 51, at 22, 27 (citing Doc. 51, at 22)). But again, this supports only that Dordt asked Doe for names of people with whom they should speak, not that Dordt informed him he could present witnesses and material evidence to the SLC at his hearing. Thus, a reasonable jury could find that Dordt failed

---

[18] This is so even though, as an undisputed conversation between two Dordt administrators supports, Dordt's written procedures for Title IX investigations were at best limited. When Coordinator Wilson emailed Dean Taylor on April 4, 2018, two days before Doe's SLC hearing, asking "Where do we have our Title IX investigation procedures defined in our handbooks?" Dean Taylor replied, "[t]his is not very prescriptive, but this is what we have," and pasted in the section of the Handbook laying out reporting options and support resources for complainants, but not actual investigation or adjudication procedures. (Docs. 58-2, at 54; 67-1, at 113).

[19] At oral argument, defendants argued its policies "did not promise a full 'trial' with cross-examination before the [SLC.]" (Doc. 69, at 141). Although this appears to be true, it does not change whether defendants provided Doe with the rights that its policies did provide.

to follow its own written procedures in failing to inform Doe of his right to present witnesses and material evidence relevant to his case, thereby depriving him of the opportunity to present witnesses and material evidence at his SLC hearing for the SLC's consideration.

Second, defendants fail to meet their initial burden as to breach based on Dordt's duty of good faith and fair dealing. Defendants did not make argument specific to the duty of good faith and fair dealing either in their briefing, or at oral argument. Thus, the Court cannot grant summary judgment on the issue of whether plaintiff can show Dordt violated its duty of good faith and fair dealing.

Moreover, a reasonable jury could find Dordt breached its duty of good faith and fair dealing based on the undisputed facts. Specifically, a reasonable jury could find Dordt's conduct, through its employees, violated community standards of decency, fairness, or reasonableness. As discussed, a reasonable jury could find that the documents constituting a contract between Doe and Dordt included the rights listed in the Annual Security Report. *See Warren*, 886 F.2d at 202. Based on this contract, a reasonable jury could find that this contract evidences an agreed common purpose of fair disciplinary investigations and proceedings, seeking the truth for the purpose of protecting the Dordt community. As such, a reasonable jury could find that Doe had a justified expectation in each of the rights enumerated in the Annual Security Report and a fair process. And, for reasons already discussed, including Dordt's failure to investigate or disclose the blackmail allegations and failure to disclose or remedy conflicts, a reasonable jury could find Dordt's conduct violated community standards of decency, fairness, or reasonableness as to the common purpose and Doe's justified expectations. *See Godar v. Edwards*, 588 N.W.2d 701, 705–06 (Iowa 1999); RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a; *Alta Vista Props.*, 855 N.W.2d

at 730; *Fogel v. Trs. of Iowa Coll.*, 446 N.W.2d 451, 456 (1989) (citing RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)).

Thus, defendants fail to meet their initial burden as to breach.

### 3.    *Can plaintiff show damages?*

As *Warren v. Drake University* states, the appropriate remedy when a school fails to follow a written disciplinary procedure is to provide the student with the process promised in his contract with the school.   886 F.2d at 203 n.3 (citing *Corso v. Creighton Univ.*, 731 F.2d 529, 533 (8th Cir. 1984)).   Thus, Doe must show that the outcome of his Title IX investigation and proceedings as promised would have been different than the outcome of the Title IX investigation and proceedings he received, such that he suffered damages.

Here, defendants meet their initial burden because they show evidence supporting that Doe cannot show damages for breach of contract because he would have been dismissed for his admitted repeated misuse of Dordt's alcohol and sexual misconduct policies regardless of whether he was found to have violated Dordt's sexual assault policy.   (Doc. 51, at 28–29).   Specifically, defendants point to Coordinator Wilson's declaration on the outcomes of previous cases pertaining to Title IX, sexual misconduct, and alcohol violations.   (*Id.* (citing Doc. 51-4, at 33–34 (discussing Doc. 51-4, at 35, 37, 39–45))).

Plaintiff, however, shows that defendants' evidence conflicts with the record, including other evidence relied on by defendants; this in turn creates a genuine dispute of material fact as to whether Doe would have received the same sanction had he not been found to have violated Dordt's sexual assault policy.   (Doc. 58-1, at 96–97).

Moreover, simply because Doe *could have* been dismissed based on his other violations does not mean he *necessarily would have* been, particularly where Doe was forthcoming about his prior alcohol misuse, as well as his prior experiences engaging in

68

extramarital sex.  The evidence on which defendants rely shows a wide range of cases with a wide range of dispositions, including probation and dismissal, with varying durations of dismissal before the student is able to apply for readmission.  (Docs. 51-4, at 37, 39–45); (*see also* Docs. 58-2, at 56; 67-1, at 117) (options Coordinator Wilson presented to SLC regarding duration of dismissal in Doe's case).   Thus, although defendants' evidence supports that although Dordt *could* dismiss a student for multiple violations of its sexual misconduct and alcohol policies, it does not support that the sanction of dismissal was required, such that Dordt *would necessarily* dismiss a student for these violations.  (*See* Doc. 51-4, at 37, 39–45).

The Appeals Committee notes cited by defendants also state that: "Without the 3rd reason [that is, the finding of sexual assault] for [Doe's] violation, he would have been dismissed for 2 semesters."  (Doc. 51-7, at 8).  A reasonable jury could find Doe suffered by being dismissed for *longer* than if he had not been found to have committed sexual assault, even if Doe would nevertheless have been dismissed.  Further, it is undisputed that the two different decision letters Wilson offered to the SLC had different lengths of dismissal, even though both found Doe committed a sexual assault, (Docs. 58-2, at 56; 67-1, at 117), and the SLC decided the sanction after its hearing.  (*See* Docs. 51-1, at 29; 58-1, at 77).  This supports that the number of violations found, the nature of the offense, and the respondent's engagement in the proceeding—such as whether he was forthcoming with information and showed remorse, (*See* Doc. 51-7, at 8)—could affect the length of dismissal.  A reasonable jury could find that because Dordt breached its contract with Doe, Doe was found to have committed sexual assault and was thus dismissed for a longer period of time than he would have been for sexual misconduct and alcohol violations alone, or perhaps that he would not have been dismissed at all.  Either way, a reasonably jury could find Doe was damaged by Dordt's breach.  Thus,

defendants' argument that "[r]equiring Dordt to provide Doe with another hearing would necessarily result in the same disciplinary outcome" is unavailing. (*See* Doc. 51, at 29).

Further, a reasonable jury could find Doe suffered damages in the form of being found to have committed sexual assault when the promised process would not have resulted in such a finding. This is particularly so in light of the serious and stigmatizing nature of a sexual assault finding.

Thus, summary judgment based on Doe's damages is inappropriate.

For these reasons, the Court **denies** defendants' motion as to Counts 5 and 6.

### E.    *Negligence & Respondeat Superior (Counts 7 & 8)*

Defendants argue that plaintiff's negligence and respondeat superior claims fail for three reasons. (Doc. 51, at 29–33). First, defendants argue plaintiff cannot show negligence because defendants Coordinator Wilson, Dean Taylor, Director Buteyn, and Chair Olson did not owe an independent duty to conduct their investigation and adjudication in any particular manner. (*Id.*, at 29–31). Second, regarding the common-law standard of care, defendants argue plaintiff cannot show that defendants breached this duty because plaintiff (1) cannot show the hearing was unfair and (2) presents no expert testimony regarding the school administrators' exercise of professional judgment in responding to the plaintiff's claimed discrimination and harassment. (*Id.*, at 31–33). Third, defendants argue plaintiff cannot show damages because, regardless of any alleged negligence, plaintiff would have been dismissed for his admitted repeated misuse of their alcohol and sexual misconduct policies. (*Id.*, at 33).

For the following reasons, the Court finds (1) the individual defendants did not owe Doe a duty of care under Iowa negligence law; (2) expert testimony is necessary to show breach and plaintiff fails to show any; (3) defendants fail to meet their initial burden as to the fairness of the disciplinary process; and (4) defendants meet their initial burden as to damages, but plaintiff shows a genuine dispute of material fact. Thus, because the

individual defendants did not owe Doe a duty of care and Doe has no expert evidence, the Court **grants** summary judgment on Counts 7 & 8.

### 1. *Applicable Law*

"The elements of a negligence claim include [1] existence of a duty to conform to a standard of conduct to protect others, [2] failure to conform to that standard, [3] proximate cause, and [4] damages." *Marcus v. Young*, 538 N.W.2d 285, 288 (Iowa 1995).

"Under the doctrine of respondeat superior, an employer is liable for the negligence of an employee committed while the employee is acting within the scope of his or her employment." *Giudicessi v. State*, 868 N.W.2d 418, 421 (Iowa Ct. App. 2015) (quoting *Godar*, 588 N.W.2d at 705–06 (cleaned up)). "Thus, a claim of vicarious liability under the doctrine of respondeat superior rests on two elements: proof of an employer/employee relationship, and proof that the injury occurred within the scope of that employment." *Id.* (quoting *Godar*, 588 N.W.2d at 705–706) (cleaned up). Defendants make no argument specific to plaintiff's respondeat superior claim; instead, they argue plaintiff cannot show negligence. Of course, if plaintiff cannot show negligence by the individual defendants, it cannot impute that negligence to Dordt and the Board.

### 2. *Can plaintiff show duty?*

Citing district court cases involving student disciplinary hearings, defendants argue Dordt and its employees owed no duty of care to Doe in his Title IX investigation or proceedings. (Doc. 51, at 29–31). In resistance, plaintiff cites other cases involving student disciplinary hearings supporting that a school and its employees participating in the disciplinary process do owe a duty of care to the accused student. (Doc. 58,

71

at 34–35).[20]  Neither defendants nor plaintiff cites a case based on Iowa negligence law in their discussions of duty.

"The question of whether a duty arises out of the parties' relationship is always a matter of law for the court."  *Soike v. Evan Matthews and Co.*, 302 N.W.2d 841, 844 (Iowa 1981).  Iowa has adopted the duty analysis described in the Restatement (Third) of Torts: Liability for Physical and Emotional Harm ("Restatement (Third)").  *See Feld v. Borkowski*, 790 N.W.2d 72, 75 (Iowa 2010) (citing *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009); RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 7(a), at 77 (2010)); *Eurich v. Bass Pro Outdoor World, L.L.C.*, No. 17-0302, 2017 WL 5179011, at *2 (Iowa Ct. App. Nov. 8, 2017) (listing Iowa Supreme Court cases relying on the Restatement (Third) analysis of duty).

The Restatement (Third)'s duty analysis provides:

(a) An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.
(b) In exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification.

§ 7.  *See also Miranda v. Said*, 836 N.W.2d 8, 14 (Iowa 2013) ("The general rule in Iowa is emotional distress damages are not recoverable in torts absent intentional conduct by a defendant or some physical injury to the plaintiff.") (internal quotation omitted).

Here, plaintiff does not allege that defendants' conduct created a risk of physical harm.  Plaintiff also does not allege this is an exceptional case where policy interests modify the ordinary duty of reasonable care or relieve defendant of duty.  Indeed, it is

---

[20] Plaintiff also argues the Court can properly find a duty of care based on Dean Taylor's statement that as a Dordt employee he owed a duty of care to Dordt students.  (Doc. 58, at 35).  The Court declines to find a duty of care based on Dean Taylor's statement.  Simply because Dean Taylor believes he had a duty does not mean one exists under Iowa law, whether as to him personally or as to the other defendants.

unclear whether the ordinary duty of reasonable care can be modified when, according to part (a), no duty existed because the actor's conduct does not create a risk of physical harm.

Plaintiff argues "numerous courts around the country have held that a school and its employees owe their students student a duty of care in carrying out the school's disciplinary process—or at least, that it was a question incapable of summary disposition." (Doc. 58, at 34). These cases, however, are each distinguishable, generally because they neither rely on Iowa law nor the Restatement Third's definition of duty. *See, e.g.*, *Collick v. William Paterson Univ.*, No. 16-471 (KM) (JBC), 2016 WL 6824374, at *26 (D. N.J. Nov. 17, 2016) (applying New Jersey law); *Vizzoni v. B.M.D.*, 459 N.J. Super. 554, 568 (N.J. Sup. Ct. 2019) (explaining that New Jersey law relies on considerations of risk, foreseeability, or likelihood of harm); *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 763 (D. Md. 2015) (applying Maryland law, which has "no set formula for the determination of whether a duty exists"); *Doe v. Univ. of S.,* No. 4:09-CV-62, 2011 WL 1258104, at *21 (E.D. Tenn. Mar. 31, 2011) (applying Tennessee law, which imposes "a duty of reasonable care . . . if defendant's conduct poses an unreasonable and foreseeable risk of harm to persons or property"); *Atria v. Vanderbilt Univ.*, 142 Fed. Appx. 246, 252 (6th Cir. 2005) (same); *Doe v. Rollins Coll.*, 352 F. Supp. 3d 1205 (M.D. Fla. 2019) (no negligence claim asserted).

Thus, plaintiff does not allege a duty necessary to state a claim for negligence or, in turn, respondeat superior. Though plaintiff's negligence and respondent superior claims must fail for this reason, the Court continues with its analysis.

### 3. Can plaintiff show breach?

Defendants argue that even if they owed a duty to plaintiff, plaintiff cannot show defendants breached that duty because he (1) does not present expert testimony as

required, (*Id.*, at 31–33), and (2) cannot show the disciplinary process was unfair, (Doc. 51, at 31).

"A breach of [the general duty to exercise reasonable care to prevent the injury of another] will subject the actor to liability if the injury caused by the actor's conduct resulted from the risks that made the actor's conduct negligent." *Feld v. Borkowski*, 790 N.W.2d 72, 75–76 (Iowa 2010) (quoting Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 6, at 67; *Thompson*, 774 N.W.2d at 839).

In determining whether plaintiff can show breach, the Court first determines whether expert testimony is required to show defendants' breach.

Defendants argue expert testimony is necessary, citing district court cases supporting that "expert testimony is necessary to define the standard of care for the school administrators' exercise of professional judgment." (Doc. 51, at 32–33 (citing *A.M.J. v. Royalton Pub. Schs.*, No. CIV 05-2541 PAM/RLE, 2006 WL 3626979, at *3 (D. Minn. Dec. 12, 2006) (applying Minnesota law to negligence action based on exercise of professional judgment); *Prasad v. George Washington Univ.*, 390 F. Supp. 3d 1, 38 (D.D.C. 2019) (applying District of Columbia law to negligent infliction of emotional distress action based on exercise of professional judgment)).

Plaintiff argues expert testimony is not necessary because the standard of care can be inferred from defendants' acknowledgement of their obligations and responsibilities to a respondent such as Doe during the disciplinary process.[21] (Doc. 58, at 35).

---

[21] Plaintiff also argues the OCR's 2017 Q&A provides parameters for a respondent's procedural protections in sexual misconduct proceedings. (*Id.*). Defendants, however, argue any departures from the 2017 Q&A guidance are irrelevant to Doe's claims. (Doc. 51, at 15–16 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291–92 (1998))). Further, defendants argue even if these departures were relevant, the OCR's assessment of compliance with its interim guidance is distinct from the standards courts use in determining a school's compliance with Title IX. (Doc. 67, at 4–5). Contrary to plaintiff's argument, the OCR's 2017 Q&A does not establish the standard of care owed by the individual defendants to plaintiff under common law. As

The Court finds expert testimony is required to show defendants' breach.

The purpose of expert testimony is to assist the fact-finder in making complex determinations of fact. *See* FED R. EVID. 702. As long as the primary facts can be accurately and intelligibly described to the jury and the jury, as people of common understanding, can understand those facts and draw correct conclusions from them, the same way that witnesses with special training or experience would, no expert testimony is required. *See Schlader v. Interstate Power Co.*, 591 N.W.2d 10, 14 (Iowa 1999). Accordingly, expert testimony is typically required to explain complex issues specific to professional responsibilities or discretion. *See Eventide Lutheran Home for the Aged v. Smithson Elec. & Gen. Const., Inc.*, 445 N.W.2d 789, 791 (Iowa 1989); *Nationwide Agribusiness v. Structural Restoration, Inc.*, 705 F. Supp. 2d 1070, 1082 (S.D. Iowa, 2010) (citing *Welte v. Bello*, 482 N.W.2d 437, 440–41 (Iowa 1992) (collecting cases)); *see also A.M.J.*, 2006 WL 3626979, at *3. Here, plaintiff alleges negligence based on the handling of his disciplinary process by school employees involved in his disciplinary process. (Doc. 1, at 89–92).

Each individual defendant exercised his or her own professional judgment at each stage of Doe's investigation and proceeding. The issues are also complex; for instance, the record supports that the individual defendants needed to balance countervailing interests, such as campus safety and Doe's rights to due process. Expert testimony is necessary to explain such complex issues related to defendants' professional responsibilities. *See Nationwide Agribusiness*, 705 F.Supp.2d at 1082; *A.M.J.*, 2006 WL 3626979, at *3 ("[I]t is beyond the scope of a layperson's knowledge to decide

---

defendants note, the Supreme Court's *Gebser* opinion clarified that such administrative requirements do not imply a private right of action. 524 U.S. at 291–92. Further, courts and the OCR assess a school's compliance with Title IX differently. *Compare, e.g.*, *Harvey*, 363 N.W.2d at 444–46, *with* (Doc. 60-1, at 65–71). Thus, the OCR's 2017 Q&A guidance is an improper substitute for expert testimony.

fundamental questions raised by the facts of this case such as whether an investigation was required; what should have been the nature and scope of any such investigation; what were the rights of the accused students, educators, and administrators; were there any applicable privacy limitations; what were the appropriate preventative steps; and what was the appropriate corrective action.").

The Court further finds the individual defendants cannot properly provide expert testimony here. Although individual defendants acknowledge certain obligations and responsibilities, as detailed in the Court's factual background, it is unclear whether the individual defendants are qualified as experts[22] and whether their testimony is the product of reliable principles and methods, FED. R. CIV. P. 702, such that their testimony would provide the jury with insight into specialized knowledge necessary to determine whether defendants breached their duty here. *See Feld*, 790 N.W.2d at 75–76.

Moreover, the individual defendants' insight would not be objective. Indeed, the Court has serious concerns about the jury receiving its information about the standard of care exclusively from parties who are being sued in this action for failing to meet that same standard. This conflict undermines the ability of individual defendants' testimony to aid jurors in resolving a factual dispute. *See* FED. R. CIV. P. 702. The Court's concerns about the individual defendants' specialized knowledge and conflict of interest preclude the Court from finding the individual defendants are proper expert witnesses under Rule 702.

---

[22] For instance, although it is undisputed that the individual defendants were each trained in Title IX investigations, (Docs. 51-1, at 11; 58-1, at 17), this does not mean they were trained in disciplinary proceedings. Further, although it is also undisputed that Coordinator Wilson was responsible for ensuring that Dordt complied with all federal laws, regulations, and guidelines with respect to its Title IX/sexual misconduct process, (Docs. 58-2, at 30; 67-1, at 62), this does not mean Coordinator Wilson was qualified to testify to the individual defendants' common-law duty under Iowa negligence law.

In sum, plaintiff must show expert testimony to show breach, but he has not provided any; thus, plaintiff cannot show breach. Though plaintiff's negligence and respondent superior claims must fail for this reason, again, the Court continues with its analysis.

Relying on their previous arguments, defendants argue plaintiff cannot show the disciplinary process was unfair because Dordt "conducted a robust and unbiased investigation" and provided Doe with "a fair hearing." (Doc. 51, at 31–32).

But, based on undisputed evidence, a reasonable jury could find the disciplinary process was unfair and that defendants failed to provide Doe with a fair hearing. But the Court has already found that a reasonable jury could find bias in the disciplinary process based on undisputed facts.

The undisputed facts also support that Doe was not provided with a fair hearing. First, a reasonable jury could find the SLC hearing was unfair. Again, much of this evidence has already been covered in detail, but a summary includes: Coordinator Wilson provided the SLC with two versions of a decision letter, each finding Doe responsible for sexual assault of an incapacitated individual; Coordinator Wilson controlled what materials were provided to the SLC in Doe's case and he chose to provide his report/finding letter, a list of questions to Doe, and the two pre-written dismissal notices—again, both dismissing Doe. Because no certification was required of SLC members and no Title IX specific training was provided to SLC members during the 2017–2018 academic year, a reasonable jury could find the SLC members were ill equipped to find any differently than Coordinator Wilson and, combined with the premade decision letters, a finding of sexual assault was a foregone conclusion simply requiring the SLC's stamp of approval. A reasonable jury could find based on these undisputed facts that leading and limited materials provided by Coordinator Wilson, combined with the SLC members' lack of training, predisposed the SLC to find Doe

77

committed sexual assault and dismiss him accordingly, which prevented Doe from having a fair SLC hearing.

A reasonable jury could also find the Appeals Committee hearing was unfair. After Doe appealed the SLC decision, Coordinator Wilson compiled the appeal packet for the Appeals Committee, even though he stated that he was incapable of being impartial at that time. Chair Van Soelen, who was untrained in Title IX requirements and regulations, relied on Coordinator Wilson's recommendations and advanced a nearly identical appeals packet. The final appeal packet did *not* contain a copy of Dordt's sexual misconduct policy, or a copy of any applicable Title IX policy or procedure at Dordt, other than the newly-drafted Appeal Document, but did include Coordinator Wilson's markup of Doe's appeal, which included an "aide-memoir" indicating that Doe may be a violent, pattern sexual predator. Also included was the Sioux County District Attorney's subpoena for Dordt's records pertaining to the investigation, even though Coordinator Wilson knew the District Attorney had already dropped the case for lack of corroborating evidence. A reasonable jury could find based on these undisputed facts that, guided by a biased Dordt administrator, the Appeals Committee considered materials that predisposed them to deny Doe's appeal based on reasons not founded in Dordt's policies or Doe's appeal, which prevented Doe from having a fair appeal hearing.[23]

Thus, defendants fail to meet their initial burden as to fairness. However, because plaintiff fails to present expert testimony, plaintiff nevertheless fails to show breach.

---

[23] As above, the extensive filings and voluminous record in this case provide much undisputed evidence from which a reasonable jury could choose. The Court does not intend these facts to represent the only facts on which a reasonable jury could make a finding that plaintiff's disciplinary process was unfair.

### 4.    Can plaintiff show damages?

As discussed, here, defendants meet their initial burden because they show evidence supporting that Doe cannot show damages for negligence under either a direct or vicarious liability theory, because he would have been dismissed for his admitted repeated misuse of Dordt's alcohol and sexual misconduct policies regardless of whether he was found to have violated Dordt's sexual assault policy. (Doc. 51, at 33). Again, defendants point to Coordinator Wilson's declaration on previous Title IX cases. (*See id.* (citing Doc. 51-4, at 33–34 (discussing Doc. 51-4, at 37, 39–45))). Thus, the burden shifts to plaintiff to show a genuine dispute of material fact as to damages.

Again, as discussed, plaintiff shows that defendants' evidence conflicts with the record, including other evidence relied on by defendants. This creates a genuine dispute of material fact as to whether Doe would have received the same sanction had he not been found to have violated Dordt's sexual assault policy. (Doc. 58-1, at 96–97). Thus, summary judgment based on Doe's damages is inappropriate.

In sum, however, the Court **grants** defendants' motion as to Counts 7 and 8 because defendants do not owe a duty to plaintiff under Iowa negligence law, and plaintiff fails to present expert testimony in support of breach.

## IV. CONCLUSION

For these reasons, defendants' motion for summary judgment (Doc. 49) is **granted** as to plaintiff's: Title IX gender-bias claim based on selective enforcement (Count 2), Title IX retaliation claim (Count 3), and negligence and respondeat superior claims (Counts 7 & 8).

Defendants' motion for summary judgment (Doc. 49) is **denied** as to plaintiff's: Title IX gender-bias claim based on erroneous outcome (Count 1), common-law due-process claim (Count 4), and breach-of-contract and breach-of-implied-contract claims (Counts 5 & 6).

**IT IS SO ORDERED** this 20th day of July, 2022.

_____
C.J. Williams
United States District Judge
Northern District of Iowa